SCHERN RICHARDSON FINTER, PLC
Michael A. Schern #022996
Michael Robert Somers #017501
Jennifer Putnam Ooms #036958
1640 S. Stapley Drive, Suite 132
Mesa, Arizona 85204
Email: courtdocs@srflawfirm.com
Tel: (480) 632-1929
*Attorneys for Plaintiffs*
*Rajabian and Dulceria La Bonita*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| ZAKIA JACKLINE RAJABIAN, a married woman, and DULCERIA LA BONITA WHOLESALE, LLC, an Arizona Corporation, | No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| MERCEDES-BENZ USA, LLC, a New York limited liability company; PHOENIX MOTOR COMPANY, INC, d/b/a MERCEDES-BENZ OF SCOTTSDALE, an Arizona Corporation; VERN FOUTZ, a married man; JANE DOE FOUTZ, a married woman; JEFF NOWAK, a married man; JANE DOE NOWAK, a married woman; GUS GONZALES, a married man; JANE DOE GONZALES, a married woman; LIONHEART SECURITY INTERNATIONAL CONSULTING, LLC, an Arizona limited liability company; GERALD SCHEIBLY, a married man; JANE DOE SCHEIBLY, a married woman, | **JURY TRIAL REQEUSTED** |
| Defendants. | |

Plaintiffs Zakia Jackline Rajabian ("Jackie") and Dulceria La Bonita Wholesale, LLC ("Dulceria")(Jackie and Dulceria are collectively referred to herein as "Plaintiffs"), by and through undersigned counsel, and for their Complaint allege as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Jackie is a resident of Maricopa County, Arizona.

2. Dulceria is an Arizona limited liability company.

3. Defendant Mercedes-Benz USA, LLC ("Mercedes") is a foreign limited liability company domiciled in Delaware and registered to do business in Arizona.

4. Defendant Phoenix Motor Company, d/b/a Mercedes-Benz of Scottsdale ("Phoenix Motor"), is an Arizona corporation.

5. Defendant Lionheart Security International Consulting, LLC d/b/a Lionheart Security Services ("Lionheart Security"), is an Arizona company authorized to do business in Arizona.

6. Upon information and belief, Defendant Vern Foutz ("Foutz") is a married man and a resident of Maricopa County, Arizona, and was at all times acting on behalf of his marital community.

7. Upon information and belief, Defendant Jane Doe Foutz ("Mrs. Foutz") is married to Vern Foutz and is a resident of Maricopa County, Arizona.

8. Upon information and belief, Defendant Jeff Nowak ("Nowak") is a married man and a resident of Maricopa County, Arizona, and was at all times acting on behalf of his marital community.

9. Upon information and belief, Defendant Jane Doe Nowak ("Mrs. Nowak") is married to Jeff Nowak and is a resident of Maricopa County, Arizona.

10. Upon information and belief, Defendant Gus Gonzales ("Gonzales") is a married man and a resident of Maricopa County, Arizona, and was at all times acting on behalf of his marital community.

11. Upon information and belief, Defendant Jane Doe Gonzales ("Mrs. Gonzales") is married to Gus Gonzales and is a resident of Maricopa County, Arizona.

12.     Upon information and belief, Defendant Gerald Scheibly ("Scheibly") is a married man and a resident of Maricopa County, Arizona, and was at all times acting on behalf of his marital community.

13.     Upon information and belief, Defendant Jane Doe Scheibly ("Mrs. Scheibly") is married to Gerald Scheibly and is a resident of Maricopa County, Arizona.

14.     Defendants' actions giving rise to this Complaint occurred in Maricopa County, Arizona.

15.     Jurisdiction is vested in this Court by virtue of 28 U.S.C.A. § 1332 because Plaintiffs and Mercedes are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.  This complaint also involves the interpretation of Federal statutes.

16.     Venue in this Court is proper pursuant to 28 U.S.C.A. § 1391 because a substantial part of the events giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS

17.     On February 8, 2022, Plaintiffs purchased a 2021 Mercedes-Benz 4DR AMG G63, VIN No. W1NYC7HJ6MX410100 (the "G63") from Mercedes-Benz of North Scottsdale ("MB North Scottsdale").

18.     On February 8, 2022 Plaintiffs entered into a Vehicle Buyer's Order with MB North Scottsdale to purchase the G63.  A copy of the Vehicle Buyer's Order is attached hereto as Exhibit A.

19.     On February 8, 2022 Plaintiffs entered into a Retail Installment Sale Contract – Simple Finance Charge (with Arbitration Provision) ("Installment Contract") with MB North Scottsdale to finance the purchase of the G63.  A copy of the Installment Contract is attached hereto as Exhibit B.

20.     On February 8, 2022 Plaintiffs purchased an Exterior and Interior Appearance Protection and Windshield Protection Limited Warranty ("Appearance Warranty") for the G63. A copy of the Appearance Warranty is attached hereto as Exhibit C.

21.     On February 8, 2022 Plaintiffs purchased a Premier Protection package providing tire and wheel repair and replacement, paintless dent repair, key replacement, and roadside emergency assistance for the G63.  A copy of the Premier Protection agreement is attached hereto as Exhibit D.

22.     On February 8, 2022 MB North Scottsdale provided an Arizona Temporary License Plate and Arizona Temporary Vehicle Registration to Plaintiffs for the G63.  A copy of the Temporary License Plate and Temporary Vehicle Registration are attached hereto as Exhibit E.

23.     On February 8, 2022, Plaintiffs took physical possession of the G63 from MB North Scottsdale.

24.     On February 10, 2022 Dulceria and MB North Scottsdale entered into a Mercedes-Benz Star Prepaid Maintenance Application for Coverage ("Maintenance Plan") for the G63.  A copy of the Maintenance Plan is attached hereto as Exhibit F.

25.     Plaintiffs' Installment Contract was purchased by Mercedes-Benz Financial Services USA, LLC ("Mercedes Financial Services").

26.     The G63 was equipped with GPS tracking technology, allowing parties with access to certain systems to locate the vehicle and observe several parameters regarding the vehicle's status, such as fuel level and whether doors or windows are open.

27.     The Installment Contract disclosed the following with regard to the rights of Mercedes Financial Services to repossess the vehicle:

> **We may take the vehicle from you.**  If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it.  If your vehicle has an electronic tracking device (such as GPS), you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle.  If any personal items are in the vehicle, we may store them for you.  If you do not ask for these items back, we may dispose of them as the law allows."

28.     A prerequisite to the right of Mercedes Financial Services to locate the vehicle and take it was a default under the Installment Contract by Plaintiffs.

29.     No terms of the Installment Contract allowed Mercedes or a Mercedes dealer, such as Phoenix Motor, to locate the vehicle and repossess it.

30.     At all relevant times, Plaintiffs were not in default under the Installment Contract.

31.     In March of 2022, Phoenix Motor claimed to have a superior ownership interest in the G63 and legal title to it.

32.     Phoenix Motor claimed it purchased the G63 from Wholesale Exotics, Inc. ("Wholesale Exotics") on October 27, 2021.

33.     On October 27, 2021 Wholesale Exotics did not have a legal right to possession of, or a legal right to the title to, the G63.

34.     The G63 was owned by Mercedes-Benz of Chandler ("MB Chandler") from October 26, 2021 through November 5, 2021.

35.     MB Chandler had possession of the G63 from about October 26, 2021 to November 14, 2021.

36.     The G63 was sold by MB Chandler to Nshan "Nick" Kotoukian ("Kotoukian") on November 5, 2021, and sent to his address in California on November 14, 2021.

37.     On January 28, 2022, MB North Scottsdale acquired the G63 from Kotoukian via a trade-in transaction.

38.     The only persons or entities that had possession of or title to the G63 during the period of October 26, 2021 to February 8, 2022 were Mercedes, MB Chandler, Kotoukian, and MB North Scottsdale.

39.     At no time during the period of October 26, 2021 to February 8, 2022 did Phoenix Motor have physical possession of the G63.

40.     At no time during the period of October 26, 2021 to February 8, 2022 did Phoenix Motor possess a certificate of title for the G63.

41.     At no time during the period of October 26, 2021 to February 8, 2022 did Phoenix Motor possess a manufacturer's certificate of origin for the G63.

42.     At no time during the period of October 26, 2021 to February 8, 2022 did Phoenix Motor have a written contract to purchase the G63 from a person with legal title to the G63.

43.     Dulceria has been making monthly payments of $4,062.34 on the G63 since March of 2022.

44.     On February 10, 2022 Jackie rented a storage unit for the G63 from CubeSmart. A copy of the CubeSmart Arizona Self-Storage Rental Agreement is attached hereto as Exhibit G.

45.     On or about March 9, 2022 Jackie brought the G63 to MB North Scottsdale for the installation of the interior and exterior protection package for the Appearance Warranty. A copy of the invoice for that service is attached hereto as Exhibit H.

46.     On or about March 12, 2022, Nowak, working in concert with Gonzales and/or Foutz, claimed to have used the Mercedes Me Connect application to locate the G63 at the CubeSmart storage facility. See the March 12, 2022 police report from the Scottsdale Police Department ("March 12 Report"), attached hereto as Exhibit I.

47.     Nowak attempted to convince police that the G63 was a stolen vehicle and sought assistance in obtaining possession of the G63.

48.     Upon information and belief, on or about March 12, 2022, Phoenix Motor, acting through Foutz and/or others, hired Lionheart Security to place security officers outside the CubeSmart facility to watch for the G63. See Exhibit J, police report dated March 15, 2022 ("March 15 Report"), page 2.

49.     Upon information and belief, one of the security officers placed by Lionheart Security to watch the CubeSmart facility was Scheibly.

50.     Upon information and belief, Scheibly was instructed to follow the G63 if it left the CubeSmart facility.

51.     On or about March 15, 2022, Foutz, Gonzales, and/or Nowak used the Mercedes Me Connect application to locate the G63 at the CubeSmart storage facility.

52.     According to the March 15 Report, Nowak "utilized the MB GPS tracking and found the vehicle reportedly at CubeSmart".

53.     According to the March 15 Report, Scheibly observed the G63 leaving the CubeSmart facility and proceeded to chase the G63 at high speeds, weaving in and out of traffic, down Shea Boulevard east towards Fountain Hills, Arizona.  See Exhibit J, March 15 Report.

54.     At the time of Scheibly's pursuit, the G63 was being driven by Jackie.

55.     On March 15, 2022, while chasing the G63 with Jackie driving it, Scheibly called Scottsdale police in an effort to have Jackie arrested and the G63 captured so that possession may be given to Phoenix Motor.

56.     Scheibly lost track of Jackie as she exited the Scottsdale Police Department's jurisdiction and advised Scottsdale police of that event.

57.     According to the March 15 Report, Scheibly "erroneously told SPD that the vehicle was stolen."

58.     According to the March 15 Report, Scheibly also admitted that his "boss told [him] to follow the vehicle."

59.     According to the March 15 Report, Nowak admitted that Phoenix Motor did not have the G63's title.

60.     According to the March 15 Report, Nowak said that dealership attorneys had gone to civil court to establish ownership of the G63, and that after a hearing on March 14, 2022, the situation had not yet been resolved.

61.     Upon information and belief, there was no hearing on March 14, 2022, to establish ownership of the G63.

62.     According to a March 18, 2022 police report ("March 18 Report"), on or about March 18, 2022, Foutz used the Mercedes Me Connect application to once again locate the G63 at the CubeSmart storage facility.  The March 18 Report is attached hereto as Exhibit K.

63.     According to records from Mercedes, attached hereto as Exhibit L, on March 15, 2022, Foutz claimed ownership of the G63 on behalf of Phoenix Motor and transferred the Mercedes Me Connect user account for the G63 to himself.

64.     It is unknown how Foutz or Nowak or Gonzales could have located the G63 before March 15, 2022, without the assistance of Mercedes.

65.     Phoenix Motor, Foutz, Gonzales, and Nowak were not authorized by Dulceria or Jackie at any time to use the Mercedes Me Connect application to discover the location of the G63.

66.     Phoenix Motor, Foutz, Gonzales, and Nowak were not authorized by Dulceria or Jackie at any time to use the Mercedes Me Connect application to discover information about the G63, such as fuel level and vehicle alarm status.

67.     During the period of February 9, 2022 to March 22, 2022, information about the location of the G63 was private and not known to the general public.

68.     On March 18, 2022 Phoenix Motor filed an "Application for Temporary Restraining Order and Preliminary Injunction Without Notice".

69.     On March 18, 2022 the Court granted the TRO and allowed Phoenix Motor to obtain possession of the G63 and store it at its place of business, at 4725 North Scottsdale Road, Scottsdale, Arizona.

70.     The Order granting the Application for Temporary Restraining Order and Preliminary Injunction Without Notice violated the due process rights of Plaintiffs.[1]

---

[1] On November 1, 2022, the Supreme Court of Arizona ordered the trial court to vacate the illegally issued TRO and ordered the trial court to proceed under Arizona's replevin statutes.  The Supreme Court's order is attached hereto as Exhibit N.

71.     Phoenix Motor was well aware that the proper process to employ to secure possession of the vehicle was in replevin, which requires a hearing with notice and the posting of a bond before personal property can be taken from a person.

72.     On March 22, 2022 Phoenix Motor applied for and received an order allowing Phoenix Motor to cut the lock on the CubeSmart storage unit rented by Jackie.

73.     On March 23, 2022 agents of Phoenix Motor entered the CubeSmart storage unit by forcible entry and took possession of the G63.

74.     At some point in time during the period of March 23, 2022 to June 1, 2022, Phoenix Motor allegedly contacted one or more of the law enforcement agencies it had allegedly previously contacted to report that the G63 had been stolen, and allegedly informed them that Phoenix Motor had possession of the G63 it had previously reported as stolen.

75.     On March 30, 2022 an ADOT Title Information report shows the owners of the G63 as "Dulceria La Bonita Wholesale or Zakia J. Rajabian".  A copy of the Title Information report is attached hereto as Exhibit M.

76.     At some time before March 18, 2022, Phoenix Motor, Foutz, Gonzales, and/or Nowak accessed records kept by Mercedes to learn that Jackie and Dulceria were the owners of the G63.

77.     Upon learning that Jackie was an owner of the G63, Phoenix Motor, Foutz, Gonzales, and/or Nowak also learned of Jackie's home address and other personal information contained in Mercedes's records.

78.     On or about March 12, 2022 at 1:44 p.m., a mysterious person contacted Jackie via telephone to falsely report that there had been vehicle thefts from the CubeSmart storage facility, referring to the fact that the G63 was being stored there.  The person would not identify himself, and when Jackie immediately tried calling the number back, she received a message that the number was not in service.

79.     The only people that could have known about Jackie's storage of the G63 at CubeSmart on March 12, 2022, were agents of CubeSmart and Phoenix Motor, Foutz, Gonzales, and Nowak.

80.     Based upon the nature of the call, it is reasonable to infer that agents of Phoenix Motor were responsible for the disturbing call to Jackie, intending to get Jackie to remove the G63 from the locked storage unit so that she may then be apprehended and have the G63 taken from her and delivered to Phoenix Motor.

## COUNT ONE – INVASION OF PRIVACY

### (Mercedes, Foutz, Gonzales, and Nowak)[2]

81.     Plaintiffs incorporate by this reference the allegations in Paragraphs 1-80 above.

82.     One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.  Restatement § 652B.

83.     The Installment Contract, in Section 3.e., provided that "If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it.  If your vehicle has an electronic tracking device (such as GPS), you agree that we may use the device to find the vehicle."

84.     Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak were not parties to the Installment Contract.

85.     Plaintiffs had a reasonable expectation of privacy with regard to the location and condition of the G63 so long as they were not in default of the Installment Contract.

86.     Jackie had a reasonable expectation of privacy with regard to her telephone number as it pertained to her ownership interest in the G63.

[2] Plaintiffs have asserted this claim against Phoenix Motor in Superior Court in Maricopa County, Arizona, CV2022-003384.

87.     During the period of February 9, 2022 to March 23, 2022, information about the location of the G63 was private and not known to the general public.

88.     On or about March 12, March 15, March 18, and March 23, 2022, Foutz, Gonzales, and/or Nowak, acting as employees of Phoenix Motor, used the Mercedes Me Connect application to locate the G63 at the CubeSmart storage facility.

89.     Upon information and belief, Mercedes was directly involved in locating the G63 on March 12, 2022, before Foutz's Mercedes Me Connect Account was established on March 15, 2022.

90.     Plaintiffs were not in default of the Installment Contract as of the time Mercedes, Phoenix Motor, Foutz, Gonzales, and/or Nowak utilized the Mercedes Me Connect system to locate the G63.

91.     Mercedes, Phoenix Motor, Foutz, Gonzales, and/or Nowak were not authorized by Plaintiffs to use the Mercedes Me Connect application to discover the location of the G63.

92.     Mercedes, Phoenix Motor, Foutz, Gonzales, and/or Nowak were not authorized by Plaintiffs to use the Mercedes Me Connect application to discover information about the G63, such as fuel level and vehicle alarm status.

93.     Foutz, Gonzales, and/or Nowak falsely claimed that Phoenix Motor was the true owner of the G63 in order to justify using the Mercedes Me Connect application to locate the G63, which the defendants knew to be in the possession of a consumer who legally purchased the G63 from MB North Scottsdale.

94.     Phoenix Motor, Foutz, Gonzales, and/or Nowak were able to use the Mercedes Me Connect application to track and locate Jackie and not just the G63.

95.     It is highly offensive to a reasonable person to have their whereabouts tracked by an unknown third party, especially where that unknown party was intending to have the person falsely arrested and have their legally owned property taken away from them without due process of law.

96.     Foutz's and Nowak's invasion of privacy was compounded by Foutz's and Nowak's entering into a locked storage unit containing the private, personal property of Jackie, including other valuable Mercedes branded vehicles.

97.     Foutz and Nowak unreasonably intruded upon the private space rented by Jackie to store the G63.

98.     Mercedes's, Foutz's, Gonzales's, and Nowak's conduct as described herein and above has caused Jackie to suffer emotional distress and a reasonable fear that she would be falsely arrested, and that the G63 would be taken without due process of law.

99.     Invasion of privacy is an intentional tort, entitling Jackie to actual and punitive damages.

100.    Mercedes's, Foutz's, Gonzales's, and Nowak's conduct as described hereinabove not only constitutes invasion of privacy, but also constitutes stalking pursuant to A.R.S. § 13-2923.

101.    Mercedes's, Foutz's, and Nowak's conduct as described hereinabove, evidences an evil mind, was intentional, knowing and malicious, was done in reckless disregard for the rights of Plaintiffs, and was done with the intent to substantially injure Plaintiffs, without just cause or excuse, so that Plaintiffs are entitled to recover punitive damages.

<u>**COUNT TWO – AIDING AND ABETTING**</u>

**(Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak)**

102.    Plaintiffs incorporate by this reference the allegations in Paragraphs 1-101 above.

103.    Upon information and belief, the Mercedes Me Connect application is owned and/or controlled by Mercedes.

104.    Upon information and belief, Mercedes is responsible for providing access to the Mercedes Me Connect application to franchise dealers, including Phoenix Motor, and individual owners of Mercedes vehicles.

105.   Mercedes failed to implement policies to prevent abuse of the Mercedes Me Connect application by its dealerships (franchisees) or software licensees.

106.   Mercedes failed to implement security procedures to prevent unauthorized access to the private consumer information available from the Mercedes Me Connect application and its Netstar database.

107.   Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak acted in concert and gave each other assistance to accomplish the tortious acts complained of in this complaint.

108.   Upon information and belief, Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak knew that their efforts to locate the G63 in the hands of Plaintiffs was part of a plan to confiscate the G63 from Plaintiffs.

109.   Upon information and belief, Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak knew that their conduct amounted to an invasion of the privacy of Plaintiffs, including locating the G63 on numerous occasions, learning Jackie's home address and telephone number, and calling Jackie to cause her to fear that the G63 was not safe at the CubeSmart facility.

110.   The foregoing actions caused an undue risk of harm to Plaintiffs, including exposure of their personal information, which includes the whereabouts of the G63 at all times and Jackie's whereabouts when operating the G63.

111.   Plaintiffs' G63 was taken from them pursuant to unconstitutional procedures as a direct result of Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak being able to locate the G63 using Mercedes Me Connect application in an unauthorized manner.

112.   If not for the Mercedes Me Connect application, Phoenix Motor would have had to use legal processes that include advance notice before the G63 could be taken from Plaintiffs.

113.   Plaintiffs have incurred damages in the form of: loss of use of the G63 during the state court litigation addressing the vehicle's legal title; emotional suffering in the form of fear, apprehension, and offense; and, legal fees and court costs to defend the state court litigation.

**COUNT THREE – UNFAIR TRADE PRACTICES (Violation of 15 U.S.C.A. §§ 41-58)**

**(Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak (including Aiding and Abetting))**

114.    Plaintiffs incorporate by this reference the allegations in Paragraphs 1-113 above.

115.    Failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is considered an unfair and deceptive trade practice, in violation of the Federal Trade Commission Act.

116.    The failure of Mercedes to maintain its privacy policy, in part by allowing abuse of the Mercedes Me Connect application by Phoenix Motor, Foutz, Gonzales, and Nowak, was likely to cause substantial injury to consumers and was not reasonably avoidable by Plaintiffs.

117.    Public policy considerations weigh strongly in favor of Plaintiffs because protection of their personal security outweighs any benefits to consumers or competition that could come from exposing consumer information to Mercedes franchisees.

118.    Mercedes failed to disclose that the information regarding the whereabouts and condition of the G63 could be accessed at any time by any user of the Mercedes Me Connect application, as was done by Phoenix Motor, Foutz, Gonzales, and Nowak.

119.    Plaintiffs have suffered damages:  from the loss of use of the G63; in the amount of the down payment and regular monthly payments paid by Plaintiffs on the loan for the G63's purchase price; in the amount of the attorneys' fees and costs incurred to defend the title to the G63 and the illegal process used by Phoenix Motor to take the G63 from Plaintiffs; and, for the emotional distress and emotional harm caused to Jackie due to her fear that her personal security is in jeopardy whenever driving a GPS-enabled Mercedes automobile.

**COUNT FOUR – VIOLATION OF 18 U.S.C.A. § 2511 (Interception and disclosure of wire, oral, or electronic communications)**

**(Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak (including Aiding and Abetting))**

120.    Plaintiffs incorporate by this reference the allegations in Paragraphs 1-118 above.

121.    The GPS technology and computers in the G63 transmit electronic communications wirelessly and over the internet.

122.    Phoenix Motor, Foutz, Gonazles, and Nowak intercepted the G63's communications using the Mercedes Me Connect application.

123.    Phoenix Motor's, Foutz's, Gonzales's, and Nowak's conduct in accessing the G63's communications is akin to wiretapping or hacking a computer system, using the Mercedes Me Connect application as the tool to do so.

124.    Upon information and belief, on or about March 12, 2022, Mercedes used the Mercedes Me Connect application, or other unidentified technology, to locate the G63 for Phoenix Motor and its employees.

125.    Phoenix Motor, Foutz, and Nowak intentionally disclosed the G63's information to law enforcement, and in publicly filed court documents seeking to illegally obtain a court order to confiscate the G63 in violation of Plaintiffs' civil rights.

126.    Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak were not acting under color of law when intercepting the G63's electronic communications and accessing its onboard computers.

127.    Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak were not authorized by contract or under color of law to intercept the G63's communications or access its onboard computers.

128.    As a direct result of Phoenix Motor's, Foutz's, Gonzales's, and Nowak's illegal conduct, which was enabled by Mercedes, Plaintiffs have suffered damages: from the loss of use of the G63; in the amount of the down payment and regular monthly payments paid by Plaintiffs on the loan for the G63's purchase price; in the amount of the attorneys' fees and costs incurred to defend the title to the G63 and the illegal process used by Phoenix Motor to take the G63 from Plaintiffs; and, for the emotional distress and emotional harm caused to Jackie due to her fear that her personal security is in jeopardy whenever driving a GPS-enabled Mercedes automobile.

129.   A civil action for violations of 18 U.S.C.A. § 2511 is authorized by 18 U.S.C.A. § 2520.

130.   Damages for violation of 18 U.S.C.A. § 2511 may include punitive damages.

131.   Statutory damages equal the greater of $100 per day for each violation or $10,000.

132.   The good faith defenses are not available to the defendants under these circumstances (court order, warrant, subpoena, statutory authorization, request of a law enforcement officer).

133.   Violation of 18 U.S.C.A. § 2511 is criminally punishable by imprisonment of up to five years.

## COUNT FIVE – VIOLATION OF A.R.S. § 13-2316

### (Mercedes, Foutz, Gonzales, and Nowak (including Aiding and Abetting))[3]

134.   Plaintiffs incorporate by this reference the allegations in Paragraphs 1-133 above.

135.   A person who acts without authority or who exceeds authorization of use commits computer tampering by accessing any computer, computer system or network, or any part thereof, with the intent to execute any scheme or artifice to defraud or deceive, or to control property by means of false pretenses or representations.

136.   Mercedes, Phoenix Motor, Foutz, Gonzales, and Nowak knew they were not authorized to access the Mercedes Me Connect application to access the computers in the G63.

137.   Phoenix Motor, Foutz, Gonzales, and Nowak accessed the G63's computers as part of a scheme to obtain title to and possession of the G63 under false pretenses.

138.   Phoenix Motor, Foutz, and Nowak knew they were not the lawful owner of the G63, but believed they could convince a court to trample on the rights of Plaintiffs through an illegal temporary restraining order, obtaining possession without notice and a hearing, in violation of Plaintiffs' civil rights.

---

[3] Plaintiffs are seeking or have sought to bring this claim against Phoenix Motor in Superior Court in Maricopa County, Arizona, CV2022-003384.

139.    Phoenix Motor, Foutz, and Nowak believed they could shift the burden of their imprudent business dealings to Plaintiffs and their insurers, or to MB North Scottsdale, by confiscating the G63 and forcing those parties to seek legal recourse from the parties who allegedly took Phoenix Motor's funds (Nshan Kotoukian, Frederick Aljundi, AMK Consulting, LLC, Mellisa Huerta Karam, and Wholesale Exotics, Inc.).

140.    Mercedes aided and abetted Phoenix Motor's, Foutz's, Gonzales's, and Nowak's computer tampering by failing to implement policies, processes, procedures, and security measures to prevent abuse of the Mercedes Me Connect application.

141.    Plaintiffs suffered damages from Phoenix Motor's successful execution of its scheme to control the G63 in violation of Plaintiffs' superior rights to title and possession, and in violation of Plaintiffs' right to privacy.

142.    Plaintiffs are entitled to restitution as damages for the defendants' violation of A.R.S. § 13-2316.

WHEREFORE, Plaintiffs pray this Court enter judgment in favor of Plaintiffs and against defendants as follows:

A. Judgment in favor of Plaintiffs and against all defendants for all of the attorneys' fees and court costs Plaintiffs have expended in defending the state court litigation with Phoenix Motor;

B. Judgment in favor of Plaintiffs for damages for Plaintiffs' loss of use of the G63; for invasion of Jackie's privacy; for emotional harm caused to Jackie, and, for the unauthorized use and exploitation of Plaintiffs' consumer information to violate Jackie's civil rights;

C. Judgment in favor of Plaintiffs for civil penalties under 18 U.S.C.A. § 2520 in the amount of the greater of $100 per day or $10,000 per violation;

D. Judgment in favor of Plaintiffs for punitive damages in an amount to be determined at trial; and

E.  For such further relief as the Court deems just and proper under the circumstances.

**<u>JURY DEMAND</u>**

Jackie Rajabian and Dulceria La Bonita Wholesale, requests a jury for all triable issues.

DATED this 25th day of January, 2023.

>                            SCHERN RICHARDSON FINTER, PLC
>
>                            <u>By s/ Michael A. Schern</u>
>                            Michael A. Schern
>                            M. Rob Somers
>                            Jennifer Putnam Ooms
>                            1640 S. Stapley Dr., Ste. 132
>                            Mesa, AZ 85204
>                            *Attorneys for Plaintiffs Zakia J. Rajabian and Dulceria*
>                            *La Bonita Wholesale*

ORIGINAL of the foregoing electronically filed
via ECF this 25th day of January 2023.

<u>s/ Ann Smith</u>

# Exhibit A

**Date:** 02/08/2022

**VEHICLE BUYER'S ORDER**

| Buyer Name and Address | Co-Buyer Name and Address | Seller/Dealer Name and Address |
|---|---|---|
| DULCERIA LA BONITA WHOLESALE 2311 N 35TH AVE PHOENIX AZ 85009 | ZAKIA J RAJABIAN 9682 N 131ST ST SCOTTSDALE AZ 85259 | MERCEDES BENZ OF NORTH SCOTTSDALE 18530 NORTH SCOTTSDALE RD PHOENIX AZ 85054 |
| County: MARICOPA | County: MARICOPA | |
| Email: RAJABIANZA@GMAIL.COM | Email: | Salesperson: |
| Phone: (248) 881-3233 | Phone: (248) 881-3233 | |
| Cell: (248) 881-3233 | Cell: (248) 881-3233 | |

**Agreement to Purchase.** Buyer and Co-Buyer agree to buy the vehicle described below ("Vehicle") from Seller/Dealer for the amount and on the terms in this Vehicle Buyer's Order ("Agreement"). "Buyer", "your" and "you" refer to the above Buyer and Co-Buyer, separately and together. "Seller", "Dealer", "we," "us," and "our" refer to the above Seller/Dealer. In this Agreement, (e) means an estimate.

### VEHICLE DESCRIPTION

| Year | Make | Model | Mileage | Vehicle Identification Number |
|---|---|---|---|---|
| 2021 | MERCEDES LI | G63W4 | 3695 | W1NYC7HJ6MX410100 |

| New/Used/Demo/Other | Color | Body | Stock Number |
|---|---|---|---|
| USED | ARABIEN GRA | 4DR AMG G63 | S08402A |

**Insurance Information.** You have arranged the following insurance on the Vehicle:

Insurance Company STATE FARM INS          Policy Number 3694421E3003

| | ITEMIZATION OF SALE | |
|---|---|---|
| ALL WARRANTIES, IF ANY, BY A MANUFACTURER OR SUPPLIER OTHER THAN SELLER ARE THEIRS, NOT SELLER'S. ONLY SUCH MANUFACTURER OR OTHER SUPPLIER SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. UNLESS SELLER FURNISHES BUYER WITH A SEPARATE WRITTEN WARRANTY OR SERVICE CONTRACT MADE BY SELLER ON ITS OWN BEHALF. SELLER NEITHER ASSUMES NOR AUTHORIZES ANY PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF ANY PRODUCTS. | Price of Vehicle (including Freight, Handling & Delivery) | \$ 286000.00 |
| | ADDITIONAL ITEMS | |
| | GAP INSURANCE | 995.00 |
| | MB PPM 3YR 30000 | 2490.00 |
| | INT & EXT PROTECTION-PREMIER | 1680.00 |
| | PAINT PRO FILM - ULTIMATE PKG | 2070.00 |
| | T&W, PDR, KEY-PREMIER | 3728.00 |
| | N/A | N/A |
| **FOR USED VEHICLES:** | N/A | N/A |
| **Used Car Implied Warranty of Merchantability:** | N/A | N/A |
| THE SELLER HEREBY WARRANTS THAT THIS VEHICLE WILL BE FIT FOR THE ORDINARY PURPOSES FOR WHICH THE VEHICLE IS USED FOR 15 DAYS OR 500 MILES AFTER DELIVERY, WHICHEVER IS EARLIER, EXCEPT WITH REGARD TO PARTICULAR DEFECTS | N/A | N/A |
| | N/A | N/A |
| | N/A | N/A |
| DISCLOSED ON THE FIRST PAGE OF THIS AGREEMENT. YOU (THE BUYER) WILL HAVE TO PAY UP TO $25.00 FOR EACH OF THE FIRST TWO REPAIRS IF THE WARRANTY IS VIOLATED. | **TAXES** | |
| | Sales Tax | 24084.14 |
| **Waiver of Used Car Implied Warranty of Merchantability:** | Other Tax (Describe) N/A | N/A |
| ATTENTION BUYER: SIGN HERE ONLY IF THE SELLER TOLD YOU THAT THIS VEHICLE HAS THE FOLLOWING PROBLEM(S) AND THAT YOU AGREE TO BUY THE VEHICLE ON THOSE TERMS: | N/A | N/A |
| 1. N/A | N/A | N/A |
| 2. N/A | N/A | N/A |
| 3. N/A | **TITLE, LICENSE & OTHER FEES** | |
| | Title Fee | 4.00 |
| Buyer N/A | Registration Fee | 8.00 |
| | *Electronic Filing Fee | N/A |
| Buyer N/A | *Seller Documentary and Administrative Fee | 642.00 |
| | LIC/LIU TX | 2290.18 |
| **WARRANTIES** | POSTAGE | 5.53 |
| Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties on the vehicle, except as described above for used vehicles. Making no warranties means that the Seller is selling the vehicle as is - not expressly warranted or guaranteed and without any implied warranties of merchantability (except as described above) or of fitness for a particular purpose. This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide. | N/A | N/A |
| | AIR QUALITY | 1.50 |
| | N/A | N/A |
| | N/A | N/A |
| | **SUBTOTAL** | \$ 323998.35 |
| | Trade-in Vehicle 1 Allowance | N/A |
| | Trade-in Vehicle 2 Allowance | N/A |
| | Trade-in Vehicles 1 and 2 Payoff Balance (e) | N/A |
| | NET TRADE-IN (If negative, enter $0 here and enter amount on Trade-in Balance Owing line.) | 0.00 |
| | Cash Deposit | 5000.00 |
| Buyer is aware of the following important defects in the motor vehicle being traded-in (if there are no defects, write NONE): NONE | Additional Cash Down Payment on Delivery | 73000.00 |
| | Manufacturer's Rebate | N/A |
| N/A | Deferred Down Payment | N/A |
| | Other Credit (Describe) N/A | N/A |
| **SELLER DOCUMENTARY AND ADMINISTRATIVE FEE** | Other Credit (Describe) N/A | N/A |
| The Seller Documentary and Administrative Fee represents Seller costs such as administrative services, processing paperwork, and registering the vehicle. It is not a governmental fee. | Other Credit (Describe) N/A | N/A |
| | Other Credit (Describe) N/A | N/A |
| | **TOTAL CREDITS** | \$ 78000.00 |
| | Trade-in Balance Owing | N/A |
| | **TOTAL BALANCE DUE** | \$ 245998.35 |

THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED. AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL

ILAW FORM NO. LAWAZ-BOARB21_0 (Rev. 12-21) ©2021 The Reynolds and Reynolds Company    Buyer Initials _____ Co-Buyer Initials _____ Page 1 of 4

BUYER

| TRADE IN VEHICLE 1 | | | |
|---|---|---|---|
| YR. N/A | MAKE N/A | MODEL N/A | BODY STYLE N/A |
| COLOR N/A | TRIM N/A | | MILEAGE N/A |
| VIN N/A | | | TRADE IN ALLOWANCE $ N/A |
| TITLE NO. N/A | | PLATE NO. N/A | EXP. DATE N/A |
| OWNER N/A | | | LOAN # N/A |
| LIENHOLDER N/A | | | PHONE N/A |
| ADDRESS N/A | | | SPOKE WITH N/A |
| PAYOFF AMOUNT $ N/A (o) | | GOOD TILL N/A | VERIFIED BY N/A |

| TRADE IN VEHICLE 2 | | | |
|---|---|---|---|
| YR. N/A | MAKE N/A | MODEL N/A | BODY STYLE N/A |
| COLOR N/A | TRIM N/A | | MILEAGE N/A |
| VIN N/A | | | TRADE IN ALLOWANCE $ N/A |
| TITLE NO. N/A | | PLATE NO. N/A | EXP. DATE N/A |
| OWNER N/A | | | LOAN # N/A |
| LIENHOLDER N/A | | | PHONE N/A |
| ADDRESS N/A | | | SPOKE WITH N/A |
| PAYOFF AMOUNT $ N/A (o) | | GOOD TILL N/A | VERIFIED BY N/A |

We may retain or receive a portion of any amounts paid to others. *This fee is not a government fee.

HOW THE BALANCE DUE WILL BE PAID:

☐ RETAIL INSTALLMENT SALES CONTRACT

☐ OTHER N/A

By initialing below, you represent that you have thoroughly inspected the Vehicle and approve and accept it. You had an opportunity to have the Vehicle inspected by a third party of your choice and at your expense. You are purchasing the Vehicle based on your inspection. You are not relying on any opinion, statement, or promise of the Seller or its employees that is not contained in the written agreements you are signing today.

Buyer's Initials _____   Co-Buyer's Initials _____

## Agreement to Arbitrate

This Agreement includes an Arbitration Provision that affects your rights. It provides that you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. By signing this Agreement to Arbitrate section, you confirm that you read, understand and agree to this Agreement's Arbitration Provision.

Buyer Signs X _____                                    Co-Buyer Signs X _____

This Agreement (all pages) is the full and final expression of the agreement between you and us on the Vehicle purchase. It cancels and replaces any verbal or written agreements on the Vehicle purchase.

**This Agreement is not effective until it is signed by both you and us.** Until it becomes effective, the terms of this Agreement are not binding and you may cancel it and get back any deposit.

By signing below, you represent that: (1) you are at least 18 years old, (2) you read all pages of this Agreement completely filled in and agree to all its terms, and (3) you received a completed copy of this Agreement.

**BUYER SIGNS X** _____                          DATE 02/08/2022

**CO-BUYER SIGNS X** _____                      DATE 02/08/2022

**SELLER**
(Must be signed by an authorized representative of the Seller)

X By: _____   Title: _____   DATE 02/08/2022
Print Name:



ILAW FORM NO. LAWAZ-BOARB21_e (Rev. 12-21)
©2021 The Reynolds and Reynolds Company

Buyer Initials _____   Co-Buyer Initials _____   Page 2 of 4

THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

## Additional Terms and Conditions

**Definitions.** The following definitions apply to this Agreement:

- "Manufacturer" means the entity that manufactured the Vehicle or its distributor. We are NOT an agent of the Manufacturer. The Manufacturer is NOT a party to this Agreement. References to Manufacturer are used to help describe the contractual relationship between the Manufacturer and us or to refer to warranties that might be separately provided to you directly by the Manufacturer.

- "Retail Installment Sale Contract" refers to a separate agreement with Seller, if any, that you sign agreeing to pay for the Vehicle purchase over time.

- "Trade-In Vehicle" refers to each used vehicle you are selling to us as part of a down payment to purchase the Vehicle. If you are selling us more than one used vehicle, "Trade-In Vehicle" refers to each vehicle separately and together. Each Trade-In Vehicle is identified on pages 1 and 2 of this Agreement.

**Manufacturer – New Vehicle Pricing, Design and Availability.** The Manufacturer may change the price, design or features of its new vehicles without notice to us. If this occurs before we deliver the Vehicle to you, we may change the Vehicle Purchase Price, design and features. If we do, you may cancel this Agreement. If canceled for this reason, we will refund to you any amounts you have paid to us. We will also return any Trade-In Vehicle to you. You agree to pay us the reasonable charges for any detailing or repairs performed on the Trade-In Vehicle and any reasonable storage charges.

If the Manufacturer changes its new vehicle designs, parts, accessories, or other features, we are not obligated to make the same or similar changes to the Vehicle either prior to or after delivery to you. Unless otherwise required by law, we are not obligated to notify you of any Manufacturer's future new vehicle design or feature changes.

**Vehicle Delivery Delays.** Preparing and delivering the Vehicle may involve a number of activities and third parties. We are not liable if delivery is delayed or fails when the cause is in any way outside our control or is without our fault or negligence.

**Trade-In Vehicle.** You will transfer title to the Trade-In Vehicle to us free and clear of all liens except those noted in this Agreement. You agree to provide us with evidence of title as we may require. You make the following representations about the Trade-In Vehicle: (a) you are the sole, lawful owner with all rights and authority needed to transfer ownership; (b) there are no liens or encumbrances except those noted in this Agreement; (c) it has never been titled under any state or federal "brand" such as "defective," "salvage," "flood," etc.; (d) it's actual mileage is as provided in this Agreement; and (e) it contains all emission control equipment required which is all in working order, unless otherwise indicated in this Agreement. You authorize us to rely on these representations. If any of these representations are not true, we may elect to cancel this transaction. You will be responsible to pay for all damages resulting from your misrepresentations, including costs to recondition, legal fees, court and collection costs.

You give us permission to contact the lienholder(s) for payoff information. We are relying on information from you and/or the lienholder or lessor of each Trade-In Vehicle to arrive at the trade-in payoff amount(s). You understand that each payoff amount quoted is an estimate. We agree to pay the provided payoff amount to each Trade-In Vehicle lienholder, lessor, or its designee. If the actual payoff amount is more than the amount provided in this Agreement, you agree to pay us on demand the additional amount owing. If the actual payoff amount is less than the amount provided in this Agreement, we will refund to you overpayment we receive from the lienholder, lessor, or its designee.

**Trade-In Allowance.** The trade-in allowance provided in this Agreement is based on our appraisal of the Trade-In Vehicle when this Agreement is signed. We may reappraise it if you deliver it to us at a later date. The reappraised value will become the trade-in allowance. If the reappraised value is less than the trade-in allowance in this Agreement, you will immediately pay us the difference. Instead, you may cancel this Agreement if you have not already taken delivery of the Vehicle.

**Refusal or Failure to Accept Delivery and Other Non-Performance.** If you refuse or fail to accept delivery of the Vehicle or otherwise do not perform under this Agreement, you will be liable for the damages it causes us. These damages may include our losses, expenses, and reasonable attorneys' fees. To pay these damages, we may keep any cash deposit up to the amount owed, unless prohibited by law. You agree to pay us any amount owed in excess of the cash deposit that we keep. You will be liable for these amounts except to the extent that they are limited or prohibited by law.

This section does not apply if you cancel this Agreement as allowed in the Trade-In Allowance or Manufacturer – New Vehicle Pricing, Design and Availability sections. This section also does not apply if we cancel this Agreement because you are not able to obtain financing in the time allowed in the Balance Due and Payment section.

**Taxes.** Unless prohibited, you agree to pay all taxes assessed on the transaction in this Agreement. For example, taxes may include sales, use, ad valorem, or other federal, state or local taxes. It does not include any taxes required to be paid only by us.

**Balance Due and Payment.** By signing this Agreement, you agree to purchase the Vehicle. If there is a Total Balance Due, you must pay that amount in cash or obtain financing for that amount.

If the actual amount of title, registration and license fees is more than the amount charged in the Itemization of Sale, you agree to pay us the difference. If the actual amount is less than the amount charged in the Itemization of Sale, we will refund the overpayment to you.

If you finance the Total Balance Due, you may do so through any finance source you choose. By signing this Agreement, we are NOT agreeing to finance your purchase of the Vehicle. Your promise to purchase the Vehicle applies even if you are not able to obtain financing, or are not able to obtain the terms you wanted or expected. If you finance the Total Balance Due through a third party, we may cancel this Agreement if you do not obtain the financing within two business days. If you choose to finance your Vehicle purchase in a retail installment sale with us, you authorize us to assist in submitting your credit application to third parties for financing. If the transaction meets its requirements, a third party may agree to take assignment of a Retail Installment Sale Contract between you and us.

You understand that financing terms may vary from one source to another. You may be able to get more favorable financing terms with another finance source than through us.

**Returned or Dishonored Payments.** We may declare this Agreement null and void and retake the Vehicle if your deposit, down payment, balance due or other payment is returned or dishonored. If you make any payment under this Agreement that is returned or dishonored, you agree to pay a fee of $25.00 plus any actual charges addressed by the financial institution as a result of the dishonored payment.

**BUYER TO PURCHASE VEHICLE INSURANCE.** This Agreement does NOT include any state-required Vehicle insurance coverage. You must buy such insurance at your expense in the amounts and coverages required. You represent that you have or will buy required insurance before the Vehicle is delivered to you.

This Agreement does not include property insurance. A creditor may require it if you finance the Vehicle purchase. You must buy such insurance at your expense in the amounts and coverages required.

You agree to provide us with your insurance information if we request it. You represent that the insurance information you provide us is current and accurate.

**Accessories and Additional Equipment.** If the Vehicle includes accessories or equipment that are not listed on the Manufacturer's window sticker, they may not have been made or approved by the Manufacturer. Such items will not be covered by the Manufacturer's express limited warranty on the Vehicle (if any).

**Servicing and Collection Contacts.** In consideration of our performance under this Agreement, you agree to provide us your contact information for our servicing and collection purposes. You agree that we may use this information to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, or other electronic messaging/communication applications, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you. Except as required by law, any change to the agreements in this paragraph must be in writing and we must sign it.

**Rebates, Incentives, and Discounts.** We are not required to find or disclose all available rebates, incentives or discounts for which you might be eligible. If conditions apply to a rebate, incentive or discount, you must provide us with all necessary documentation to verify your eligibility. By this Agreement, all rebates, incentives, discounts and other similar payments are assigned to us.

**Applicable Law.** Federal law and the law of the State of Arizona apply to this Agreement.

**General Terms.** If any part of this Agreement is not enforceable for any reason, the other terms still apply and will be enforceable. Carrying out the intent of this Agreement may require you and us to sign a number of documents. You agree to assist as needed in their completion. You also agree to sign all documents reasonably needed to fulfill the promises and intent of this Agreement. You authorize us to correct any clerical errors or omissions in this Agreement or in any related document.

**Used Car Buyers Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.**

**Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

BUYER

## ARBITRATION PROVISION
### PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1. **EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN YOU AND US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**

2. **IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.**

3. **DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this Vehicle, this Agreement or any resulting transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose the American Arbitration Association (www.adr.org), or any other organization to conduct the arbitration subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statute of limitations. The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller is a party to the claim or dispute, in which case the hearing will be held in the federal district where this Agreement was executed. We will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $5000, unless the law or the rules of the chosen arbitration organization require us to pay more. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Provision, then the provisions of this Arbitration Provision shall control. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration. Any award by the arbitrator shall be in writing and will be final and binding on all parties, subject to any limited right to appeal under the Federal Arbitration Act.

You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the Vehicle, to recover a deficiency balance, or for individual injunctive relief. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Provision shall survive any termination, payoff or transfer of this Agreement. If any part of this Arbitration Provision, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Provision shall be unenforceable.



BUYER

# Exhibit B

**LAW** 553-AZ-ARB-e 1/22

Account Number: 5002144405091
The approval code is:14901077

## RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE
### (WITH ARBITRATION PROVISION)

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Seller-Creditor (Name and Address) |
|---|---|---|
| DULCERIA LA BONITA WHOLESALE 2311 N 35TH AVE PHOENIX AZ 85009 MARICOPA | ZAKIA J RAJABIAN 9682 N 131ST ST SCOTTSDALE AZ 85259 MARICOPA | MERCEDES BENZ OF NORTH SCOTTSDAL 18530 NORTH SCOTTSDALE RD PHOENIX AZ 85054 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements in this contract. You agree to pay the Seller - Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-in-Lending Disclosures below are part of this contract.

| New/Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| USED | 2021 | MERCEDES LIGHT TRUCK G63W4 | 3695 | W1NYC7HJ6MX410100 | Personal, family, or household unless otherwise indicated below ☐ business ☐ agricultural ☐ N/A |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 78000.00 |
|---|---|---|---|---|
| 5.79 % | $ 46490.13 | $ 245998.35 | $ 292488.48 | $ 370488.48 |

(e) means an estimate

**Your Payment Schedule Will Be:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | $ 4062.34 | MONTHLY beginning 03/23/2022 |
| N/A | $N/A | N/A |
| N/A | | |

**Late Charge.** If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.

**Prepayment.** If you pay early, you will not have to pay a penalty.

**Security Interest.** You are giving a security interest in the vehicle being purchased.

**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

### APPLICABLE LAW

Federal law and the law of the state of Arizona apply to this contract.

**OPTIONAL GAP CONTRACT.** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4C of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term 72 Mos.

PREMIER PROTECTION GAP – TMIS
Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _____

### FOR USED VEHICLES ONLY

The Seller hereby warrants that this vehicle will be fit for the ordinary purposes for which the vehicle is used for 15 days or 500 miles after delivery, whichever is earlier, except with regard to particular defects disclosed on the first page of this agreement. You (the purchaser) will have to pay up to $25.00 for each of the first two repairs if the warranty is violated.

**ATTENTION PURCHASER: SIGN HERE ONLY IF THE DEALER TOLD YOU THAT THIS VEHICLE HAS THE FOLLOWING PROBLEM(S) AND THAT YOU AGREE TO BUY THE VEHICLE ON THOSE TERMS:**
**ATENCIÓN COMPRADOR: FIRME AQUÍ SOLAMENTE SI EL VENDEDOR LE HA DICHO QUE EL VEHÍCULO TIENE EL/LOS SIGUIENTE(S) PROBLEMA(S) Y QUE USTED ESTÁ DE ACUERDO EN COMPRAR EL VEHÍCULO BAJO ESTOS TÉRMINOS:**

1. N/A        2. N/A        3. N/A

X N/A                            N/A        X N/A                            N/A
**Buyer Signs**              **(Date)**     **Co-Buyer Signs**           **(Date)**

**Agreement to Arbitrate:** By signing below, you agree that, pursuant to the Arbitration Provision on page 5 of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _____        Co-Buyer Signs X _____

**ITEMIZATION OF AMOUNT FINANCED**

**1 Cash Price**

| | | |
|---|---|---|
| A Cash Price of Motor Vehicle (including accessories, services) | $ | 288070.00 |
| B Sales Tax | $ | 24084.14 |
| C Prior Credit or Lease Balance paid to N/A | $ | N/A |
| D Other DEALER DOCUMENTARY FEE | $ | 642.00 |
| E Other N/A | $ | N/A |
| F Other N/A | $ | N/A |
| G Other N/A | $ | N/A |
| H Other N/A | $ | N/A |
| Total Cash Price (A through H) | $ | 312796.14 (1) |

**2 Total Downpayment =**

Trade-In N/A
(Year)          (Make)          (Model)

| | | |
|---|---|---|
| Gross Trade-In Allowance | $ | N/A |
| Less Pay Off Made By Seller to N/A | $ | N/A |
| Equals Net Trade In | $ | N/A |
| + Cash | $ | 78000.00 |
| + Other N/A | $ | N/A |
| + Other N/A | $ | N/A |
| + Other N/A | $ | N/A |
| (If total downpayment is negative, enter "0" and see prior credit or lease balance, item 1C, above) | $ | 78000.00 (2) |

**3** Unpaid Balance of Cash Price (1 minus 2)  $  234796.14 (3)

**4** Other Charges Including Amounts Paid to Others on Your Behalf

(Seller may keep part of these amounts):

| | | |
|---|---|---|
| A Cost of Optional Credit Insurance Paid to Insurance Company or Companies. | | |
| Life | $ | N/A |
| Disability | $ | N/A |
| B Other Optional Insurance Paid to Insurance Company or Companies | $ | N/A |
| C Optional Gap Contract | $ | 995.00 |
| D Official Fees Paid to Government Agencies | $ | N/A |
| E Government Taxes Not Included in Cash Price | $ | N/A |
| F Government License and/or Registration Fees | | |
| REGISTRATION FEE$8/LICENSE FEE$2290.18 | | |
| AIR QUALITY FEE$1.50/POSTAGE FEE$5.53 | $ | 2305.21 |
| G Government Certificate of Title Fees | $ | 4.00 |
| H Other Charges (Seller must identify who is paid and describe purpose) | | |
| to ECP for INT & EXT PROTECTI | $ | 1680.00 |
| to IAS for T&W,PDR,KEY-PREMIE | $ | 3728.00 |
| to MERCEDES BENZ for MB PPM 3YR 30000 | $ | 2490.00 |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| to N/A for N/A | $ | N/A |
| Total Other Charges and Amounts Paid to Others on Your Behalf | $ | 11202.21 (4) |

**5** Amount Financed (3 + 4)  $  245998.35 (5)

If the "Amount Financed" exceeds $61,000 or if the motor vehicle is primarily for commercial use, the "Amount Financed" is also the "Final Cash Price Balance" and the "Total of Payments" is also the "Time Balance".

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 5, is paid in full on or before N/A , Year N/A . SELLER'S INITIALS N/A

---

**Insurance.** You may buy the physical damage insurance this contract requires from anyone you choose who is acceptable to us. You may also provide the physical damage insurance through an existing policy owned or controlled by you that is acceptable to us. You are not required to buy any other insurance to obtain credit.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

**Check the insurance you want and sign below:**

**Optional Credit Insurance**

☐ Credit Life:   ☐ Buyer  ☐ Co-Buyer  ☐ Both

☐ Credit Disability:  ☐ Buyer  ☐ Co-Buyer  ☐ Both

Premium:

Credit Life $ N/A

Credit Disability $ N/A

Insurance Company Name N/A

N/A

Home Office Address N/A

N/A

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

**Other Optional Insurance**

☐ N/A                                          N/A
Type of Insurance                        Term

Premium $ N/A

Insurance Company Name N/A

N/A

Home Office Address N/A

N/A

☐ N/A                                          N/A
Type of Insurance                        Term

Premium $ N/A

Insurance Company Name N/A

N/A

Home Office Address N/A

N/A

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

I want the insurance checked above.

X N/A                                          N/A
Buyer Signature                          Date

X N/A                                          N/A
Co-Buyer Signature                      Date

---

**Returned Check Charge:** You agree to pay a charge of $25.00, plus actual charges assessed by a financial institution, if any check you give us is dishonored.

---



**OTHER IMPORTANT AGREEMENTS**

**1. FINANCE CHARGE AND PAYMENTS**

**a. How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed with a day counted as 1/365th of a year (or 1/366th in a leap year).

**b. How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose as the law allows.

**c. How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on page 1 of this contract on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

**d. You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

**2. YOUR OTHER PROMISES TO US**

**a. If the vehicle is damaged, destroyed, or missing.**
You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

**b. Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

**c. Security Interest.**
You give us a security interest in:
- The vehicle and all parts or goods put on it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle. You will not allow any other security interest to be placed on the title without our written permission.

**d. Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. You agree to name us on your insurance policy as an additional insured and as loss payee. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge computed at the Annual Percentage Rate shown on page 1 of this contract or, at our option, the highest rate the law permits.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

**e. What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, we will subtract the refund from what you owe.

**3. IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

**a. You may owe late charges.** You will pay a late charge on each late payment as shown on page 1 of this contract. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

If you pay late, we may also take the steps described below.

**b. You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once. Default means:
- You do not pay any payment on time;
- You give us false, incomplete, or misleading information during credit application;
- You start a proceeding in bankruptcy or one is started against you or your property; or
- You break any agreements in this contract.

The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

**c. Debtor's Liability for Failure to Return Vehicle:** If you are in default, we may send you a notice of default. It is unlawful to fail to return a motor vehicle subject to a security interest within 30 days after receiving notice of default. A notice of default may be mailed to the address on the contract. It is your responsibility to keep the listed address current. Unlawful failure to return a motor vehicle subject to a security interest is a class 6 felony. Assuming there are no aggravating circumstances, and you have no prior felony convictions, the maximum penalty is 1.5 years in prison and a $150,000 fine.

**d. You may have to pay collection costs.** If we hire an attorney to collect what you owe, you will pay the attorney's fee and court costs as the law allows. You will also pay any reasonable collection costs we incur as the law allows.

**e. We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device (such as GPS), you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you. If you do not ask for these items back, we may dispose of them as the law allows.

**f. How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

**g. We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us unless the law provides otherwise. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

**h. What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, you agree that we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

**WARRANTIES**

**Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties on the vehicle, except as described above for used vehicles. Making no warranties means that the Seller is selling the vehicle as is – not expressly warranted or guaranteed and without any implied warranties of merchantability (except as described above) or of fitness for a particular purpose.**

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

---

**Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.

**Spanish Translation:** Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

---

**SERVICING AND COLLECTION CONTACTS**

You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

---

**SELLER'S RIGHTS IN ABSENCE OF CREDIT APPROVAL:**

(a) You agree to furnish us any documentation necessary to verify information contained in the credit application. (b) You acknowledge that it may take a few days for us to verify your credit and assign this contract. In consideration of our agreeing to deliver the vehicle, you agree that if we are unable to assign the contract to any one of the financial institutions with which we regularly do business pursuant to terms of assignment acceptable to us, we may cancel this contract. (c) In the event we cancel this contract, we shall give you notice of the cancellation. Upon delivery of such notice, you shall immediately return the vehicle to us in the same condition as when sold reasonable wear and tear excepted. We agree, upon cancellation of this contract to restore to you all consideration we received in connection with this contract, including any trade-in vehicle. (d) In the event the vehicle is not immediately returned to us upon notice of our cancellation of this contract, you agree to pay and shall be liable to us for all expenses incurred by us in obtaining possession of the vehicle, including attorney's fees, and we shall have the right to repossess the vehicle with free right of entry wherever the vehicle may be found, as the law allows. (e) While the vehicle is in your possession, all terms of this contract, including those relating to use of the vehicle and insurance for the vehicle shall be in full force and all risk of loss or damage in the vehicle shall be assumed by you, you shall pay all reasonable repair costs related to any damage sustained by the vehicle while in your possession or control of and until the vehicle is returned to us.

---

**Electronic Contracting and Signature Acknowledgment.** You agree that (i) this contract is an electronic contract executed by you using your electronic signature, (ii) your electronic signature signifies your intent to enter into this contract and that this contract be legally valid and enforceable in accordance with its terms to the same extent as if you had executed this contract using your written signature and (iii) the authoritative copy of this contract ("Authoritative Copy") shall be that electronic copy that resides in a document management system designated by us for the storage of authoritative copies of electronic records, which shall be deemed held by us in the ordinary course of business. Notwithstanding the foregoing, if the Authoritative Copy is converted by printing a paper copy which is marked by us as the original (the "Paper Contract"), then you acknowledge and agree that (1) your signing of this contract with your electronic signature also constitutes issuance and delivery of such Paper Contract, (2) your electronic signature associated with this contract, when affixed to the Paper Contract, constitutes your legally valid and binding signature on the Paper Contract and (3) subsequent to such conversion, your obligations will be evidenced by the Paper Contract alone.

---

**GUARANTY**

The undersigned, jointly and severally, guarantee payment of all amounts owing under this contract and the payment upon demand of the entire amount owing on this contract in the event of default in payment by Buyer named therein. The undersigned waives notice of performance, demands for performance, notice of non-performance, protests, notice of protests, notice of dishonor, notice of acceptance of this Guaranty, of any extensions in time of payment, of sale of any of the collateral and of all other notices to which the undersigned would be otherwise entitled by law and agrees to pay all amounts owing thereunder upon demand, without requiring any action or proceeding against Buyer, and specifically waives any right to require action against Buyer as provided in A.R.S. §§ 12-1641 *et seq.* The undersigned agree to deliver to Seller or, after assignment, to Assignee timely financial statements and/any other information relating to the undersigned's financial condition as may be reasonably requested. The undersigned acknowledges receipt from the Seller, prior to signing below, of a separate "Notice to Cosigner."

| **N/A** | **N/A** | |
|---|---|---|
| DATED AT | | GUARANTOR |
| **N/A** | **N/A** | |
| DATED AT | | GUARANTOR |

Marital Community Property Joinder: The undersigned spouse of the Guarantor joins in the execution of this guaranty for the purpose of binding the marital property of the Guarantor, and the undersigned, in accordance with A.R.S. § 25-214 or other applicable law. THE UNDERSIGNED SPOUSE OF THE GUARANTOR ACKNOWLEDGES RECEIPT FROM THE SELLER, PRIOR TO SIGNING BELOW, OF A SEPARATE "NOTICE TO COSIGNER."

| **N/A** | **N/A** |
|---|---|
| Date | Spouse of the Guarantor |



**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

☐ **IF THE BOX IS CHECKED, THIS CONTRACT IS SUBJECT TO A BROKER FEE PAID BY THE SELLER TO**
N/A
_____ .

### NO COOLING OFF PERIOD
**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

**You acknowledge an express intent to grant a security interest in the vehicle and hereby waive and abandon all personal property exemptions granted upon the vehicle, which is the subject of this contract. NOTICE: BY GIVING US A SECURITY INTEREST IN THE VEHICLE, YOU WAIVE ALL RIGHTS PROVIDED BY LAW TO CLAIM SUCH PROPERTY EXEMPT FROM PROCESS.**

### ARBITRATION PROVISION
PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1. **EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**
2. **IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.**
3. **DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose the American Arbitration Association (www.adr.org) or any other organization to conduct the arbitration subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statute of limitations. The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller-Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $5000, unless the law or the rules of the chosen arbitration organization require us to pay more. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Provision, then the provisions of this Arbitration Provision shall control. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration. Any award by the arbitrator shall be in writing and will be final and binding on all parties, subject to any limited right to appeal under the Federal Arbitration Act.

You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the vehicle, to recover a deficiency balance, or for individual injunctive relief. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Provision shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Provision, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Provision shall be unenforceable.

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding. Buyer Signs **X** _____ Co-Buyer Signs **X** _____

If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

**NOTICE TO THE BUYER: (1) Do not sign this contract before you read it or if it contains any blank spaces. (2) You are entitled to an exact copy of the contract you sign.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**YOU ACKNOWLEDGE THAT YOU HAVE READ ALL PAGES OF THIS CONTRACT, INCLUDING THE ARBITRATION PROVISION ON PAGE 5, BEFORE SIGNING BELOW.**

| | | |
|---|---|---|
| You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it. | ANY INSURANCE REFERRED TO IN THIS CONTRACT DOES NOT INCLUDE LIABILITY COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS. | The Arizona Department of Insurance and Financial Institutions regulates the Seller and can be contacted at 100 N 15th Avenue, Suite 261, Phoenix, AZ 85007-2630, (602) 771-2800, if you have any complaints concerning this contract. |

**X** _____   02/08/2022      **X** _____   02/08/2022
**Buyer Signs**    **Date**       **Co-Buyer Signs**    **Date**

DULCERIA LA BONITA WHOLESALE      ZAKIA J RAJABIAN
**Buyer Printed Name**            **Co-Buyer Printed Name**

**X** MERCEDES BENZ OF NORTH SCOTTSDALE 02/08/2022   By **X** _____   F&I MANAGER
**Seller Signs**    **Date**                              **Title**

If the "business" use box is checked in "Primary Use for Which Purchased": Print Name N/A _____ Title N/A

### SEE THE REST OF THIS CONTRACT FOR OTHER IMPORTANT TERMS AND AGREEMENTS.

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here **X** N/A _____ Date N/A   Address N/A



FORM NO. 553-AZ-ARB-e (REV. 1/22)
©2022 The Reynolds and Reynolds Company
THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO CONTENT OR
FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

# Exhibit C



**P.O. Box 5187 • Downers Grove, IL 60517**
**1-877-275-8234**

# EXTERIOR AND INTERIOR
# APPEARANCE PROTECTION
# AND WINDSHIELD PROTECTION
### LIMITED WARRANTY

100600466

| Customer Name: DULCERIA LA BONITA WHOLESALE | Co-Buyer: ZAKIA RAJABIAN |
|---|---|

| Address: 2311 N 35TH AVE PHOENIX | Address: 9682 N 131ST ST SCOTTSDALE |
|---|---|
| City/State/Zip: AZ     85009 | City/State/Zip: AZ     85259 |
| Phone: (248) 881-3233 | Phone: (248) 881-3233 |

Year: 2021    Make: MERCEDES-BENZ  Model: G 63 AMG    Vehicle Identification Number: W1NYC7HJ6MX410100

Dealer Information:    Mercedes-Benz of North Scottsdale
Dealer Address:  18530 N Scottsdale Rd

| City: Phoenix | State: AZ | Zip Code: 85054 |
|---|---|---|
| Mileage: 3,695 | Product Purchase Price: $1,680.00 | Date of Sale: 2022-02-08 |

## EXTERIOR AND INTERIOR APPEARANCE PROTECTION
### LIMITED WARRANTY: (PLEASE CHECK THE APPROPRIATE BOX)

☑ **New Vehicle Protection:**
Full repair including repainting (if required) and interior replacement (if required). Repairs are limited to re-dyeing for stains caused by dyes, inks, or bleaches. Remedy for rips, tears, punctures, and burns includes repair or replacement. *Eligibility: Four (4) model years of age or newer, regardless of mileage.*

☐ **Pre-Driven (Used) Vehicle Protection:**
Professional detailing. Exterior: Wet sanding, buffing, polishing, and re-application. Interior: Stain removal, cleaning, and re-dyeing, if required. Remedy for rips, tears, punctures, and burns is limited to repair only, not replacement. *Eligibility: Five (5) model years of age or older, regardless of mileage.*

### Exterior Protection
**Environmental Paint Protection**
*Warranted protection of the treated exterior factory painted surfaces against:* weather induced fading, weather induced chalking, weather induced loss of gloss, acid rain, bird waste, tree sap, insect damage (including love bugs), sun's UV damage, hard water spots, de-icing agents/road salt, ocean spray, brake dust, rail dust, paint overspray, and fuel stains.
**Headlight Lens Protection**
*Warranted Protection against:* the sun's harmful UV rays causing dulling, yellowing, or fading of the headlight lens(es). *Repair Only.*
**Alloy Wheel Protection**
*Warranted Protection against:* pitting or corrosion from road salt, ocean spray, weather-induced damage, and staining from brake dust that can not be easily removed.
**Black Trim/Molding Protection**
*Warranted Protection against:* fading & discoloring of the exterior black trim/molding/cladding caused by the sun's harmful UV rays. *Repair Only.*

### Interior Protection
*Warranted protection of the treated interior surfaces (including headliners, sun visors, and factory floor mats) against:* fast food, beverage stains, juice boxes, bleaches, dyes, inks, fading, discoloration, cracking of the dash, sun's UV rays, mold, mildew, chewing gum, crayons, makeup, blood & bodily fluids (including those caused by pets), rips & tears less than six (6) inches long, and punctures & burns up to one (1) inch in diameter.

### Windshield Repair / Replacement
*Warranted protection for:* chips or cracks to the treated vehicle's windshield, caused by small rocks, stones or other propelled road debris.
*Warranted water repellency of:* the windshield.

| *Select the Products Purchased by Checking the Applicable Boxes Below:* | | **Authorization** (Check Applicable Box) |
|---|---|---|
| **Exterior and Interior Protection** Seven (7) Year Warranty | **JPSKPLS** | ☑ |
| **Exterior Protection** Seven (7) Year Warranty | **JPSKPP** | |
| **Interior Protection** Seven (7) Year Warranty | **JPSKIP** | |
| **Windshield Protection** Seven (7) Year Warranty | **JPSKWP** | |

Appearance Protection Information Statement: Before you decide to purchase Appearance Protection products from us, we encourage you to review the vehicle manufacturer's warranty; specifically with respect to paint deterioration, interior staining, and the written policy statement of the vehicle manufacturer or distributor, if any, with respect to post-manufacture Appearance Protection products including paint and interior protection. Such warranty and statements, if any, are available for your review prior to your signing any agreement. Ask your salesperson for copies.
The purchase of these products is optional and is in no way a condition to either the purchase or financing of a vehicle.
This is a limited product warranty included in the purchase of the protection products applied to your vehicle. It is not insurance. It is not subject to state insurance laws, but may be subject to state law concerning warranties.
Claims against this limited warranty are not subject to deductibles, but are subject to all other provisions of this limited warranty.
**The protections afforded by the windshield product warranty may duplicate coverages available under your vehicle's insurance policy. Please review both prior to purchasing this product.**
Acknowledgement: This is to verify my agreement to purchase the appearance protection products chosen above and my agreement to the terms, conditions, and exclusions of the limited warranty (see complete terms, conditions, and exclusions on the reverse).

Date: 2022-02-09   Buyer: _DULCERIA LA BONITA WHOLESALE_   Co-Buyer: _ZAKIA RAJABIAN_

© 2019 ECP Incorporated 06/19 Rev.

FORM # AMT1449

## LIMITED WARRANTY TERMS AND CONDITIONS

### DEFINITIONS

**ECP, We, Us, Our:** ECP Incorporated, 11210 Katherine's Crossing, Suite 100; Woodridge, IL 60517. ECP is the manufacturer and warrantor of the appearance protection products and the administrator of all claims against this warranty.
**You, Your:** The vehicle owner and purchaser of the appearance protection products, identified on the face of this document.
**Application Date:** The Date of Sale shown on the face of this document, which is the date on which the appearance protection products were applied to the Vehicle.
**Commercial Vehicle:** Any vehicle titled or registered to a business, or used for delivery, hire, or other business activities.
**Vehicle:** The vehicle identified on the face of this document, to which the appearance protection products have been applied.
**Black Molding:** Factory-installed cowl moldings, wheel opening moldings, rocker panel cladding, black bumper strips, and black body side moldings.
**Hard Water Spots:** Mineral deposits that have collected on the treated, factory-painted surfaces of the Vehicle.
**Insect Damage:** Permanent etching or staining of the treated, factory painted surfaces of the Vehicle by insect entrails, including love bugs (Plecia nearctica), provided that the remains of the insects are removed from the Vehicle within two (2) days of deposition.
**Hydrophobicity, Hydrophobic:** The ability of the windshield to repel water. Hydrophobicity is measured by the angle at which a water droplet attaches to horizontal glass. Water droplets will attach to an unprotected windshield at approximately 12-15 degrees. Protected with the Windshield protection product, water droplets will attach at an angle of 60 to 115 degrees. This means that water will bead up instead of spreading onto the windshield, and will be shed quickly, greatly improving Your ability to see through the windshield in inclement weather.

### VEHICLE ELIGIBILITY

**Commercial Vehicles,** conversion vans, RV's, and mobile homes are not eligible for any of the protections under this warranty.
**New Vehicles:** A Vehicle four (4) model years of age or newer as of the Application Date.
**Pre-Driven (Used) Vehicles:** A Vehicle five (5) or more model years old as of the Application Date.

### WARRANTY TERM

All Vehicles: Seven (7) years from the Application Date.

### EXTERIOR AND INTERIOR PROTECTION

#### ENVIRONMENTAL PAINT PROTECTION

The Environmental Paint Protection product is warrantied to protect treated factory painted surfaces of the Vehicle against damage from weather induced fading, weather induced chalking, weather induced loss of gloss, acid rain, bird waste, tree sap, insect Damage, sun's UV rays, Hard Water Spots, de-icing agents/road salt, ocean spray, brake dust, rail dust, paint overspray, and fuel stains. This limited warranty does not apply to any of the following: (1) damage on the exhaust system, chrome plated trim, or hinges; (2) paint delamination, peeling, scratches, bubbling, cracking, or flaking; (3) paint chips; (4) collision, neglect, abuse, or vandalism; (5) damage present on the Application Date; (6) surface corrosion and/or corrosion perforation; (7) paint damage on the panels or tailgate of a truck bed facing the inside of the bed, or on the floor panel of the bed; (8) damage on repaired, replaced, or repainted areas unless the Environmental Paint Protection products have been reapplied; (9) exterior damage due to defective design, materials or workmanship in the manufacture of the Vehicle, as documented in Vehicle manufacturer technical bulletins or recall notices; (10) damage not reported to Us within sixty (60) days of it first becoming evident to a reasonably diligent owner; or (11) general cleaning and maintenance.

### EXTERIOR AND INTERIOR PROTECTION

#### HEADLIGHT LENS PROTECTION

The Headlight Lens Protection product is warrantied to protect the treated headlight lenses of the Vehicle from becoming dull, yellow, or faded as a result of exposure to the sun's harmful UV rays. This limited warranty does not apply to any of the following: (1) Collision damage; (2) vandalism; (3) condensation inside the headlight capsule; (4) broken, cracked, or chipped lenses; (5) headlight lens replacement; or (6) replacement of failed bulbs, HID lamps, or LED's.

#### ALLOY WHEEL APPEARANCE PROTECTION

The Alloy Wheel Protection product is warrantied to protect treated alloy (non-chrome) wheels against pitting or corrosion from road salt, ocean spray, weather-induced damage, and staining from brake dust. This limited warranty does not apply to any of the following: (1) damage from potholes, road debris, or curbs; (2) the failure of the wheels or tires to hold air; (3) chrome wheels; (4) costs for the replacement of wheels in excess of $400.00 per wheel over the term of the warranty; (5) claims exceeding an aggregate total of $1,600.00 over the term of the warranty; or (6) damage not reported to Us within sixty (60) days of it first becoming evident to a reasonably diligent owner.

#### BLACK MOLDING AND TRIM PROTECTION

The Black Molding and Trim Protection product is warrantied to protect the treated Black Molding on the Vehicle from becoming faded or discolored as a result of exposure to the sun's harmful UV rays. This limited warranty does not apply to any of the following: (1) Collision or impact damage; (2) rubberized gaskets around the windows and doors; (3) side view mirror housings; (4) window / door appliques; or (5) the failure of the molding to adhere to the Vehicle surfaces.

#### INTERIOR PROTECTION PRODUCT

The Interior Appearance Protection product is warrantied to protect the treated interior surfaces of the Vehicle (including the headliner, sun visors, and factory floor mats) against damage by fast food, beverage stains, juice boxes, bleaches, dyes, inks, fading, discoloration, cracking of the dash, sun's UV rays, mold, mildew, chewing gum, crayons, lipstick, makeup, blood & bodily fluids (including those caused by pets), rips & tears less than six (6) inches long, and punctures & burns up to one (1) inch in diameter. This limited warranty does not apply to any of the following: (1) damage or stains caused by paints, acids, or other corrosives; (2) materials that have been subjected to vandalism or mishandled by Your failure to exercise reasonable care; (3) pre-existing damage present on the Application Date; (4) cracking or normal age-related deterioration of interior surfaces other than the treated dash; (5) non-factory floor mats, steering wheels, seat belts, suede, nubuck, or aniline leather; (6) damage on repaired or replaced areas unless the Interior Appearance Protection products have been reapplied; (7) damage due to defective design, materials, or workmanship in the manufacture of the Vehicle, as documented in Vehicle manufacturer technical bulletins or recall notices; (8) damage not reported to Us within sixty (60) days of it first becoming evident to a reasonably diligent owner; (9) general cleaning and maintenance; or (10) stains, losses, or other damage arising out of or related to catastrophic events, such as accidents, injuries, or death, which produce large volumes of blood or bodily fluids.

### WINDSHIELD PROTECTION

The windshield protection product is warrantied to protect the treated windshield of the Vehicle against minor chips or cracks from propelled rocks or other propelled road debris. Additionally, the product is warrantied to remain Hydrophobic during the term of this warranty. This limited warranty does not apply to any of the following: (1) Cracks or other damages caused by any peril other than flying road debris. This exclusion includes, but is not limited to stress cracks and damages caused by hail or other weather conditions, crime, or negligence; (2) Pre-existing damage; (3) Any damage that occurs while Your Vehicle is being operated off a public highway or street; (4) manufacturer defects; (5) claims exceeding the aggregate total of $10,000.00 over the warranty term; and (6) repairs or replacements performed without first completing the claims process and receiving a repair authorization from Us.

### REMEDIES AVAILABLE UNDER THIS WARRANTY EXTERIOR AND INTERIOR PROTECTION

#### NEW VEHICLES

##### ENVIRONMENTAL PAINT PROTECTION

If the Environmental Paint Protection product fails to perform as guaranteed, We will (1) pay to repair the damaged, treated surface of the Vehicle, including repainting if necessary, and (2) will pay to re-apply appearance protection product to the affected surface, at no cost to You. We will also provide rental car reimbursement to You, up to $50.00 a day for up to five (5) days while Your Vehicle is being repaired under this warranty.

##### HEADLIGHT LENS PROTECTION

If the Headlight Lens Protection product fails to perform as guaranteed, We will (1) pay to professionally refinish and detail the headlight lens to restore clarity, and (2) pay to re-apply appearance protection product to the affected headlight lens at no cost to You. Under no circumstances will We pay for the replacement of headlight lenses.

##### ALLOY WHEEL PROTECTION

If the Alloy Wheel Protection product fails to perform as guaranteed, We will (1) clean, buff, and detail the treated wheel surface to remove the corrosion and staining, and (2) will re-apply appearance protection product to the affected wheel at no cost to You. If We are unable to effect a suitable repair via detailing, We will reimburse You for the actual cost of a replacement wheel, up to a maximum of $400.00 per wheel. The maximum aggregate benefit available under the Alloy Wheel Protection product warranty is $1,600.00 for all claims.

##### BLACK TRIM AND MOLDING PROTECTION

If the Black Trim and Molding Protection product fails to perform as guaranteed, We will (1) detail the affected trim or molding to restore the deep black color, and (2) will re-apply appearance protection product to the affected wheel at no cost to You. Under no circumstances will We pay for the replacement of black trim or molding.

##### INTERIOR PROTECTION

If the Interior Protection product fails to perform as guaranteed, We will (1) pay to repair the damaged surface, including replacement of damaged surfaces if needed, and (2) will re-apply appearance protection product to the affected surface at no cost to You. We will also provide rental car reimbursement to You, up to $50.00 a day for up to three (3) days while Your Vehicle is being repaired under this warranty. Damage caused by rips, tears, punctures, or burns is limited to the most cost-effective industry-standard method of repair, and may not include the replacement of an entire seat, carpet, or dashboard. For stains caused by dyes, inks, or bleaches, Your remedy is limited professional dyeing of the damaged surface.

© 2019 ECP Incorporated 06/19 Rev. 04/21

FORM # AMT1449

## LIMITED WARRANTY TERMS AND CONDITIONS

### REMEDIES AVAILABLE UNDER THIS WARRANTY
### EXTERIOR AND INTERIOR PROTECTION

#### NEW VEHICLES

#### WINDSHIELD PROTECTION

In the event that **Your** treated windshield suffers covered damage during the warranty term, **We** will pay for the repair of the damaged portion of the windshield and reapplication of the windshield protection product. In the event that any covered windshield damage cannot be repaired (to be determined by an independent third party inspector chosen and paid for by **Us**), **We** will pay the actual cost for replacement of the damaged windshield with an Original Equipment Manufacturer (OEM) windshield, subject to the $10,000.00 aggregate benefit limit applicable to this warranty. **We** will also pay for any safety equipment recalibration procedure(s) required by the manufacturer of **Your** Vehicle in the event of a windshield replacement. In the event that the Windshield Protection product fails to remain **Hydrophobic** after **You** use the consumer windshield maintenance kit, **We** will pay to clean **Your** windshield and to reapply the Windshield Protection product. **Claims under this warranty are limited to a cumulative aggregate of $10,000.00 over the term of the warranty. Claims exceeding $10,000.00 over the warranty term will not be honored. Once the sum of claims paid by Us reaches $10,000.00, this warranty will end and further claims will be denied.**

#### PRE-DRIVEN (USED) VEHICLES

#### ENVIRONMENTAL PAINT PROTECTION

If the Environmental Paint Protection product fails to perform as guaranteed, **We** will (1) pay to repair the damaged, treated surface of the **Vehicle** using industry-standard detailing techniques, and (2) will pay to re-apply appearance protection product to the affected surface, at no cost to **You**. **We** will also provide rental car reimbursement to **You**, up to $50.00 a day for up to five (5) days while **Your** Vehicle is being repaired under this warranty. Under no circumstances will **We** pay for repainting or replacement of affected surfaces.

#### HEADLIGHT LENS PROTECTION

If the Headlight Lens Protection product fails to perform as guaranteed, **We** will (1) pay to professionally refinish and detail the headlight lens to restore clarity, and (2) pay to re-apply appearance protection product to the affected headlight lens at no cost to **You**. Under no circumstances will **We** pay for the replacement of headlight lenses.

#### ALLOY WHEEL PROTECTION

If the Alloy Wheel Protection product fails to perform as guaranteed, **We** will (1) clean, buff, and detail the treated wheel surface to remove the corrosion and staining, and (2) will re-apply appearance protection product to the affected wheel at no cost to **You**. If **We** are unable to effect a suitable repair via detailing, **We** will reimburse **You** for the actual cost of a replacement wheel, up to a maximum of $400.00 per wheel. The maximum aggregate benefit available under the Alloy Wheel Protection product warranty is $1,600.00 for all claims.

#### BLACK TRIM AND MOLDING PROTECTION

If the Black Trim and Molding Protection product fails to perform as guaranteed, **We** will (1) detail the affected trim or molding to restore the deep black color, and (2) will re-apply appearance protection product to the affected wheel at no cost to **You**. Under no circumstances will **We** pay for the replacement of black trim or molding.

### REMEDIES AVAILABLE UNDER THIS WARRANTY
### EXTERIOR AND INTERIOR PROTECTION

#### PRE-DRIVEN (USED) VEHICLES

#### INTERIOR PROTECTION

If the Interior Protection product fails to perform as guaranteed, **We** will (1) pay to repair the damaged surface using industry-standard detailing and repair techniques, and (2) will re-apply appearance protection product to the affected surface at no cost to **You**. **We** will also provide rental car reimbursement to **You**, up to $50.00 a day for up to three (3) days while **Your** Vehicle is being repaired under this warranty. **Your** remedy for stains caused by dyes, inks, or bleaches is limited professional dyeing of the damaged surface. Under no circumstances will **We** pay for the replacement of any interior component or part of a **Pre-Driven (Used) Vehicle.**

#### WINDSHIELD PROTECTION

In the event that **Your** treated windshield suffers covered damage during the warranty term, **We** will pay for the repair of the damaged portion of the windshield and reapplication of the windshield protection product. In the event that any covered windshield damage cannot be repaired (to be determined by an independent third party inspector chosen and paid for by **Us**), **We** will pay the actual cost for replacement of the damaged windshield with an Original Equipment Manufacturer (OEM) windshield, subject to the $10,000.00 aggregate benefit limit applicable to this warranty. **We** will also pay for any safety equipment recalibration procedure(s) required by the manufacturer of **Your** Vehicle in the event of a windshield replacement. In the event that the Windshield Protection product fails to remain **Hydrophobic** after **You** use the consumer windshield maintenance kit, **We** will pay to clean **Your** windshield and to reapply the Windshield Protection product. **Claims under this warranty are limited to a cumulative aggregate of $10,000.00 over the term of the warranty. Claims exceeding $10,000.00 over the warranty term will not be honored. Once the sum of claims paid by Us reaches $10,000.00, this warranty will end and further claims will be denied.**

#### ALL PRODUCTS

**Limitations: We** will pay for ONE (1) REPAIR of each damaged area for damage arising from the same cause over the term of this warranty. **We** will use aftermarket parts and supplies in place of original equipment manufacturer parts and supplies in repairs performed under this warranty unless such materials are not available or are not cost-effective, except with respect to claims under the windshield protection warranty, in which case **We** will use original equipment parts and supplies. The decision to repair or replace damaged parts of the **Vehicle**, or to use aftermarket parts and supplies, is entirely at **Our** discretion. **We** will cause the service to be performed with reasonable promptness and quality. Due to the effects of aging over time, there is no guarantee of the color match of repaired portions of the **Vehicle**. In no event will **You** be provided with reimbursement of transportation or inconvenience costs during time of repair, except for the rental car reimbursement described herein. If repair costs exceed the current average wholesale value of the **Vehicle**, as defined by Black Book (published by Hearst Business Media) or similarly accepted industry publication, the average wholesale value amount will be paid to **You** and the remaining coverage under this warranty will end.

### REMEDIES AVAILABLE UNDER THIS WARRANTY
#### ALL PRODUCTS

WE SHALL HAVE NO FURTHER LIABILITY OR OBLIGATION OF ANY NATURE WHATSOEVER ARISING OUT OF **YOUR** EXPRESS LIMITED WARRANTY, INCLUDING BUT NOT LIMITED TO LIABILITY OR OBLIGATION FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO **YOU**. ANY IMPLIED WARRANTIES ACCOMPANYING THE SALE OF THE APPEARANCE PROTECTION PRODUCTS ARE LIMITED IN DURATION TO THE DURATION OF **YOUR** EXPRESS LIMITED WARRANTY. SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO **YOU**. **YOUR** LIMITED WARRANTY IS GRANTED FOR **YOUR** SOLE BENEFIT, AND THAT OF SUCH TRANSFEREE AS PERMITTED. THIS WARRANTY GIVES **YOU** SPECIFIC LEGAL RIGHTS, AND **YOU** MAY ALSO HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

#### YOUR DUTIES

(1) Where any treated panel or area of the **Vehicle** is replaced, repaired or otherwise altered, except for those areas repaired under this warranty, **You** must bring the **Vehicle** to the dealer for a touch up application of the appearance protection products. This touch-up application is to occur within sixty (60) days of the alteration and is to be at **Your** expense. **Your** failure to comply will relieve **Us** of liability for such affected areas; (2) **You** should maintain the **Vehicle** by regular cleaning and prompt use of touch-up paint on nicks and scratches. (3) In case of spills: remove all liquids or solids from the interior material as soon as possible. This can be done by gently blotting the spilled material with a napkin or absorbent cloth. Avoid rubbing spills into interior surfaces.

#### HOW TO MAKE A CLAIM

To file a claim **You** may call 1-877-275-8234 to request a claim form. **You** may also file online at claims.ecpinc.net, or using the ECP Claims mobile app available for both Apple and Android devices. If **You** prefer, **You** may file via mail by sending a completed claim form (available at claims.ecpinc.net), a copy of this agreement (front and back), and an itemized estimate of repair (for exterior damage only) to the following address: Warranty Administration Department; P.O. Box 5187; Downers Grove, IL 60517. If necessary, within fifteen (15) days of receiving **Your** completed claim information, **We** will arrange for an inspection of **Your** Vehicle, at **Our** Expense, with an independent damage appraisal company. **You** will then be notified of the approval or denial of **Your** claim within ten (10) days of **Our** receipt of the completed inspection report. If the claim is approved, a check will be issued payable to the repair facility. Do not have the repairs completed until **You** receive written authorization from **Us**. ANY REPAIRS UNDERTAKEN WITHOUT PRIOR WRITTEN AUTHORIZATION FROM US WILL NOT BE REIMBURSED. Claims must be filed within sixty (60) days of the occurrence of covered damage. Claims for damage that is more than sixty (60) days old or claims filed after the warranty expires will be denied.

## LIMITED WARRANTY TERMS AND CONDITIONS

### TRANSFER OF UNEXPIRED WARRANTY PROTECTION

Any subsequent owner of the Vehicle may apply for continued protection under the unexpired portion of this warranty. To make this application for transfer, the subsequent owner must send the following to Warranty Administration Department at P.O. Box 5187; Downers Grove, IL 60517, **within ninety (90) days of purchasing the Vehicle:** (1) a copy of the front and back of this warranty; (2) a copy of the **Vehicle's** title or registration certificate (do NOT send the original), showing the transfer applicant as the **Vehicle** owner; and (3) a check for $50.00, payable to Warranty Administration Department. Active members of the US Military are exempt from the transfer fee requirement.  In lieu of the check, please send evidence of active duty status.

### RENEWAL OF WARRANTY TERM FOR DETAILING

The original owner of the Exterior and Interior Protection products may extend the warranties for these products, in three-year increments, for as long as he or she owns the **Vehicle**. To apply for warranty extension, **You** must do the following: (1) within the ninety (90) days preceding the expiration of the warranty, pay a Premier Protection dealer, at prevailing prices, for a pre-cleaning and re-application of the Exterior and Interior Protection products; (2) Submit this warranty document, proof of ownership, and the dealer's work order, showing the re-application of the Exterior and Interior Protection Products, to Warranty Administration Department at P.O. Box 5187; Downers Grove, IL 60517. **OUR OBLIGATIONS UNDER THIS WARRANTY EXTENSION ARE LIMITED TO INDUSTRY-STANDARD REPAIR AND RECONDITIONING METHODS AND DO NOT INCLUDE REPAINTING / COMPONENT REPLACEMENT.   THE WINDSHIELD PROTECTION PRODUCT WARRANTY IS NOT ELIGIBLE FOR RENEWAL.**

### CANCELLATION

This is a product warranty, included freely in the price of the appearance protection products purchased by **You**. It is, therefore, not cancellable.

### THIS WARRANTY BACKED BY INSURANCE

**Our obligations under this warranty are insured by a reimbursement insurance policy issued by Wesco Insurance Company; 59 Maiden Lane, 43rd Floor; New York, NY 10038. In the event We cease to operate, become bankrupt or fail to pay Your valid claim within sixty (60) days after proof of loss has been filed, You may file a direct claim with Wesco Insurance Company at 59 Maiden Lane, 43rd Floor; New York, NY 10038 or toll-free at 1-866-505-4048.**

### STATE AMENDMENTS AND DISCLOSURES

**GEORGIA:** Benefits under this limited warranty are limited to only those areas where protective product has been applied.

**HAWAII:** Unresolved complaints about a warrantor, or questions regarding the regulation of a warrantor, may be directed to the Hawaii Department of Commerce and Consumer Affairs, Insurance Division, at 1-808-586-2790.  **You** may also write to the Department at P.O. Box 3614; Honolulu, HI 96811.

**INDIANA:** This contract is not insurance and is not subject to Indiana insurance law.

**MASSACHUSETTS: ECP** Incorporated does business in Massachusetts as Entire Car Protection Incorporated.

**MISSISSIPPI:** Regulated by the Mississippi Motor Vehicle Commission; 1755 Lelia Drive, Suite 200; Jackson, MS 39236; 1-601-987-3995.

**MISSOURI:** Payment of the purchase price of the **Vehicle** protection products backed by this warranty is due to **Your** selling dealer at the time of purchase on the terms reached between the selling dealer and **You**.

**OREGON:** Unresolved complaints about a warrantor, or questions regarding the regulation of a warrantor, may be directed to the Department of Consumer and Business Services; Division of Financial Regulation.  **You** may contact the Consumer Advocacy Unit at 350 Winter Street SE; P.O. Box 14480; Salem, OR 97309-0405.  They may also be reached at 1-888-877-4894 or at dfr.oregon.gov.

### STATE AMENDMENTS AND DISCLOSURES

**VIRGINIA:** If any promise made in the contract has been denied or has not been honored within sixty (60) days after **Your** request, **You** may contact the Virginia Department of Agriculture and Consumer Services, Office of Charitable and Regulatory Programs at http://www.vdacs.virginia.gov/food-extended-service-contract-providers.shtml to file a complaint.

**WASHINGTON:** This agreement, issued by the warrantor is considered to be a Protection Product Guarantee subject to the requirements of Chapter 48.110RCW.  As a protection product guarantee holder, **You** are entitled to apply directly and without delay to the reimbursement insurance company for payment or performance due under the Agreement.

**WISCONSIN:** There is no limit on the number of environmental paint claims **You** may make during the term of this limited warranty.  There is also no limit on the number of times a factory-painted, treated exterior surface covered by this limited warranty will be repaired, as long as the value of all claims under this limited warranty remains within the limitations specified in this agreement.  **We** will pay for environmental paint repairs covered under this limited warranty, even if they are also eligible for service under a manufacturer's warranty.  In the event that **We** should require an inspection in connection with an environmental paint damage claim, **Your Vehicle** will be inspected within thirty (30) miles of the location of the selling dealer, unless **You** agree otherwise.  If **You** are a subsequent **Vehicle** owner and wish to transfer the coverage of this limited warranty to **You** within the limited warranty term, please submit this limited warranty document and a copy of **Your** title for this **Vehicle**, with **Your** name shown as the titled owner.

**This form not for use in New York.**

# Exhibit D

# PREMIER PROTECTION

F&I Code No.

| Issuing Dealer: | Name MERCEDES BENZ OF NORTH SCOTTSDALE | | Telephone 4809911155 | |
|---|---|---|---|---|
| | Address 18530 N SCOTTSDALE ROAD | City PHOENIX | State AZ | Zip 85054 |

**IMPORTANT: PLEASE TYPE OR PRINT**

| Owner Name: | Last Name DULCERIA LA BONITA WHOLESALE | First Name - Initial | | Contract Sale Date 2/8/2022 | |
|---|---|---|---|---|---|
| Address: | Street 2311 N 35TH AVE | | City PHOENIX | State AZ | Zip 85009 |
| Co-Owner Name | Last Name RAJABIAN | First Name - Initial ZAKIA | J | | |
| Co-Owner Address | Street 9682 N 139ST ST | | City SCOTTSDALE | State AZ | Zip 85009 |

| Vehicle: | 2021 | MERCEDES-BENZ | G-CLASS | W1NYC7HJ6MX410100 | | | |
|---|---|---|---|---|---|---|---|
| Lienholder: | Name MERCEDES-BENZ FINSERVUSA I | Address PO BOX 997542 | | City SACRAMENTO | State CA | Zip 95899 | Price $ 3,728.00 |

---

## PREMIER PROTECTION PACKAGE OPTIONS
*Cosmetic Alloy Wheel Repair Excludes Steel and Chrome Wheels*

☑ **Platinum Premier Protection**
- Tire Replacement and Wheel Repair or Replacement
- Cosmetic Alloy Wheel Repair
- Paintless Dent Repair
- Key Replacement
- Roadside Emergency Assistance

☐ **Gold Premier Protection**
- Tire Replacement and Wheel Repair or Replacement
- Cosmetic Alloy Wheel Repair
- Paintless Dent Repair
- Roadside Emergency Assistance

☐ **Silver Premier Protection**
- Tire Replacement and Wheel Repair or Replacement
- Cosmetic Alloy Wheel Repair
- Key Replacement
- Roadside Emergency Assistance

---

| INDIVIDUAL OPTIONS *Cannot be selected with package options. Select all that apply.* | TERM | VEHICLE INFORMATION |
|---|---|---|
| Roadside Emergency Assistance is included with all options. | ☐ 1 Year  ☐ 4 Year | ☐ New Vehicle |
| ☐ Tire Replacement and Wheel Repair or Replacement with Cosmetic Alloy Wheel Repair *Cosmetic Alloy Wheel Repair Excludes Steel and Chrome Wheels, No Replacement* | ☐ 2 Year  ☑ 5 Year | ☑ Certified Pre-Owned Vehicle |
| ☐ Paintless Dent Repair | ☐ 3 Year | ☐ Used Vehicle *(any Vehicle that has been previously titled)* |
| ☐ Key Replacement | | |

| | CLASS |
|---|---|
| | 12 (T/W)   See originating Dealer for class definition. |

## PROOF OF REGISTRATION

**CONTRACT DEFINITIONS:** (Obligor) "We", "Us," and "Our" refer to the obligor of this Contract, which is IAS Warranty, Inc., P.O. Box 204329, Austin, TX 78720; Phone: (800) 346-6469. "You," "Contract Holder," and "Your" refer to the purchaser of the Vehicle described as the Owner Name in the Proof of Registration section of this Contract above. Any other capitalized words and phrases that have particular meaning are defined in the "Definitions" Section herein.

We have retained an Administrator to provide administrative services on Our behalf. Should You have any questions concerning coverage or benefits under this Contract, You may call the Administrator: Innovative Aftermarket Systems L.P., P.O. Box 204329, Austin, TX 78720 at (800) 346-6469 for assistance. Please call (888) 822-6922 for roadside emergency assistance.

Definitions, coverage terms, exclusions, responsibilities, transfer information, and cancellations provisions, as well as details on filing a claim, are attached to this Proof of Registration. Specific state requirements may apply to Your Contract and are listed under "State Changes" Section, herein.

**By signing below, You acknowledge that** You have read and accept the provisions of this Contract as a complete statement of Your coverage and rights, and that You are not relying on any writings other than this Contract or any other representations or promises. You agree to maintain Your Vehicle according to the manufacturer's specifications. We will provide the coverage only to You for the Vehicle and for the term shown in the Proof of Registration section of this Contract. **The purchase of this Contract is not required to either purchase or obtain financing for the Vehicle.** This Contract is not an insurance policy. No deductible will apply to these benefits.

**Key Replacement Only:**
Additionally, I certify that I have received two (2) sets of master keys at the time of purchase. A valet key is not considered a master key.

| Owner / Authorized Signature | 2/8/2022 Date | Co-Owner / Authorized Signature | 2/8/2022 Date |
|---|---|---|---|
| Dealership Authorized Representative | 2/8/2022 Date | Contract # **10TDKVSCP MX410100** *(Last 8 digits of VIN)* | |

## PREMIER PROTECTION PACKAGES
### Note: Each coverage option is only available if you have elected to purchase that coverage.

**Platinum Premier Protection includes:** Tire Replacement and Wheel Repair or Replacement with Cosmetic Alloy Wheel Repair, Paintless Dent Repair, Key Replacement, and Roadside Emergency Assistance

**Gold Premier Protection includes:** Tire Replacement and Wheel Repair or Replacement with Cosmetic Alloy Wheel Repair, Paintless Dent Repair, and Roadside Emergency Assistance

**Silver Premier Protection includes:** Tire Replacement and Wheel Repair or Replacement with Cosmetic Alloy Wheel Repair, Key Replacement, and Roadside Emergency Assistance

## TIRE REPLACEMENT & WHEEL REPAIR OR REPLACEMENT WITH COSMETIC ALLOY WHEEL REPAIR
### Note: Each coverage option is only available if you have elected to purchase that coverage.

<u>**Agreement Between You and Us**</u>
We agree to pay You or a licensed repair facility for the fair market value Costs to replace the original tires and repair or replace wheel equipment of Your Vehicle that fail due to contact with a Road Hazard. We agree to pay for Alloy Wheel Repair **(Note: If the cosmetic damage to the wheel is unable to be repaired through normal cosmetic repair procedures, the wheel will not be replaced.)** We agree to pay up to $35 per day to a maximum of $105 for rental car service reimbursement, as specified in this Contract.

<u>**Tire and Wheel Coverage**</u>
We will pay for Costs **to replace the original tires and repair or replace wheels equipment of Your Vehicle that fail due to contact with a Road Hazard** (pothole or debris on the road surface such as a nail, rock or tree limb) with like kind and quality replacement tires and/or wheels. **Note: Road conditions (for example, uneven lanes due to repaving or metal plates used to temporarily cover a hole in the road) found in areas designated as construction zones or construction sites will not be considered a covered Road Hazard.** Damage from these conditions or any accident should be reported to Your automobile physical damage insurance company. This Contract will cover the replacement of the TPMS if it is damaged by a Road Hazard. **TPMS damaged while removing the tire or wheel from Your Vehicle is not covered. Coverage is limited to the manufacturer's original equipment tires and wheels or comparable or like replacements as deemed necessary by Our Administrator. Tires are eligible for replacement down to three/thirty-seconds of an inch (3/32") tread depth.** Wheels will be repaired whenever possible when damaged due to a covered Road Hazard. Wheels are eligible for replacement only if the damage from a Road Hazard will not allow the tire to seal or the wheel is unsafe for use. Coverage also includes the cost of mounting, balancing, valve stems, and taxes for any tire replaced under this Contract. **Upon prior authorization, You will be reimbursed up to $35 per day to a maximum of $105 for rental car expenses incurred during a claim. This coverage begins on the Contract Sale Date and expires at the end of the Contract term listed on the Proof of Registration Section of this Contract. Special Provisions relating to Aftermarket Wheels:** In the event the Vehicle has damage to an aftermarket wheel, please be advised that it may not be possible for the repair facility to locate an exact matching replacement wheel. Aftermarket wheels are generally discontinued after a certain time period. It is the responsibility of the repair facility (or the customer) to locate a replacement. If a matching replacement cannot be found a cash settlement will be made to the Contract Holder in the amount for which the original damaged wheel was purchased. Contract Holder's coverage includes the repair of cosmetic damage only to Alloy Wheels (See "Definitions" Section herein for the definition of Alloy Wheel Repair.) Due to aging and variance in Alloy Wheel color and texture, it is not always possible to match colors or texture to the other Alloy Wheels, so an exact color or texture match is not guaranteed. **Repair to traditional steel wheels and chrome wheels are excluded under this Contract.**

<u>**MA, MT, NJ, ND, PA, SD, VT Residents Only**</u>
Tire and Wheel Coverage is amended to include coverage due to normal wear and tear.

<u>**CT Residents Only**</u>
Tire and Wheel Coverage is amended to include coverage due to defect in material and workmanship.

<u>**Tire and Wheel Non-Covered Parts and Expenses not Covered by this Contract**</u>
1. **Shop supplies**
2. **Recapped tires**
3. **Shipping and surcharges**
4. **Normal wear (Except in MA, MT, NJ, ND, PA, SD, VT)**
5. **Damage due to dry rot**
6. **Vandalism**
7. **Acts of God, floods or fires**
8. **Manufacturer defects (Except in CT)**
9. **Vehicles involved in an accident**
10. **Environmental or disposal charges**
11. **Snow tire mounting or removal of snow tires or chains**
12. **Alignments or mechanical adjustments to the Vehicle**
13. **Tire or wheel failure outside the United States and Canada**
14. **Racing tires and driving on unpaved roads**
15. **Commercial Vehicles**
16. **Abnormal wear caused by misalignment or suspension problems**

## YOU MUST RECEIVE PRIOR AUTHORIZATION FROM THE CLAIMS CENTER BEFORE ANY REPAIR OR REPLACEMENT HAS BEGUN: 1-800-346-6469

## TIRE REPLACEMENT & WHEEL REPAIR OR REPLACEMENT WITH COSMETIC ALLOY WHEEL REPAIR
Note: Each coverage option is only available if you have elected to purchase that coverage.

17. Tires and wheels that do not meet factory specifications
18. Wheel locks and/or any additional expense caused by wheel locks
19. Tires with less than 3/32" tread depth - NOTE: tread depth measurements are taken in 3 positions: inner, outer, and middle position; any measurement below 3/32" excludes tire from coverage
20. Scheduled maintenance such as tire rotation and balancing when a failure caused by a Road Hazard has not occurred
21. Coverage under this Contract is secondary to any other tire warranty which provides coverage to the Vehicle's tires (including Vehicle Manufacturer Warranties or replacement tires, Road Hazard warranties provided by tire sellers, etc.)
22. TPMS damaged while removing the tire or wheel from Your Vehicle
23. Charges for filling tires with nitrogen
24. Damages caused by operator error or vandalism
25. Any wheel(s) composed in whole, or in significant amount, of any composite material including, but not limited to, carbon fiber reinforced polymer/plastic, carbon fiber reinforced thermoplastic, carbon fiber, carbon composite, glass fiber reinforced plastic, and magnesium
26. Sidewall damage
27. Damage caused by impact with curb, except for Cosmetic Alloy Wheel Repair

### Tire and Wheel Exclusions
1. Any tire or wheel damage which is covered by the Contract Holder's primary insurance coverage
2. Any repairs or replacements not authorized by the Administrator
3. Any replacements covered by a Manufacturer's Warranty or recall
4. Pre-existing conditions, peeling paint, normal wear, damage due to collision (other than Road Hazard covered by this Contract), overloading, dry rot, fire, flood, vandalism, acts of God, abnormal wear or damage from improper alignment or failure of suspension components, damage from off-road usage, racing tires, re-treaded, re-grooved or recapped tires, tires with less than 3/32" remaining tread depth – Note: Tread depth measurements are taken in 3 positions: inner, outer, and middle position; any measurement below 3/32" excludes tire from coverage), Commercial Vehicles
5. Damage to other parts of Your Vehicle caused by improper repairs, installation, mounting or balancing as well as repairs performed in a manner that does not comply with manufacturer's guidelines
6. Cosmetic damage to tires and/or wheels such as scuffing or discoloration due to car wash damage
7. Any damage resulting from continued operation or caused by Your failure to take reasonable precautions to protect from further damage when an apparent problem exists
8. Damage or wear to tires caused by Vehicle modifications that do not comply with the Vehicle manufacturer's specifications
9. Tires transferred from Your Vehicle to another motor vehicle
10. Any expense for the modification, replacement, or alteration of existing parts or systems necessitated by the replacement of obsolete, superseded or unavailable parts with current replacement parts in excess of the value of the failed part
11. Any repair or replacement of any covered component or part which has <u>not</u> failed due to contact with a Road Hazard as defined in this Contract, but which the repair facility or manufacturer recommends or requires to be repaired or replaced such as, but not limited to, matching sets of tires or wheels
12. Tire, wheel, and benefit coverages on this Contract are <u>not</u> extended to a vehicle attached to Your Vehicle such as a trailer or vehicle in tow.
13. Any loss or consequential damage, including physical damage, personal injury or death, or property damage, which results from the failure of a tire or wheel covered by this Contract due to a contact with a Road Hazard
14. Hubcaps, center caps, and wheel covers
15. Alloy Wheel Repair to an Alloy Wheel that is dented or bent from contact resulting in suspension, body, or frame damage
16. Cosmetic repairs to traditional steel wheels and chrome wheels
17. Replacement of Alloy Wheel where the damage to the wheel is too great to be repaired, but a technician determines the wheel is still sealing with the tire, unless deemed unsafe by Service Center

### Tire and Wheel Claim Procedure
Please call **(800) 346-6469** for instructions on filing a claim. **You must contact Our Service Center during the hours of 8:00 AM and 5:00 PM CST at (800) 346-6469 for authorization prior to any tire or wheel repairs or replacements.** Our Administrator reserves the right to inspect or require photographs of any tire or wheel failure prior to claim authorization. The Administrator has the right to require that the Vehicle be present during inspection. **In the event the damaged tire or wheel is not available for inspection, there will be no claim benefit payable.** In the event of a weekend or after-hours repair, please contact Our Service Center as soon as the office re-opens for authorization on submitting a claim for reimbursement. Documents to complete claim processing must be received by the Administrator within 180 days of the date of the claim or the claim will be void and no payment will be issued.

## PAINTLESS DENT REPAIR
Note: Each coverage option is only available if you have elected to purchase that coverage.

### Agreement Between You and Us
We agree to pay You or a licensed repair facility for the fair market value Costs to repair any minor dents/dings.

## YOU MUST RECEIVE PRIOR AUTHORIZATION FROM THE CLAIMS CENTER BEFORE ANY REPAIR OR REPLACEMENT HAS BEGUN: 1-800-346-6469

## PAINTLESS DENT REPAIR
### Note: Each coverage option is only available if you have elected to purchase that coverage.

#### Dent and Ding Coverage

Repair of any minor dents or dings on this Vehicle that are repairable through existing Paintless Dent Repair (PDR) techniques, subject to the limitations and exclusions contained in this Contract. Dent Repairable Areas are defined as and limited to exterior vertical and horizontal painted sheet metal body panels. Most small dents and dings can be removed and in most cases a completed repair will not be noticeable. **Collision damage or very deep dents will most likely require traditional body shop repairs and are not covered conditions under this Contract.** A PDR technician will examine the damaged area prior to performing PDR to determine if the dent(s) can be repaired. You may seek a second opinion. **In the event any qualified PDR provider repairs damage that We deemed unrepairable, We will pay that PDR provider for Your repairs if the PDR provider used only PDR processes to make the repair and received Our authorization prior to making the repair.** Access Areas: In order to obtain access to certain dented areas, drilling a small hole may be required. Any drilled holes will be small, out of direct view and plugged. Dent Location: Access may not allow some dents to be fixed, due to the location of the dent. Examples of these areas are: Creases: A crease or bend in some dents will not allow a dent to be repaired under this process because the metal is creased or bent too far; Body Lines: Some curves in auto panels will prevent metal from flexing to massage the dent out, and conventional body shop repairs must be utilized; Edges: Damage on the edge of an auto body panel may not allow a dent to be removed because bracing can be too thick to allow the metal to be pushed and/or can prohibit access to the dent; Size of Dent: A large or deep dent will stretch the metal too far, not allowing the metal to retract back. **This type of damage is not repairable under the PDR process, and requires typical body shop repair: Dents exceeding 4" are considered non-repairable;** Aftermarket: Custom aftermarket services or equipment installed may not allow a technician to access the dent. **We cannot repair areas in which aftermarket services or equipment have changed the normal body configuration or eliminate normal access to the area using the special tools utilized during the PDR process.** Horizontal Panel Coverage Limits: As long as the proper procedures are followed, up to $75 reimbursement per occurrence - maximum $300 reimbursement, within the Contract period for the term indicated on the Proof of Registration page. Vertical Panel Coverage Limits: As long as the proper procedures are followed, there are no limitations as to the number of times the PDR process can be used within the Contract period for the term indicated on the Proof of Registration page. Reimbursement will be at fair market value.

#### MA, MT, NJ, ND, PA, SD, VT Residents Only
**Dent and Ding Coverage is amended to include coverage due to normal wear and tear.**

#### CT Residents Only
**Dent and Ding Coverage is amended to include coverage due to defect in material and workmanship.**

#### Dent and Ding Exclusions
1. **Hail damage, consequential damage, chipped paint, vandalism, collision and environmental damage, and pre-existing conditions**

#### Dent and Ding Claim Procedure

To make a claim for dent removal, return Your Vehicle to the Issuing Dealer or repair facility. A PDR technician will inspect the Vehicle and determine whether any dent damage is covered by the Contract and provide appropriate services as described herein. You must present to Us a copy of this Contract (all pages) that You received from the Issuing Dealer, along with Your current address and telephone number. The Administrator reserves the right to inspect any Vehicle and/or request relocation to a service facility of the Administrator's choice. **Do not proceed with any repairs yourself without approval from the Administrator at P.O. Box 204329, Austin, TX 78720.** Documents to complete claim processing must be received by the Administrator within 180 days of the date of the claim or the claim will be void and no payment will be issued.

## KEY REPLACEMENT
### Note: Each coverage option is only available if you have elected to purchase that coverage.

#### Agreement Between You and Us
We agree to pay You or a licensed repair facility up to the Manufacturer's Suggested Retail Price (MSRP) to replace Your Eligible Key if lost, stolen, or destroyed.

#### Key Replacement Coverage
In the event Your Eligible Key is lost, stolen or destroyed, the Administrator will pay for a replacement key in the amount of and not to exceed $799 per year. Prior authorization required for key replacement. Call **(800) 346-6469** to register claim. The Administrator reserves the right to use "like kind and quality" replacements for lost or damaged keys. **Your coverage begins on the Contract Sale Date and expires at the end of the Contract term listed on the Proof of Registration Section of this Contract.**

#### Key Replacement Exclusions
1. **Any replacement key made without the Administrator's prior authorization**
2. **Any key repair or replacement covered by warranty, recall, or acknowledgement of responsibility issued by the manufacturer of the Eligible Key to be replaced**
3. **Any damages or loss whatsoever, whether consequential, direct or otherwise, resulting from the failure or loss of a programmed key**
4. **Valet keys**
5. **Aftermarket devices (such as remote start)**

#### Key Replacement Claim Procedure
To obtain key replacement benefits under this Contract, You must comply with the following conditions: **All requests for key replacement must be reported to the Key Service Center before any replacement is begun.** Key Service Center: P.O. Box 204329, Austin, TX 78720; **(800) 346-6469**. If you return to the originating Dealer for key replacement, You are not responsible for any out of pocket expense other than Costs in excess of their yearly limit of $799. All non-

## YOU MUST RECEIVE PRIOR AUTHORIZATION FROM THE CLAIMS CENTER
## BEFORE ANY REPAIR OR REPLACEMENT HAS BEGUN: 1-800-346-6469

# Exhibit E

# 2021


**ADOT**
Motor Vehicle Division

# MERZ

# 03/25/2022

# 733968B

## ARIZONA TEMPORARY LICENSE PLATE

**DEALER NAME: PAG NORTH SCOTTS**

**DEALER NUMBER: L00014823**

**VIN: W1NYC7HJ6MX410100**

**ISSUE DATE: 02/08/2022**

The owner or operators of the vehicle shall display this
so it is clearly visible from outside of vehicle.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please cut here. Do not tear.

**ADOT**
Motor Vehicle Division

**ARIZONA TEMPORARY VEHICLE REGISTRATION**

**Expiration Date**
**03/25/2022**

**DULCERIA LA BONITA WHO**

1232 E SOUTHERN AVE 112

MESA      AZ      85204

**Permit Number**
733968B

**Permit Type**
45 day TRP

**SAR**
Effective/End Date      Weight

**Year/Make**
2021   Mercedes-Benz

**Model**
G

**VIN**
W1NYC7HJ6MX410100

**Issue Date**
02/08/2022

**Registration Usage**
Truck

**GVW**

**CARRY IN VEHICLE AT ALL TIMES**

azmvdnow.az.gov

# Exhibit F

Contract Number AZ 6017560

# Mercedes-Benz Star Prepaid Maintenance Application For Coverage

Mercedes-Benz USA, LLC
One Mercedes-Benz Drive
Sandy Springs, GA 30328-4201
Phone: (800) 367-6372

| | | |
|---|---|---|
| DULCERIA LA BONITA | | 03123 |
| WHOLESALE | | Dealer Code |
| Purchaser Last Name | First | PAG NORTH SCOTTSDALE M1, LLC |
| | | Dealer Name |
| 2311 N 35TH AVE | | MERCEDES-BENZ OF NORTH SCOTTSDALE |
| Address | | D/B/A |
| PHOENIX | AZ | PHOENIX | AZ |
| City | State | Dealer City | State |
| | | |

| | | | | | |
|---|---|---|---|---|---|
| PHOENIX | AZ | 850091417 | 248-881 3233 | | |
| City | State | Zip | Phone | | |
| | | | | SACRAMENTO | CA | 95899 | |
| | | | | City | State | Zip | Phone |

MERCEDES-BENZ FINSERV USA LLC
Lienholder Name

PO BOX 997542
Address

W1NYC7HJ6MX410100
Vehicle Identification Number

| | | | |
|---|---|---|---|
| 02/08/2022 | | | |
| New Vehicle Retail Date | G63W4 | 2021 | CurrentMileage 3,695 |
| | Model | Model Year | |

Original New Vehicle In-Service/Warranty Start Date:   Month 11   Day 05   Year 2021

STR PPMSC-3 Services   $2,490   $0.00   $2,490
Agreement Type/Term**   Purchase Price   + Sales Tax   = Total Purchase Price

Agreement End Date***:   Month 02   Day 09   Year 2025

Customer Signature   02/10/2022   Dealer Representative Signature   MONTGOMERY, DON SCOTT   02/10/2022
Date   Representative Name   Date

☑ This checkbox indicates you are providing the equivalent of your signature and indicating your intent to enter into this agreement upon acceptance.

This is an application for coverage which is subject to approval and acceptance by Mercedes-Benz USA, LLC (MBUSA). This Mercedes-Benz Prepaid Maintenance Agreement is as indicated above between the Purchaser and MBUSA. In order to claim benefits under the terms of the Mercedes-Benz Prepaid Maintenance Agreement, you must follow the set forth below. You hereby declare that you have fully read the terms of the Mercedes-Benz Prepaid Maintenance Agreement and accept all of the conditions therein. There is no obligation to purchase a Mercedes-Benz Prepaid Maintenance Agreement for the vehicle other than those expressly contained in the Mercedes-Benz Prepaid Maintenance Agreement. The purchase of the Prepaid Maintenance Agreement is not required in order to purchase or obtain financing for a motor vehicle.

MBUSA-PASS-SPPMA-0916.B

02/10/2022 14:34:15 EST

Page 1

# 1. BACKGROUND

1.1. **TO BE ELIGIBLE FOR THE PURCHASE OF THIS AGREEMENT, THE COVERED VEHICLE MUST BE A MERCEDES-BENZ PASSENGER VEHICLE, EIGHT (8) MODEL YEARS OLD OR NEWER, AND HAVE LESS THAN 80,000 TOTAL MILES.**

1.2. **THE PURCHASER UNDERSTANDS AND AGREES THAT THIS AGREEMENT IS NOT A POLICY OR CONTRACT OF INSURANCE, AND THAT THE PURCHASE OF THIS AGREEMENT IS NOT REQUIRED IN ORDER TO PURCHASE OR OBTAIN FINANCING FOR A MOTOR VEHICLE.**

1.3. Agreement Territory:

1.3.1. This Mercedes-Benz Prepaid Maintenance Agreement (this "Agreement") applies only to repairs to the Vehicle occurring within the United States and Puerto Rico and covered by this Agreement.

1.4. Coverage under this Agreement (the "Term"):

1.4.1. begins on the Agreement Start Date, as indicated on page 1.

1.4.2. expires when all service intervals purchased, as indicated on Agreement Type/Term on page 1, have been performed, or on the Agreement End Date, whichever occurs first.

1.5. This Agreement is not valid for use in connection with Mercedes-Benz SLS and SLR vehicles.

1.6. This Agreement may be cancelled by MBUSA if the vehicle does not meet the eligibility guidelines stated herein.

# 2. DEFINITIONS

2.1. **We, Us, and Our:** Mercedes-Benz USA, LLC (MBUSA), the party obligated to provide the services under this Agreement. One Mercedes-Benz Drive, Sandy Springs, GA 30328-4201; 1-800-FOR-MERCEDES (1-800-367-6372).

2.2. **You, your and Purchaser:** The party indicated as the "Purchaser" on page 1.

2.3. **Authorized Dealer:** Any authorized Mercedes- Benz Dealership in the United States and Puerto Rico of the owner's choice.

2.4. **Selling Dealer:** The Authorized Mercedes-Benz Dealership from which you purchased this Agreement.

2.5. **Private Party Purchaser:** Any subsequent purchaser of the Vehicle other than a Motor Vehicle Dealer or Authorized Mercedes-Benz Dealer, or a person actively engaged in the business of buying, selling, or exchanging vehicles.

2.6. **No Charge:** Mercedes-Benz Prepaid Maintenance services will be provided at no charge for parts, labor or diagnostic operations which are directly related to the Agreement coverage.

2.7. **Maintenance Booklet:** Manufacturer's manual containing maintenance work information utilized for the Vehicle's specific model, age, or mileage.

2.8. **Vehicle or Motor Vehicle:** The Mercedes-Benz passenger Vehicle specified on page 1.

# 3. WHAT IS COVERED BY THIS AGREEMENT

3.1. Routine ("required") maintenance services contained in the Maintenance Booklet.

3.2. Term coverage for the service intervals as defined on page 1.

3.3. The number of service intervals indicated on page 1 dictates the number of service intervals included, either two (2) or three (3) service intervals.

3.4. Most routine maintenance services are required to occur either: (a) every 12 months; or (b) every 10,000 miles, whichever occurs first.

3.5. Failure to perform routine maintenance services as close to the specified service intervals as possible, in sequential order, may result in services covered under this Agreement being denied.

3.6. All service-related functions must be performed by personnel of any Authorized Dealer in the United States or Puerto Rico.

3.7. If an Authorized Dealer has failed to perform the requested maintenance services as described in the Maintenance Booklet, please contact the Mercedes-Benz Customer Assistance Center at 1-800-FOR-MERCEDES (1-800-367-6372) or refer to the Maintenance Booklet.

3.8. MBUSA reserves the right to make changes to maintenance service requirements as listed in the Maintenance Booklet.

## 4. WHAT IS NOT COVERED BY THIS AGREEMENT

4.1. **ALL ITEMS OR COSTS NOT SPECIFICALLY IDENTIFIED AS COVERED BY THIS AGREEMENT AND WHICH ARE NOT LISTED IN YOUR MAINTENANCE BOOKLET ARE NOT COVERED.**

4.2. **ANY WEAR ITEMS, REPLACEMENT OF PARTS OR ADDITIONAL DEALER-RECOMMENDED SERVICE NOT SPECIFICALLY IDENTIFIED HEREIN ARE NOT COVERED.**

4.3. **ELECTRIC-DRIVE VEHICLES:** Maintenance, service or replacement of/to the lithium ion battery or electric powertrain, or any components thereof, for electric-drive vehicles.

4.4. **SERVICES AT NON-AUTHORIZED DEALERS:** Otherwise covered maintenance services when the prescribed service is not performed by an Authorized Dealer.

4.5. **CONSEQUENTIAL DAMAGES:** Any consequential or secondary damages that may be suffered as a result of the need to repair or replace a part except to the extent coverage of such damage is required by the state whose law governs this Agreement.

4.6. **ALTERED ODOMETER:** Any Vehicle on which the odometer has been altered and the actual mileage cannot be determined.

4.7. Any repairs to or mechanical breakdowns of the Vehicle, whether associated with or not associated with a prescribed maintenance service.

4.8. Loss of use of the Vehicle.

4.9. Damages arising from your failure to have prescribed maintenance performed in accordance with the maintenance schedule.

4.10. Claims where the procedures for obtaining the prescribed maintenance service, as described under the "How to Obtain Service" section below are not followed.

4.11. Services that fall outside of the purchased sequence for redemption, based on vehicle mileage and service history at the time of contract purchase, and number of services acquired in the contract plan.

## 5. LIABILITIES AND LIMITATIONS

5.1. The performance of work for prescribed maintenance services as stated under this Agreement is the only remedy available under this Agreement.

5.2. **MBUSA WILL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE UNDER THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, LIABILITY FOR INJURY, LOSS OF LIFE, PROPERTY DAMAGE, LOSS OF USE, LOSS OF TIME, INCONVENIENCE OR COMMERCIAL LOSS, OR BREACH OF IMPLIED OR EXPRESSED WARRANTIES. ANY AND ALL SUCH LIABILITY IS EXPRESSLY EXCLUDED.**

5.3. **LIABILITY FROM USE OF THE VEHICLE:** Liability for damage to property or injury or death of any person arising out of the operation, maintenance, or use of the Vehicle, whether or not related to the prescribed services, is not covered by this Agreement.

5.4. **TAXES:** Any and all taxes required on services under this Agreement, including taxes prescribed by law, are not covered by this Agreement.

5.5. **PURCHASER AGREES AND UNDERSTANDS THAT THE LIABILITY OF MBUSA UNDER THIS AGREEMENT OR OTHERWISE FOR ANY ONE MAINTENANCE SERVICE INTERVAL SHALL NOT EXCEED THE RETAIL VALUE OF THE REQUIRED MAINTENANCE SERVICE AS RECOMMENDED BY MBUSA IN THE MAINTENANCE BOOKLET.**

5.6. **THE MAXIMUM LIABILITY OF MBUSA FOR THE ENTIRE TERM OF THIS AGREEMENT SHALL NOT EXCEED THE AGGREGATE RETAIL VALUE OF ALL REQUIRED MAINTENANCE SERVICES AS RECOMMENDED BY MBUSA IN THE MAINTENANCE BOOKLET THAT OCCURS DURING THE TERM OF THIS AGREEMENT.**

## 6. HOW TO OBTAIN SERVICE

6.1. Contact your Selling Dealer, or Any Authorized Dealer in the United States and Puerto Rico of the owner's choice, all of whom can perform Mercedes-Benz Prepaid Maintenance services.

6.1.1. Schedule an appointment for the appropriate Vehicle service.

6.1.2. Bring the Vehicle along with the Maintenance Booklet and this Agreement to your Selling Dealer, or any Authorized Dealer.

6.1.3. Sign the repair order upon completion of all repairs and replacements.

6.1.4. Pay for any non-covered services and/or parts and taxes, if applicable.

6.2. The Vehicle should be delivered to the Authorized Dealer during normal service hours. A reasonable time should be allowed after taking the

Vehicle to the Authorized Dealer for performance of the Mercedes-Benz Prepaid Maintenance services.

6.3. If you require assistance in locating an Authorized Dealer, please call the Mercedes-Benz Customer Assistance Center toll-free at 1-800-FOR-MERCEDES (1-800-367-6372) or visit the following website: https://www.mbusa.com/mercedes/dealers/locator.

# 7. CANCELLATION

7.1. Subject to any specific exclusions or limitations applicable under State law, **THIS AGREEMENT CANNOT BE CANCELLED BY THE PURCHASER AND IS NON-REFUNDABLE.**

7.2. If you have not paid for this Agreement in full and a lien is outstanding against the Vehicle and/or this Agreement itself, any permitted cancellation refund under State law will be made payable to the Lienholder/Lessor.

7.3. Should the Vehicle be repossessed, any cancellation rights hereunder shall transfer to the Lienholder/Lessor as its interest may appear, and the Selling Dealer, or any Authorized Mercedes-Benz Dealer, agrees to effect cancellation at such Lienholder's/Lessor's request only pursuant to the terms of cancellation as applicable.

# 8. TRANSFER

8.1. This Agreement's benefits may only be transferred by the original Purchaser to a Private Party Purchaser (the approved transferee) to whom you sell the vehicle. This can be done only if the Private Party Purchaser presents the Selling Dealer, or any Authorized Dealer, with proof of ownership for the Vehicle and a copy of this Agreement.

8.2. **THIS AGREEMENT MAY NOT BE TRANSFERRED TO ANOTHER VEHICLE.**

# 9. STATE SPECIFIC AMENDMENTS TO THIS AGREEMENT

9.1. **CALIFORNIA:** If you purchased this Agreement in California, this Agreement is amended for the specific provisions indicated below only,

which supersede any other applicable provision herein. All other terms and conditions of this Agreement remaining unchanged:

9.1.1. We have the burden of proving a claim is not covered by the Agreement.

9.1.2. You may cancel this Agreement at any time by submitting to the Selling Dealer or any Authorized Dealer proof of ownership for the Vehicle and a completed written Cancellation Form, which is available from the Selling Dealer or any Authorized Dealer.

9.1.3. If this Agreement is cancelled prior to the date coverage begins, or within the first sixty (60) days after coverage begins, and no services have been rendered under this Agreement, the entire Agreement price will be refunded by the Selling Dealer.

9.1.4. If within the first sixty (60) days the Vehicle has received service under this Agreement, the Selling Dealer shall issue a refund equal to the Total Purchase Price minus the cost of any services received under this Agreement.

9.1.5. If the Agreement has been in effect more than sixty (60) days, the Selling Dealer will refund an amount of the Agreement purchase price according to the pro-rata method reflecting the greater of the Agreement days in force or the miles driven based on the term/miles selected and the date coverage begins, less the amount of any claims paid under this Agreement.

9.1.6. If You cancel this Agreement, cancellation is effective immediately and this Agreement will not be reinstated.

9.1.7. If We cancel this Agreement, a notice of cancellation will be mailed to you listing the reason for cancellation. The Agreement ceases to be valid no less than five (5) days after the postmark date of such notice.

9.1.8. After this Agreement has been in effect for more than sixty (60) days, we may only cancel this Agreement for non-payment, fraud, or material misrepresentation.

9.1.9. Cancellation due to fraud or material misrepresentation is effective immediately.

9.1.10. In the event of cancellation by either party, any servicing approved prior to the cancellation date will be honored and/or reviewed for Coverage under the terms of the Agreement.

9.1.11. Any cancellation refund will be paid within thirty (30) days of the cancellation.

9.1.12. If any promise made in this Agreement has been denied or has not been honored within sixty (60) days after your request, you may contact the California Department of Insurance at 1-800-927-4357 or access the department's Internet Web site at (www.insurance.ca.gov).

9.1.13. Prior to the initiation of formal dispute resolution procedures, the Parties shall first attempt to resolve their dispute informally and agree to meet and confer in good faith on any matter of controversy, claim, or dispute arising under or relating to this Agreement or a breach thereof (each, a Dispute). If the Parties cannot resolve the Dispute within thirty (30) days or such shorter period required for its resolution, then either Party may exercise any legal and equitable right at its disposal.

**ALL OBLIGATIONS UNDER THIS AGREEMENT ARE BACKED BY THE FULL FAITH AND CREDIT OF THE PROVIDER AND OBLIGOR, MBUSA, AND ARE NOT GUARANTEED UNDER A SERVICE CONTRACT REIMBURSEMENT POLICY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS AGREEMENT, PLEASE CONSULT YOUR AUTHORIZED MERCEDES-BENZ DEALER, OR CONTACT MBUSA AT 1-800-FOR-MERCEDES (1-800-367-6732).**

MBUSA-PASS SPPM-2019.9

# Exhibit G

# CUBESMART® self storage

Effective Date:          2/10/2022

## ARIZONA SELF-STORAGE RENTAL AGREEMENT ("AGREEMENT")

This Agreement includes the terms, conditions and agreements contained herein as well as the Rules and Regulations located at https://www.cubesmart.com/legal/rulesandregulations/ and any addendums executed in connection with this Agreement. Customer (identified below) promises, acknowledges, and agrees with CubeSmart Management, LLC in its capacity as manager for the record owner of the Store ("Operator") as follows:

## CUSTOMER INFORMATION:

| | | | |
|---|---|---|---|
| Name ("Customer"): | Jackie Raja | Phone Number: | (248) 881-3233 |
| Date of Birth: | 2/2/1981 | Alternate Phone Number: | |
| Address: | | Email *(Customer recognizes and agrees that **all** notices* | |
| | 9682 N 131st ST, Scottsdale, AZ 85259 | *may be sent to this email)* | jackie.goodyear@yahoo.com |
| Military Member: | ☐ Yes ☒ No | End of Active Service Date: | |

| | | | |
|---|---|---|---|
| Customer represents and warrants that no party has a lien on or security interest in the items stored in the Cube; except for the following "Lienholders" *(if blank then no Lienholders; contact Operator immediately of any additional Lienholders):* | 1) | Lienholder Name: | |
| | | Lienholder Address: | |
| | 2) | Lienholder Name: | |
| | | Lienholder Address: | |

## RENTAL INFORMATION:

| | | | |
|---|---|---|---|
| Storage Cube Number ("Cube"): | 2300 | Approximate Cube Size: | 10x20x8 |
| Store Address("Store"): | 11000 N 115th St, Scottsdale, AZ 85259 | Rental Term ("Term"): | Month to Month starting on the Effective Date |
| | | Monthly Rent Due Date: | On or before the 10 day of each month |
| | | Monthly Rent Amount ("Monthly Rent"): | $223.60 |
| Store Phone #: | (480) 314-2100 | SureSmart Protection Plan Payment, if any: | $0.00 |
| Store Email: | STORE0349@CUBESMART.COM | Monthly Invoice Fee, if any: | $0.00 |
| Move-In Promotion, if any: | 35% Off | Disc or cylinder lock: | yes |
| **Total Monthly Amount Due (plus any taxes):** | **$228.63** | | |

## FEES:

| | | | |
|---|---|---|---|
| Administrative Rental Fee: | $24.00 at signing. | Insufficient Funds Fee: | $30.00 if a check, ACH, credit card, or other payment is reversed, returned, or refused. |
| Administrative Invoice Fee: | $1.00 per month on the Monthly Rent Due Date. | Late Fee: | **Greater of $10.00 or 20% of the Monthly Rent if Monthly Rent is not received by the 11th day after it became due.** |
| Administrative Lien Fee: | $110.00 if Monthly Rent is not received by the 30th day after it became due. | | |

**PLEASE NOTE THAT PARAGRAPHS 20 AND 21 OF THIS AGREEMENT CONTAIN IMPORTANT PROVISIONS THAT REQUIRE YOU TO RESOLVE ANY DISPUTE WITH OPERATOR THROUGH BINDING ARBITRATION ON AN INDIVIDUAL BASIS AND WAIVE YOUR RIGHT TO HAVE ANY DISPUTE WITH OPERATOR DECIDED BY A COURT.**

## AUTOMATIC PAYMENT AUTHORIZATION:

Customer authorizes Operator to automatically charge or debit Customer's designated credit card/debit card or bank account, as applicable, for the Monthly Amount Due on Customer's monthly bill (the "Automatic Payments"). Automatic Payments will be made on the date that is specified in Customer's monthly bill, which Operator will provide at least ten (10) days in advance of the Automatic Payments date. Customer understands that when the date for Automatic Payments falls on a weekend or holiday, Operator will process Automatic Payments on the next business day. Customer authorizes Operator to treat Customer's electronic signature as evidence of Customer's consent to save Customer's payment information and initiate electronic payment transactions from Customer's designated bank, debit card, or credit card account. Customer's authorization via electronic signature has the same effect as a handwritten signature on a paper-formatted agreement. Operator is not liable for erroneous bill statements or incorrect debits or charges. If a billing error occurs, Operator is responsible for correcting such error if and when Customer notifies Operator of the error in accordance with the notice provisions of this Agreement. To cancel Automatic Payments, Customer must deliver written notice of cancellation to Operator at least 10 days before the next billing cycle in accordance with the notice provisions of this Agreement. Customer's participation in Automatic Payments is subject to Operator's approval. Operator and participating

financial institutions reserve the right to terminate Customer's participation in Automatic Payments at any time, as authorized by applicable law. Operator does not impose a fee for participating in Automatic Payments. Customer should verify with Customer's financial institution to determine if additional charges to participate in Automatic Payments apply.

Customer is an authorized user of the credit card provided to Operator for the Automatic Payments ("Credit Card") or is an authorized signer for direct payments from the bank account provided for the Automatic Payments ("Bank Account"). If Customer elects to use a Bank Account, Customer authorizes the bank named above to debit Automatic Payments from the Bank Account. It is Customer's sole responsibility to update the above Credit Card or Bank Account information with Operator, as necessary. If the Credit Card is declined for any reason (including its expiration) or a debit is returned for insufficient funds, Customer will be responsible for all fees set forth in this Agreement that result from the late, insufficient funds, or non-payment of amounts due under this Agreement. If the Credit Card is declined or a Bank Account debit is returned for any reason, Operator may, at its option, cease automatic debits from the Bank Account or charges to the Credit Card and require that Customer pay all amounts due under this Agreement by cash, check or otherwise. Automatic Payments from a Bank Account may take up to 45 days to start, and as such Customer should continue to make payments by an alternate payment method until Customer is notified that Automatic Payments have begun.

Customer Signature:

**TERMS AND CONDITIONS:**

1. Cube. Customer has examined the Cube and Store and rents the Cube ("Cube") for the Term in "as-is" condition. The measurements of the Cube are an approximation only and do not refer to usable space and any referenced Cube size is given for illustration only and may vary from actual Cube measurements. Customer will have access to the Store and Cube only during such hours and days as are regularly posted at the Store, which are subject to change by Operator, and further provided that Customer is not in default under this Agreement. Customer shall safeguard the Cube and securing Customer's personal property (the "Cube Contents"), and Customer shall provide one lock for the rental of the Cube to secure the Cube and Cube Contents. If Customer or Customer's guest damages the Cube or the Store, Customer will immediately pay to Operator the costs to repair the damage. Customer is solely responsible for locking the Cube and securing the Cube Contents. In an emergency, Operator may relocate the Cube Contents to a different space and Customer will rent that space as the Cube under this Agreement. Operator may access the Cube for inspections, repairs, or maintenance. Except in an emergency, Customer will receive advance notice by email of Operator's intent to access the Cube and, if Customer does not provide access within 5 days, Operator may remove the lock and access the Cube without Customer being present. Operator does not assume care, custody of, or control over, the Cube Contents even if Operator enters the Cube or denies Customer access to the Cube. No bailment or deposit of goods for safekeeping is intended or created under this Agreement.

2. **Storage of Personal Property.** Customer will store only the Cube Contents in the Cube, and the Cube Contents shall have an aggregate fair market value of no more than $5,000. Customer has read and reviewed the Rules and Regulations located at https://www.cubesmart.com/legal/rulesandregulations/ and Customer agrees to abide by those Rules and Regulations. Operator shall have the right from time to time to amend, update or otherwise change the Rules and Regulations for the safety, care, and cleanliness of the Store and all common areas, or for the preservation of good order. Customer agrees to not use the Cube for any prohibited purposes, including for residential purposes, or use the Cube in violation of the Prohibited Uses contained in the Rules and Regulations. Customer agrees to take precautions and act in a reasonable and prudent manner when storing the Cube Contents. Such precautions and reasonable acts shall include, without limitation, storing the Cube Contents in the Cube in a manner that prevents the occurrence of mold or mildew growth within the Cube. In furtherance of such obligations, CUSTOMER AGREES TO THE FOLLOWING TERMS AND CONDITIONS:

   a. To not store or bring in to the Cube any personal property of any kind or type that is wet, moist, or otherwise impacted by moisture including without limitation by rain, plumbing leaks, power failure, intentional or negligent acts, flood, or stream or river waters;
   b. To keep the Cube Contents free from dirt and debris that can harbor mold;
   c. To not air-dry wet clothes, household goods, furniture, linens, bedding, toys, merchandise, files or any other personal property of any kind in the Cube;
   d. To inspect the Cube Contents regularly for the indications and sources of indoor moisture;
   e. To immediately report to management any discoloration evidenced on the Cube Contents or walls, floors, or ceiling and/or any water intrusion, such as plumbing leaks, drips or flooding;
   f. To clean *upon first appearance*, any suspected mildew from condensation on or moisture contained in the Cube Contents in accordance with best practices. Dispose of any rags or sponges used to clean the mildew in a sealed bag as directed by Operator;
   g. *TO REPORT TO OPERATOR IN WRITING AND VERBALLY THE PRESENCE OF ANY SUSPECTED MOLD GROWTH ON SURFACES INSIDE THE CUBE;*
   h. To allow Operator *immediate entry* to the Cube to inspect and take any reasonable actions if mold or water intrusion are present;
   i. To maximize the circulation of air by keeping the Cube Contents away from walls and out of corners.

3. **Payment and Reasonableness of Fee Schedule.** Customer will pay the Monthly Rent and any tax or assessment levied on the Monthly Rent in advance, without demand, setoff or reduction, on each Monthly Rent Due Date. Customer will pay all applicable Fees when due. **The late fee may be charged by Operator for each month that Customer does not pay rent when due.** All payments will be applied to the oldest delinquency first, including the Fees which have become due. Customer agrees that the Fees and Schedule of Fees in Section A are reasonable and are not a penalty. Customer recognizes and understands that the Fees and schedule of Fees are agreed upon because it is difficult to calculate the administrative costs or damages that Operator will incur due to the Cube rental or Customer's default.

4. **Changes to Lease.** Operator may change or modify the terms and conditions of this Agreement including, but not limited, and without limitation, Monthly Rent, late fees, Administrative Lien Fees and other charges, by notifying Customer in accordance with the notice provisions

of this Agreement at least 30 days in advance of such changes and modifications. If Customer continues use of the Cube for 30 days after the date of the advance notice of such changes or modifications, such use of the Cube by Customer is and shall be deemed an acceptance of the changes or modifications to the terms and conditions of the Agreement that were contained in the 30-day advance notice. Only the continued use of the Cube after the 30-day advance notice period is necessary for Customer to effectively accept the changes and modifications to the Agreement.

5. **Termination of the Lease.** Either Customer or Operator may terminate this Agreement at any time. If Customer terminates this Agreement before the end of a monthly Term, Customer is obligated for the entire payment for the monthly Term and Customer will not receive a refund. Before this Agreement terminates, Customer will remove all Cube Contents from the Cube and leave the Cube in the same condition it was in on the Effective Date, subject to reasonable wear and tear.

6. **Default.** Customer will be in default for the violation of any terms of this Agreement, including if Operator does not receive any rent when due or if Customer does not vacate and surrender the Cube as required by this Agreement. If Customer defaults on this Agreement, Operator may: (1) immediately terminate this Agreement, (2) exercise any rights or remedies under this Agreement, at law, or in equity, (3) deem as abandoned any Cube Contents not timely removed and which remain in the Cube or on the Property and dispose of them at Customer's cost; (4) repair any damage to the Cube at Customer's cost, and/or (5) deactivate Customer's gate code, if any, and, if Customer's default continues for 5 days after the date when rent is due under this Agreement, deny Customer access to the Cube. In addition to Operator's other remedies, Operator may deem Customer to be in "holdover" and immediately increase the Monthly Rent by 200% if Customer does not vacate and surrender the Cube as required by this Agreement. Customer understands and agrees that Customer is responsible for the Operator's attorneys' fees, court costs, and other expenses incurred by Operator in connection with Customer's default, and Customer agrees to promptly pay Operator those fees, costs and expenses. If Customer is renting more than one Cube at any given time, default on one rented Cube shall constitute default on all rented Cubes, entitling Operator to deny access on all rented Cubes.

7. **Operator's Statutory Lien.** UNDER THE SELF-SERVICE STORAGE LAW (AZ ST § 33-1701 ET. SEQ.), OPERATOR HAS A LIEN ON ALL CUBE CONTENTS, WHETHER OR NOT OWNED BY CUSTOMER, FOR RENT, LABOR, OR OTHER CHARGES, PRESENT OR FUTURE, IN RELATION TO THE CUBE CONTENTS, AND FOR ANY FEES OR EXPENSES NECESSARY FOR THE PRESERVATION OF THE CUBE CONTENTS, OR EXPENSES REASONABLY INCURRED IN THE SALE OR OTHER DISPOSITION OF THE CUBE CONTENTS. <u>CUSTOMER UNDERSTANDS AND AGREES THAT THE CUBE CONTENTS MAY BE SOLD TO SATISFY ALL OR PART OF OPERATOR'S LIEN IF CUSTOMER IS IN DEFAULT OF THIS AGREEMENT AND THE USE OF AN ONLINE AUCTION OR LIEN SALE PROVIDER IS DEEMED TO BE SOLD IN A COMMERCIALLY REASONABLE MANNER.</u> If a published advertisement of the sale is required, Operator may meet this requirement by posting an advertisement on Operator's website, <u>www.cubesmart.com</u> or <u>www.cubesmart.com/storage-auctions/</u>. At any time prior to a lien sale, any person claiming a right to the Cube Contents subject to the lien sale may stop the sale by **paying in full in the form of CASH ONLY** all amounts owed. Upon release of the Cube Contents to the payor, Operator shall have no further liability to any person for the liened property.

8. **INSURANCE.**

    a. **CUSTOMER AGREES TO AND DOES BEAR THE ENTIRE RISK OF LOSS FOR THE CUBE CONTENTS.**

    b. **AS A MATERIAL CONDITION OF THIS AGREEMENT, CUSTOMER SHALL AND PROMISE TO (1) PURCHASE AND MAINTAIN INSURANCE FOR THE CUBE CONTENTS FOR THEIR FULL REPLACEMENT VALUE, OR (2) PARTICIPATE IN THE SURESMART PROTECTION PLAN DESCRIBED IN PARAGRAPH 9 BELOW (THE "SURESMART PROTECTION PLAN"). CUSTOMER UNDERSTANDS THAT IT IS ENTIRELY CUSTOMER'S CHOICE TO EITHER MAINTAIN INSURANCE ON THE CUBE CONTENTS OR PARTICIPATE IN THE SURESMART PROTECTION PLAN. THE OPERATOR ADVISED CUSTOMER TO CHECK THE TERMS AND CONDITION OF CUSTOMER'S HOMEOWNERS OR APARTMENT INSURANCE TO DETERMINE WHETHER CUSTOMER MAY HAVE INSURANCE COVERAGE FOR THE CUBE CONTENTS.**

    C. **CUSTOMER UNDERSTANDS THAT THE OPERATOR DOES NOT AND WILL NOT INSURE THE CUBE CONTENTS AND THAT THE OPERATOR IS NOT RESPONSIBLE OR LIABLE FOR THE LOSS OF ANY CUBE CONTENTS. CUSTOMER UNDERSTANDS THAT CUSTOMER WILL BE MATERIALLY BREACHING THIS AGREEMENT AND IN DEFAULT OF THIS AGREEMENT IF CUSTOMER FAILS AT ANY TIME DURING THE TERM OF THIS AGREEMENT TO MAINTAIN THE REQUIRED INSURANCE OF THE CUBE CONTENTS FOR THE FULL REPLACEMENT VALUE OR PARTICIPATE IN THE SURESMART PROTECTION PLAN.**

By initialing here _____. Customer acknowledges that Customer understands the provisions of this paragraph 8 and agrees to these provisions and that maintaining insurance or participation in the SureSmart Protection Plan is Customer's sole responsibility and obligation.

9. **SURESMART PROTECTION PLAN.** Participation in the SureSmart Protection Plan is not mandatory, and it is Customer's choice whether to participate in the SureSmart Protection Plan as an alternative to the requirement to maintain insurance on the Cube Contents set forth in Paragraph 8. Customer understands that participation in the SureSmart Protection Plan is voluntary.

    a. **SureSmart Protection Plan.** For an additional monthly payment by the Customer (the <u>"SureSmart Protection Plan Payment"</u>), Operator agrees to and will assume *limited* liability for loss of or damage to the Cube Contents if the loss or damage (i) occurs while the Cube Contents are stored in the Cube and (ii) is caused by an event listed in subparagraph c below. Operator's assumption of limited liability modifies Customer's waiver and release of liability for Cube Contents loss or damage in Paragraph 11 of the Agreement and releases Customer from the obligation to maintain insurance under Paragraph 8 of the Agreement. Operator otherwise has no liability for loss or

damage to the Cube Contents. **Customer understands and agrees that the SureSmart Protection Plan is an indemnity agreement incidental to the Agreement and <u>not</u> insurance, and that Operator is <u>not</u> an insurance company.**

b. **Options for Customer Participation in the SureSmart Protection Plan.**

Customer has three options for participation in the SureSmart Protection Plan and the extent of Operator's limited liability depends on the limit of liability selected by the Customer. The limit of liability and monthly cost options for Customer to select for participation in the SureSmart Protection Plan are set forth below:

| Coverage: | ☐ $2,000.00 | ☐ $3,000.00 | ☐ $5,000.00 |
|---|---|---|---|
| Total Monthly Cost: | $12.27 | $17.38 | $27.61 |

Customer must also select one of the three options below to participate in the SureSmart Protection Plan:

<u>☐ Option A – Use of Disc or Cylinder Lock</u>: This Option may be selected only if Customer agrees to lock the Cube with a disc or cylinder lock. If the loss of or damage to the Cube Contents is the result of burglary and if the Cube was locked with a disc or cylinder lock, Operator agrees to assume limited liability for the loss or damage up to the Limit of Liability selected above. If the loss of or damage to the Cube Contents was caused by any event listed in subparagraph c. below other than burglary, Operator agrees to assume limited liability for the loss or damage to the Cube Contents caused by any event listed in subparagraph c. below in excess of $100, up to the Limit of Liability selected above.

<u>☐ Option B – Use of Customer Lock</u>: Operator agrees to assume limited liability for loss or damage to the Cube Contents caused by any event listed in subparagraph c. below in excess of $100, up to the Limit of Liability selected above.

<u>☐ Option C - Vehicles</u>: Operator agrees to assume limited liability for loss of or damage to a land motor vehicle, boat, mobile equipment or trailer identified below if (a) the vehicle is stored in Customer's indoor or outdoor open-air parking space at the Store and (b) the loss or damage is caused by one of the applicable events listed in subparagraph c. below in excess of $100.

| Make | Model | License Plate Number | License Plate State | VIN | Description |
|---|---|---|---|---|---|
| | | | | | |

c. **Causes of Loss or Damage.** Operator assumes liability, up to the Limit of Liability described in subparagraph b of this Paragraph 9, for direct physical loss or damage to the Cube Contents while stored in the Cube and caused by any of these events:

- **Fire or Lightning**
- **Sonic Boom.**
  - **Explosion,** including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This cause of loss does not include loss or damage by rupture, bursting or operation of any one or more pressure-relief devices or rupture or bursting due to expansion or swelling of the Cube Contents of any building or structure at the Store, caused by or resulting from water.
  - **Windstorm or Hail,** but not including, frost or cold weather; ice (other than hail), snow or sleet, whether driven by wind or not; or loss or damage to the interior of any building or structure at the Store, or to the Cube Contents inside the building or structure at the Store, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure at the Store first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters.
  - **Smoke** causing sudden and accidental loss or damage, but not including smoke from agricultural smudging or industrial operations.
  - **Aircraft or Vehicles,** meaning only physical contact of an aircraft, a spacecraft, a self-propelled missile, a vehicle, or an object thrown up by a vehicle, with the Cube Contents or with the building or structure at the Store containing the Cube Contents. This cause of loss includes objects falling from aircraft.
  - **Riot or Civil Commotion,** including, acts of striking employees while occupying the building or structure at the Store; and looting occurring at the time and place of a riot or civil commotion.
  - **Vandalism,** meaning willful and malicious damage to, or destruction of, the Cube Contents at the building or structure at the Store.
  - **Sinkhole Collapse,** meaning the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include, the cost of filling sinkholes; or sinking or collapse of land into manmade underground cavities.
  - **Falling Objects** but this cause of loss does not include, objects falling from aircraft; or loss or damage to Cube Contents in the open except to a vehicle if Option C is selected; or the interior of a building or structure at the Store, or Cube Contents inside a building or structure at the Store, unless the roof or an outside wall of the building or structure at the Store is first damaged by a falling object.
  - **Weight of Snow, Ice or Sleet** but Operator will not pay for loss or damage to the Cube Contents outside of buildings or structures at the Store, except to a vehicle if Option C is selected.

- ■ **Burglary**, meaning the unlawful taking of Cube Contents from inside of the Cube by a person unlawfully entering or leaving the Cube as evidenced by marks of forcible entry or exit.
- ■ **Collapse** meaning an abrupt falling down or caving in of the building or structure at the Store or any part of the building or structure at the Store with the result that the building or structure at the Store or part of the building or structure at the Store cannot be occupied for its intended purpose and such Collapse is caused by one or more of the following:

  - ○ Fire or Lightning; Sonic Boom; Explosion; Windstorm or Hail; Smoke; Aircraft or Vehicles; Riot or Civil Commotion; Vandalism; Sinkhole Collapse; Falling Objects; Weight of Snow, Ice or Sleet; or Water Damage but on as, and to the extent that those causes of loss are covered by the SureSmart Protection Plan;
  - ○ Damage; but only as, and to the extent that, those causes of loss are covered by the Protection Plan;
  - ○ Building or structural decay that is hidden from view;
  - ○ Insect, vermin or rodent damage that is hidden from view;
  - ○ Weight of people or Cube Contents at the building or structure at the Store;
  - ○ Weight of rain or snow that collects on a roof; or
  - ○ Use of defective material or methods in construction, remodeling or renovation, if the Collapse occurs during the course of that construction, remodeling or renovation.

  Collapse does not apply to Cube Contents stored in the building or structure at the Store or any part of the building or structure at the Store that is in danger of falling down or caving in, but that has not abruptly fallen down or caved in; or Cube Contents stored in a part of the building or structure at the Store that is standing, even if it has separated from another part of the building or structure at the Store; or in building or structure at the Store that is standing or any part of the Store that is standing, even if the building or structure at the Store or the Cube Contents show evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

- ■ **Earthquake and Volcanic Eruption,** meaning earthquake shocks or the eruption, explosion, or effusion of a volcano. All earthquake shocks or volcanic eruptions that occur within any 168 consecutive hour period will constitute a single earthquake or volcanic eruption. The expiration or termination of the Protection Plan will not reduce the 168-hour period. If a loss by fire or volcanic action results from the eruption, explosion, or effusion of a volcano, Operator will pay for that resulting loss. Loss by volcanic action means direct loss resulting from the eruption of a volcano when the loss is caused by airborne volcanic blast or airborne shock waves, ash, dust or particulate matter; or lava flow. Loss by volcanic action does not include any cost to remove ash, dust or particulate matter that does not cause direct physical loss to the Cube Contents. Operator will not pay for loss or damage caused by or resulting from any earthquake or volcanic action or eruption that began before Customer's participation in the SureSmart Protection Plan became effective.
- ■ **Water Damage**, except for damage to the Cube Contents building or structure at the Store whether the loss arises from man-made or natural forces from tidal waves; tsunami; tides; waves; flood (which means a general and temporary condition of partial or complete inundation of normally dry land area from inland or tidal waters); surface water (which means the unusual and repaid accumulation of water above the ground surface); overflow of any body of water or their spray, all whether driven by wind or not; water that backs up or overflows from a sewer, drain or sump or water under the surface of the ground exerting pressure on, flowing, or seeping through foundations, walls, floors or paved surfaces, basements, whether paved or not; or doors, windows or other openings; mudslide or mudflow (which means flowing mud on the surface of normally dry land); or release of water impounded by a dam.

d. **Cube Contents Not Included.** Operator will not pay for loss or damage to the following kinds of Cube Contents: accounts, bills, currency, data, documents, records, deeds, evidences of debt, money, notes, securities or stamps; animals, birds or fish; aircraft; firearms and ammunition; furs, fur garments and garments trimmed with fur; jewelry, watches, precious or semiprecious stones, bullion, gold, goldware, gold plated ware, silver, silverware, platinum or other precious metals or alloys; photographic equipment; Cube Contents while in the custody of other bailees unless the Cube Contents are within the Cube; contraband or other Cube Contents held for, or in the course of, illegal transportation, sale, or trade; valuable papers and records, including those which exist as electronic data and photographs.

e. **Additional Protections.** The following Additional Protections do not increase Customer's selected Limit of Liability and are limited to no more than 25% of the Limit of Liability described in subparagraph b of this Paragraph 9, plus the deductible amount applicable to that loss or damage.

- ■ **Debris Removal.** Operator will pay Customer's out-of-pocket expense to remove debris of the Cube Contents caused by one of the events listed in subparagraph c. above provided such expense is reported to Operator or an authorized claim representative within 180 days of the earlier of, the date of direct physical loss or damage; or the end of the SureSmart Protection Plan. This Additional Protection does not apply to any cost to extract pollutants from land or water; or remove, restore or replace polluted land or water.
- ■ **Cube Contents in Transit Protection.** Operator also agrees to assume limited liability for loss of or damage to the Cube Contents that occurs while the Cube Contents are in transit within 100 miles of the Store and being transported to or from the Store at the time of the loss or damage, but only if that loss or damage is caused by one of these events: fire, lightning, explosion, windstorm, hail, riot, civil commotion, vandalism or vehicle collision or upset or overturn of a vehicle upon which

the Cube Contents are being transported. Collision means accidental contact of a vehicle with another vehicle or object; it does not mean a vehicle's contact with the road-bed.

■ **Substitute Storage Unit Rental Expense.** Operator will pay Customer's actual and necessary expense for a substitute storage unit that is incurred because of direct physical loss to the Cube that renders the Cube inaccessible or unusable. The loss must be caused by or result from a cause of loss by one of the events listed in subparagraph c. above.

f **Exclusions.** Operator will not pay for a loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

■ **Governmental Action.** Any governmental action, seizure or destruction of Cube Contents by order of governmental authority. But Operator will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if loss caused by that fire would be covered under the SureSmart Protection Plan.

■ **Nuclear Hazard.** Any weapon employing atomic fission or fusion; or nuclear reaction or radiation, or radioactive contamination from any other cause. However, if these cause a fire, Operator will pay for direct loss caused by that fire if that loss would otherwise be covered under the SureSmart Protection Plan.

■ **War and Military Action.** War; including undeclared or civil war, warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, sovereign or other authority using military personnel or other agents; or insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these

■ **Earth Movement.** Any earth movement other than an earthquake, such as a landslide, or earth sinking, rising or shifting. But if loss or damage by fire or explosion results from such earth movement, Operator will pay for loss caused by that fire or explosion if that loss would otherwise be covered under the SureSmart Protection Plan. This exclusion applies whether the loss arises from man-made or natural forces.

■ **Loss of Use.** Delay, loss of use, loss of market or any other consequential loss.

■ **Dishonesty.** Dishonest acts by Customer, or any of Customer's employees (including leased employees), partners, members, trustees, officers or authorized representatives, anyone else with an interest in the Cube Contents, or their employees or authorized representatives, anyone else (other than a carrier for hire) to whom Customer entrusts the Cube Contents. This exclusion applies whether or not such persons are acting alone or in collusion with other persons, and whether or not such acts occur during the hours of employment.

■ **Shortage.** Shortage found upon taking inventory, unexplained loss, or mysterious disappearance.

■ **Processing.** Processing or work performed on the Cube Contents, unless the loss or damage to the Cube Contents was caused by fire or explosion resulting from such processing or work, if that loss would otherwise be covered under the SureSmart Protection Plan.

■ **Electric Malfunction.** Artificially generated electric current creating an electric disturbance (including arcing) within the Cube, except that Operator will pay for loss caused by a resulting fire or explosion if that loss would otherwise be covered under the SureSmart Protection Plan.

■ **Media Restoration.** The cost to research, replace or restore converted data, programs, or instructions, used in any data processing operation, including the media or materials on which the data, programs, or instructions are recorded.

■ **Wear and Tear.** Wear and tear, any quality in the Cube Contents that causes it to damage or destroy itself, gradual deterioration, insects, vermin or rodents.

■ **Weather.** Weather conditions but only to the extent such weather conditions contribute in any way with a cause or event that would be excluded in the Water Damage provision.

■ **Mechanical Breakdown.** Mechanical breakdown or failure of all or any portion of the Cube Contents.

■ **Defect.** Faulty, inadequate or defective design, specifications, workmanship, repair, materials, or maintenance of all or any portion of the Cube Contents.

g. **Maximum Amount the Operator Will Pay.** Operator will assume liability for and pay the lesser of the actual cost paid by Customer to repair the damaged Cube Contents or the actual cost of replacing the lost or damaged item with an item of similar quality and condition. The maximum amount Operator will pay for all loss or damage to the Cube Contents is the Limit of Liability selected in subparagraph b of this Paragraph 9.

h. **Concealment, Misrepresentation or Fraud.** Operator will not assume any liability for loss of or damage to the Cube Contents if Customer has made fraudulent statements or engaged in fraudulent conduct in connection with any loss or damage for which protection is sought under the SureSmart Protection Plan.

i. **Duties in the Event of Loss.** Customer has a duty to cooperate with Operator and its representatives in the investigation of loss or damage to the Cube Contents. Cooperation includes, but is not limited to: notifying the police in the event of a burglary or other violation of law; providing prompt written notice of the loss or damage to the Operator, including a description and details of the loss; taking reasonable steps to protect the Cube Contents from further damage; providing a written inventory of the damaged Cube Contents including a description, age and replacement cost of the damaged Cube Contents; allowing inspection of the damaged Cube Contents; completing a sworn proof of loss within thirty (30) days of a request for proof of loss by the Operator; meeting with representatives as necessary; and any other duties as requested by Operators and its representatives during the investigation or settlement of any loss or damage to the Cube Contents.

j. **Valuation.** The value of the Cube Contents will be the least of the following amounts: the actual cash value of the Cube Contents; the cost of reasonably restoring the Cube Contents to their condition immediately before loss or damage; or the cost of replacing the Cube Contents with substantially identical property. In the event of loss or damage, the value of the Cube Contents will be determined as of the time of loss or damage. In case of loss or damage to any part of a pair or set, Operator may repair or replace any part to restore the pair or set to its value before the loss or damage or pay the difference between the value of the pair or set before and after the loss or damage.

k. **Failure to Pay Rent.** If Customer fails to pay all Monthly Rent, SureSmart Protection Plan Payment, and Fees due under this Agreement within five (5) days of the Monthly Due Date, the selected SureSmart Protection Plan Option will be cancelled without further notice to Customer. Operator will not be responsible for any loss or damage to any of the Cube Contents from any event or cause. Upon payment of all amounts due and owing, Operator, at its sole discretion, may reinstate the SureSmart Protection Plan Option for the Cube Contents.

l. **Cancellation.** Customer may cancel participation in the SureSmart Protection Plan by sending Operator thirty (30) days' advance written notice of cancellation in accordance with Paragraph 15 of this Agreement. Operator may cancel Customer's participation in the SureSmart Protection Plan by sending Customer thirty (30) days' advance written notice of cancellation.

By initialing here ___, Customer acknowledges that Customer understands the provisions of this paragraph 9 and agrees to these provisions and that Customer has elected to participate in the SureSmart Protection Plan and Customer's participation in such plan is voluntary.

10. **Decline Participation in SureSmart Protection Plan.** If Customer chooses not to participate in the SureSmart Protection Plan, Customer agrees to keep the following insurance coverage (or equivalent replacement coverage) in force during the term of this Agreement. A copy of Customer's policy declarations page is attached as evidence of coverage and Customer agrees to provide Operator with evidence of all renewals of Customer's policy during the term of this Agreement.

      **Insurance Company Name**:    State Farm
      **Policy Number**:    49858965
      **Policy Expiration Date**:

Coverage:   ☐ Home Owners   ☐ Renters   ☐ Business   ☐ Owners   ☒ Auto   ☐ Other

By initialing here ___, Customer acknowledges that Customer understands the provisions of this paragraph 10 and agrees to these provisions and that Customer has elected to keep and maintain insurance coverage (or equivalent replacement coverage) in force during the term of this Agreement.

11. **Waiver, Release, & Indemnity.** ALL CUBE CONTENTS STORED WITHIN THE CUBE BY THE CUSTOMER *SHALL BE AT THE CUSTOMER'S SOLE RISK.* CUSTOMER WAIVES, AND CUSTOMER RELEASES THE OPERATOR PARTIES FROM, ANY CLAIMS THAT CUSTOMER MAY HAVE IF THE CUBE CONTENTS ARE LOST, STOLEN, OR DAMAGED FOR ANY REASON WHATSOEVER (INCLUDING FIRE, WATER, ELEMENTS, ACTS OF GOD, THEFT, BURGLARY, VANDALISM, MYSTERIOUS DISAPPEARANCE, MOLD, MILDEW, RODENTS, INSECTS, OR THE ACTIVE OR PASSIVE ACTS OR OMISSIONS OF THE OPERATOR PARTIES). Operator Parties have not made and do not make any representations or warranties, including any representations or warranties as to the physical and environmental condition, or other matters with respect to the Store. Operator Parties hereby disclaim all warranties of any kind or nature whatsoever (including, without limitation, warranties of habitability and fitness for particular purposes), whether expressed or implied including, without limitation warranties with respect to the Cube. Customer acknowledges that it is not relying upon any representation of any kind or nature made by Operator Parties. Customer waives any right of subrogation that Customer's insurance company may have against the Operator Parties, and Customer will cause their insurance policy to reflect this waiver. Customer will indemnify, defend, and hold harmless the Operator Parties from any Claims arising out of (1) the acts, omissions, negligence, or breach of this Agreement by Customer or Customer's guests, and (2) the loss, damage, or release of any Cube Contents including any private or personally identifiable information. "Operator Parties" refers to the record owner of the Store, Operator, CubeSmart Management, LLC, CubeSmart, CubeSmart, L.P., and their officers, directors, employees, agents, subsidiaries, parents, affiliates, successors, and assigns. "Claims" refers to any claims, costs, liabilities, or damages (including indirect, incidental, special, or consequential), arising from strict liability, Operator's negligence, or otherwise.

12. **WAIVER OF TRIAL BY JURY AND ONE YEAR STATUTE OF LIMITATIONS.** OPERATOR AND CUSTOMER EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION. OPERATOR AND CUSTOMER WAIVE AND RELEASE EACH OTHER FROM ALL CLAIMS FOR WHICH A LAWSUIT OR ACTION HAS NOT BEEN COMMENCED WITHIN 1 YEAR AFTER THE CLAIM AROSE.

13. **OPERATOR'S LIMITATION OF LIABILITY & WARRANTIES.** THE OPERATOR PARTIES' MAXIMUM, AGGREGATE LIABILITY WITH RESPECT TO THE CUBE CONTENTS IS $5,000. I WAIVE ANY RIGHT TO MAKE A CLAIM FOR MORE THAN $5,000 IN THE AGGREGATE AGAINST THE OPERATOR PARTIES WITH RESPECT TO THE CUBE CONTENTS. OPERATOR PARTIES DO NOT MAKE AND DISCLAIMS, AND I WAIVE, ALL WARRANTIES OF ANY KIND WITH RESPECT TO THE STORE, THE CUBE, THE GATES, THE DOORS, OPERATOR PARTIES' SERVICES OR ANY ITEMS SOLD AT THE STORE. I WAIVE ANY CLAIMS FOR SENTIMENTAL OR EMOTIONAL VALUE RELATED TO ALL OR ANY PORTION OF THE CUBE CONTENTS. NO PROMISES OR REPRESENTATIONS OF SAFETY OR SECURITY HAVE BEEN MADE TO CUSTOMER

**BY THE OPERATOR PARTIES.  THERE SHALL BE NO LIABILITY TO OPERATOR PARTIES IF THE ALARM, VIDEO OR SPRINKLER SYSTEMS, THE GATES, DOORS OR ANY COMPONENTS THEREOF, SHALL FAIL OR MALFUNCTION.**

14. **Customer's OFAC Representation and Warranty.** Customer has been, and will continue to be, in compliance with U.S. Executive Order 13224 ("Order"). Customer is not a Blocked Person, Specially Designated National, Terrorist, Global Terrorist, part of a Foreign Terrorist Organization, Specially Designated Narcotics Trafficker, or otherwise included in the OFAC List, Order, or 31 CFR Ch V (Part 595) Appendix A.

15. **Notices.** Any notices that Customer sends to Operator must be in writing and sent by certified mail to the Store address. Any notices that Operator sends to Customer shall be sent in accordance with applicable law.  Operator and Operator's employees and agents may contact Customer by phone or text with business-related communications. Unless prohibited by applicable law, Operator may send all notices to Customer (including default and lien sale notices) to Customer's e-mail address in the Customer Information section of this Agreement. Customer will immediately send notice to Operator of any changes to Customer's address, phone number, e-mail address or any other Customer Information set forth in this Agreement. Customer releases Operator from any Claims that may arise if Customer does not notify Operator of any changes to the Customer Information.

16. **Electronic Marketing Preferences.** Customer entered into a business relationship with Operator, and Customer consents to and agrees that Operator and Operator's employees, agents, vendors, and contractors may contact Customer by e-mail, electronic (including without limitation social media, forums, or other forms of written, visual or audio communications) or written communications, or otherwise with business and marketing-related communications.  Customer may revoke or withdraw Customer's consent to receive promotional emails at any time by providing notice to Operator in accordance with Paragraph 15 of this Agreement or by clicking the "unsubscribe" link contained in a marketing email.

17. **Telephone Communications.**  Customer agrees that Operator and Operator's employees, agents, vendors, and contractors may call or send recurring text messages to Customer by telephone (including, without limitation, through the use of prerecorded/artificial voice messages and/or automatic telephone dialing system) with marketing communications at the telephone number provided by Customer.  Customer's consent is not a condition of purchasing any goods or services.  In the case of text messages, message and data rates may apply.  Customer may revoke consent at any time by providing notice to Operator in accordance with Paragraph 15 of this Agreement or by following any instructions which may be contained in a call or text message.

18. **Privacy Policy/Release of Information.**  Customer acknowledges and agrees that information collected pursuant to this Agreement is subject to the terms and conditions of Operator's Privacy Policy located at **https://www.cubesmart.com/legal/privacy-policy/** and is incorporated in full herein by reference.  If Customer is a California resident, then the collection, use, disclosure, and other processing of personal information about Customer is subject to Operator's California Privacy Notice, which can be found at **https://www.cubesmart.com/legal/privacy-policy/california-privacy-notice/**. Customer hereby authorizes Operator Parties to release any information regarding Customer as may be required by law or requested by governmental authorities or agencies, law enforcement agencies, or courts, or to others for marketing and similar purposes to the extent permitted by, and subject to Customer's rights under, applicable law.

19. **Miscellaneous.** This is the entire Agreement. This Agreement binds and inures to the benefit of Operator and Customer and their respective successors, heirs, administrators, legal representatives, and permitted assigns, and is governed by the laws of the state where the Store is located. If any part of this Agreement is unenforceable or invalid, the remaining parts of this Agreement will remain enforceable and valid. As used in this Agreement, "rent" refers to Monthly Rent and all fees, charges, and other amounts that Customer must pay under this Agreement. Customer will not assign this Agreement or sublease the Cube without Operator's consent. Operator may freely assign this Agreement. If Customer is a business, the person signing for Customer represents and warrants that he/she is authorized to sign, and to bind the business to, this Agreement. Time is of the essence.

20. **BINDING ARBITRATION**: In the event of a dispute arising under or relating to this Agreement, such dispute will be finally and exclusively resolved by binding arbitration. **NEITHER CUSTOMER NOR OPERATOR PARTIES SHALL HAVE THE RIGHT TO LITIGATE ANY CLAIM IN COURT OR TO HAVE THE CLAIM DECIDED BY A JUDGE OR JURY. DISCOVERY RIGHTS, SUCH AS EACH PARTY'S RIGHT TO THE EXCHANGE OF PREHEARING INFORMATION OR PREHEARING TAKING OF SWORN TESTIMONY, MAY ALSO BE LIMITED IN ARBITRATION.**  All disputes will be resolved before a  single neutral arbitrator, whose decision will be final except for a limited right of appeal under the Federal Arbitration Act.  The arbitration shall be commenced and conducted under the Commercial Arbitration Rules of the American Arbitration Association (AAA) and, where appropriate, the AAA's Consumer Arbitration Rules, both of which are available at the AAA website www.adr.org.  Arbitration shall be commenced by making written demand on the other party by certified mail. The demanding party must provide the other party with a demand for arbitration that includes a statement of the basis for the dispute, the names and addresses of the parties involved, and the amount of monetary damages involved and/or any other remedy sought. The arbitration may be conducted in person, through the submission of documents, by phone or online. If conducted in person, the arbitration shall take place in Phoenix, Arizona. The parties may litigate in court to compel arbitration, to stay proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator. The Federal Arbitration Act and federal arbitration law apply to this agreement. **Each party shall bear its own costs and fees, including but not limited to witness and attorneys' fees, involved in the arbitration, with the exception of the arbitrator's fees and expenses which shall be shared and borne equally by the Operator and Customer. If the Customer demonstrates an inability to pay their one-half share of the arbitration costs, then the Operator agrees to pay the full share of such costs, which expressly excludes witnesses and attorney fees or other costs incurred by the Customer for their own benefit.**

21. **CLASS ACTION WAIVER:** Any arbitration or proceeding shall be limited to the dispute between Operator and Customer individually. To the full extent permitted by law, (1) no arbitration or proceeding shall be joined with any other; (2) there shall be no right or authority for any dispute to be arbitrated or resolved on a class action-basis or to utilize class action procedures; and (3) there shall be no right or authority for any dispute to be brought in a purported representative capacity on behalf of the general public or any other persons. **CUSTOMER AGREES THAT CUSTOMER MAY BRING CLAIMS AGAINST OPERATOR ONLY IN CUSTOMER'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

22. Protected Property. I will notify Operator in writing before I store in the Cube any alcoholic beverages, pharmaceuticals (unless dispensed by a licensed pharmacy for My personal use), firearms, or documents, files or electronic data containing Personal Information about clients, customers, patients, or others in connection with My business. "Personal Information" means passport information, medical or legal records, or, unless encrypted, redacted, or secured by a method rendering it unreadable or unusable, an individual's first name or first initial and last name combined with the individual's social security, driver's, or non-operating identification license number, or financial, credit, or debit card account number which is combined with a security or access code, or a password allowing access to that account.

Customer and Operator, intending to be legally bound, sign this Agreement as of the Effective Date. **CUSTOMER MAY NOT STORE ITEMS IN THE CUBE WITH A TOTAL VALUE ABOVE $5,000. OPERATOR'S MAXIMUM LIABILITY FOR STORED ITEMS, IF ANY, IS $5,000.**

CUBESMART MANAGEMENT, LLC, in its capacity as manager of the Store

CUSTOMER

By: _____/s/_____

Operator *(electronic signature)*

02 / 10 / 2022

©2020 CUBESMART CONFIDENTIAL AND PROPRIETARY INFORMATION

# Exhibit H



**Mercedes-Benz of North Scottsdale**
18530 N. Scottsdale Rd.
Phoenix, AZ 85054
480-538-6100

CELL: 248-881-3233

| CUSTOMER NO | | | | |
|---|---|---|---|---|
| 37887 | | | | |

| ADVISOR | | TAG NO | INVOICE DATE | INVOICE NO |
|---|---|---|---|---|
| LUKE MORGAN | 44399 | 5915 | 03/10/22 | M8CS145619 |

DULCERIA LA BONITA WHOLESALE
2311 N 35TH AVE
PHOENIX, AZ 85009

RAJABIANZA@GMAIL.COM

| LABOR RATE | LICENSE NO | MILEAGE | COLOR | STOCK NO |
|---|---|---|---|---|
| | | 3,754 | G MANUFAKTU | S08402A |

| YEAR / MAKE / MODEL | DELIVERY DATE | DELIVERY MILES |
|---|---|---|
| 21/MERCEDES LIGHT TRUCK/G-CLASS/4DR | 11/05/21 | 3,695 |

| VEHICLE I.D. NO | SELLING DEALER NO | PRODUCTION DATE |
|---|---|---|
| W 1 N Y C 7 H J 6 M X 4 1 0 1 0 0 | 03102 | 08/31/21 |

| F.T.E NO | P.O. NO | R.O. DATE |
|---|---|---|
| | | 03/09/22 |

| RESIDENCE PHONE | BUSINESS PHONE |
|---|---|
| 248-881-3233 | |

| COMMENTS | | |
|---|---|---|
| C# 4632771X410100 | E# 17798060193159 | MO: 3755 |

TOTALS - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| TOTAL LABOR.... | 0.00 |
| TOTAL PARTS.... | 0.00 |
| TOTAL SUBLET... | 0.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 0.00 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 0.00 |
| **TOTAL INVOICE $** | **0.00** |

CLIENT SIGNATURE
*************************    D U P L I C A T E   I N V O I C E    ***************************

**NOTE TO CONSUMER: PLEASE READ IMPORTANT INFORMATION ON EITHER BACK SIDE OR LAST PAGE HEREOF**

Customer agrees that this Agreement includes all of the terms and conditions on the **front and either back side or last page hereof,** that this Agreement cancels and supersedes any prior agreement including oral agreements, and as of the date above comprises the entire agreement between Customer and Dealer relating to these repairs or other matters referred to on the front or back side of this document. Customer also acknowledges receipt of copy of this invoice.

Arbitration Agreement. Customer agrees that Customer or Dealership may elect to resolve any dispute by binding arbitration pursuant to the Arbitration Provision on either the back side or last page of this document.

**DIGITAL SERVICES -** This charge represents costs to the motor vehicle repair facility for digital services.

The Reynolds and Reynolds Company  ERA/NT/NVT
SF-691320 Q  (07/21)



**Mercedes-Benz of North Scottsdale**
18530 N. Scottsdale Rd.
Phoenix, AZ 85054
480-538-6100

CELL: 248-881-3233

| CUSTOMER NO | ADVISOR | TAG NO | INVOICE DATE | INVOICE NO |
|---|---|---|---|---|
| 37887 | LUKE MORGAN    44399 | 5915 | 03/10/22 | M8CS145619 |

11011M8CS145619

| | LABOR RATE | LICENSE NO | MILEAGE | COLOR | STOCK NO |
|---|---|---|---|---|---|
| DULCERIA LA BONITA WHOLESALE | | | 3,754 | G MANUFAKTU | S08402A |

2311 N 35TH AVE
PHOENIX, AZ 85009

| YEAR / MAKE / MODEL | DELIVERY DATE | DELIVERY MILES |
|---|---|---|
| 21/MERCEDES LIGHT TRUCK/G-CLASS/4DR | 11/05/21 | 3,695 |

| VEHICLE I.D NO | SELLING DEALER NO | PRODUCTION DATE |
|---|---|---|
| W 1 N Y C 7 H J 6 M X 4 1 0 1 0 0 | 03102 | 08/31/21 |

RAJABIANZA@GMAIL.COM

| F T E NO | P O NO | R O DATE |
|---|---|---|
| | | 03/09/22 |

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS | |
|---|---|---|---|
| 248-881-3233 | | C# 4632771X410100    E# 17798060193159 | MO: 3755 |

```
JOB# 1 CHARGES--------------------------------------
LABOR---------------------------------------------
J# 1 04MBZDUEBILL    DUE BILL ATACHED            TECH(S):99              INTERNAL
            INSTALL INTERIOR AND EXTERIOR PROTECTION- PREMIER. SEE WE
            OWE.
            SALES DUE BILL
            DUE BILL COMPLETE.

SUBLET-----PO#--------VEND INV#-INV. DATE-DESCRIPTION----------------------------------
    21109     503561   03/09/22 CLEAR BRA                                 INTERNAL
                                              TOTAL - SUBLET       0.00

JOB# 1 TOTALS-------------------------------------------
                       JOB# 1 JOURNAL PREFIX  M8CS  JOB# 1 TOTAL       0.00
JOB# 2 CHARGES--------------------------------------

LABOR---------------------------------------------
J# 2 00MBZC11       ADDITIONAL CONCERNS          TECH(S):99              INTERNAL
            INSTALL PAINT PRO FILM- ULTIMATE PACKAGE. SEE WE OWE.
            PAINT PRO FILM COMPLETE

JOB# 2 TOTALS-------------------------------------------
                       JOB# 2 JOURNAL PREFIX  M8CS  JOB# 2 TOTAL       0.00
JOB# 3 CHARGES--------------------------------------

LABOR---------------------------------------------
J# 3 00MBZRC       REPORT CARD                   TECH(S):99              INTERNAL
            VEHICLE REPORT CARD VISUAL INSPECTION
            PERFORMED VEHICLE REPORT CARD VISUAL INSPECTION
            REVIEW REPORT CARD RESULTS FOR ANY RECOMMENDATIONS

JOB# 3 TOTALS-------------------------------------------
                       JOB# 3 JOURNAL PREFIX  M8CS  JOB# 3 TOTAL       0.00
JOB# 4 CHARGES--------------------------------------

LABOR---------------------------------------------
J# 4 04MBZLCFUEL    CONVENIENCE FEE              TECH(S):99              INTERNAL
            GAS/GLASS CONVENIENCE FEE
            THANK YOU FOR CHOOSING MERCEDES-BENZ OF NORTH SCOTTSDALE

JOB# 4 TOTALS-------------------------------------------
                       JOB# 4 JOURNAL PREFIX  M8CS  JOB# 4 TOTAL       0.00

ESTIMATE-------------------------------------------
CLIENT HEREBY ACKNOWLEDGES RECEIVING
      ORIGINAL ESTIMATE OF     $0.00 (+TAX)
COMMENTS-------------------------------------------
++FOB 423++
```

**NOTE TO CONSUMER: PLEASE READ IMPORTANT INFORMATION ON EITHER BACK SIDE OR LAST PAGE HEREOF**

Customer agrees that this Agreement includes all of the terms and conditions on the **front and either back side or last page hereof**, that this Agreement cancels and supersedes any prior agreement including oral agreements, and as of the date above comprises the entire agreement between Customer and Dealer relating to these repairs or other matters referred to on the front or back side of this document. Customer also acknowledges receipt of copy of this invoice.

Arbitration Agreement. Customer agrees that Customer or Dealership may elect to resolve any dispute by binding arbitration pursuant to the Arbitration Provision on either the back side or last page of this document

**DIGITAL SERVICES** - This charge represents costs to the motor vehicle repair facility for digital services.

PAGE 1 OF 2          CUSTOMER COPY          [CONTINUED ON NEXT PAGE]   10:21am

The Reynolds and Reynolds Company  (PRINTED)
SF691320 Q (07/21)

# Exhibit I



| Scottsdale Police Department |
| --- |

**Field Interview Detail**

Scottsdale Police Department
8401 E. Indian School Rd.
Scottsdale, AZ 85251

(480) 312-5000
www.scottsdalepd.com

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY. for the original purpose requested. Contact the originating agency for any questions regarding this material.

Printed on: 10/27/2022
Printed by:   B847

### Field Contact Details

| Field Contact ID | Date | Time | Reason | Officer |
| --- | --- | --- | --- | --- |
| 118056 | 03/12/2022 | 12:37 | CIVIL - NO CRIME | (1565) SLEDGE, J |

| Address | City | State | ZIP Code | Beat | Zone | District |
| --- | --- | --- | --- | --- | --- | --- |
| 110█ N 115TH ST | SCOTTSDALE | AZ | | 14 | 3117 | D3 |

| Location Comments |
| --- |
| @SCDL SELF STORAGE |

### Person Details

| Name | Sex | DOB | Age | SSN | Race | Ethnicity |
| --- | --- | --- | --- | --- | --- | --- |
| JEFFREY MICHAEL NOWAK | M | | 52 | | W | N |

| Height | Weight | Hair | Eyes | Place of Birth |
| --- | --- | --- | --- | --- |
| 6-01 | 250 | BRO | BRO | |

| Scars / Marks / Tatoos |
| --- |
| |

| Residential Address | City, State, ZIP | Home Phone |
| --- | --- | --- |
| | | |

| Employer Address | Employer | Occupation |
| --- | --- | --- |
| | | |

| Driver's License |
| --- |
| |

### Remarks

```
===INVOLVED PARTIES===
Reporting Party / Jeff Nowak
Involved Other /


===RESPONDING UNITS===
Ofc. Sledge #1565


===CALL NOTES===
On 03/12/22 at approximately 1634 hours, I (Ofc. Sledge #1565) was on routine patrol in a
fully marked patrol vehicle and wearing full SPD uniform with Axon camera (OBC). I was
dispatched to contact the Reporting Party in reference to an auto theft that occurred at
Scottsdale Self Storage                    in reference to an information call. The call notes
indicated the following:

RP SAYING HE IS TRACKING A STOLEN VEH TO THIS LOCATION AT A STORAGE FACILITY
POSS SITUATION OF "WASHING TITLE"
UNK IF THIS VEH HAS BEEN REPORTED AS STOLEN  YET
MERZ BENZ 2020 GWAGON//GRY


===REPORTING PARTY / JEFF NOWAK===
```



## Scottsdale Police Department

### Field Interview Detail

Scottsdale Police Department
8401 E. Indian School Rd.
Scottsdale, AZ 85251

(480) 312-5000
www.scottsdalepd.com

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY. for the original purpose requested. Contact the originating agency for any questions regarding this material.

Printed on: 10/27/2022
Printed by:    B847

| Field Contact Details | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Field Contact ID** 118056 | **Date** 03/12/2022 | | **Time** 12:37 | **Reason** CIVIL – NO CRIME | | **Officer** (1565) SLEDGE, J | |
| **Address** 110___ N 115TH ST | | **City** SCOTTSDALE | | **State** AZ | **ZIP Code** | **Beat** 14 | **Zone** 3117 | **District** D3 |

**Location Comments**
@SCDL SELF STORAGE

I contacted the Reporting Party on the phone. The Reporting Party identified himself by his name and date of birth as Jeff Nowak. The following is a summary of what Jeff told me:

Jeff _____ the Mercedes Benz dealership located at _____ In October 2021, the dealership purchased a 2020 Mercedes Benz G Wagon from Wholesale Exotics in California on behalf of a purchaser. Jeff was notified in November 2021 that the vehicle was transported to the Mercedes Benz dealership located at _____ Jeff indicated that the vehicle remained at the other dealership for an unknown amount of time.

In January 2022, Jeff was conducting inventory of the vehicles and discovered that the G Wagon was no longer at the other dealership. Upon further investigation, Jeff discovered that the vehicle`s title was registered to a _____ Jeff utilized Mercedes Benz "meConnect" to remotely track the installed GPS monitoring device, which showed the vehicle being located at an unknown storage unit at Scottsdale Self Storage.

Jeff was unable to determine if the dealership in California fraudulently sold the vehicle to two parties, or if _____ somehow "washed" the title and effectively stole the vehicle.

Jeff indicated that the incident was being heard by a judge on March 14, 2022.

Jeff did not provide any further pertinent information.


===VEHICLE DESCRIPTION===
The vehicle is described as a grey 2021 Mercedes Benz with an unknown license plate.

Jeff provided a VIN number of #W1NYC7HJ6MX410100.

I was unable to locate any registration information in Arizona or California with the above VIN number.


===SCOTTSDALE SELF STORAGE===
I contacted the manager on duty at Scottsdale Self Storage who had already been contacted by Jeff reference the vehicle. The manager advised that they did not have any storage units registered to _____ and they were unaware of any vehicles being stored in the storage units.



| Scottsdale Police Department |
| --- |

## Field Interview Detail

**Scottsdale Police Department**
8401 E. Indian School Rd.
Scottsdale, AZ 85251

**(480) 312-5000**
www.scottsdalepd.com

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY. for the original purpose requested. Contact the originating agency for any questions regarding this material.

Printed on: 10/27/2022
Printed by:   B847

### Field Contact Details

| Field Contact ID | Date | Time | Reason | | Officer |
| --- | --- | --- | --- | --- | --- |
| 118056 | 03/12/2022 | 12:37 | CIVIL - NO CRIME | | (1565) SLEDGE, J |

| Address | City | State | ZIP Code | Beat | Zone | District |
| --- | --- | --- | --- | --- | --- | --- |
| 110█  N 115TH ST | SCOTTSDALE | AZ | | 14 | 3117 | D3 |

**Location Comments**
@SCDL SELF STORAGE

===INVOLVED OTHER / ▓▓▓▓▓▓▓===

I located ▓▓▓▓▓▓ information in the MVD database, listing her address at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Due to the circumstances being civil in nature, it was determined that no contact would be made with ▓▓▓▓.

===DOCUMENT/EVIDENCE SUBMISSION===

Jeff advised that he would be able to provide electronic documentation for the purchase of the vehicle.

I sent a Citizen request to Jeff using the Axon Capture application.

===OUTCOME OF INVESTIGATION===

At the conclusion of the investigation, I determined that the issue was civil in nature which was already scheduled to be heard by a judge.

Field Contact report submitted for documentation purposes.

NFD



## Scottsdale Police Department

### Field Interview Detail

**Scottsdale Police Department**
**8401 E. Indian School Rd.**
**Scottsdale, AZ 85251**

**(480) 312-5000**
**www.scottsdalepd.com**

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY, for the original purpose requested. Contact the originating agency for any questions regarding this material.

Printed on:  10/27/2022
Printed by:     B847

### Field Contact Details

| Field Contact ID | Date | Time | Reason | Officer |
|---|---|---|---|---|
| 118056 | 03/12/2022 | 12:37 | CIVIL - NO CRIME | (1565) SLEDGE, J |

| Address | City | State | ZIP Code | Beat | Zone | District |
|---|---|---|---|---|---|---|
| 110█  N 115TH ST | SCOTTSDALE | AZ | | 14 | 3117 | D3 |

**Location Comments**
@SCDL SELF STORAGE

### Related Vehicles

| | Color | Year | Make | Model | Style | License | State | Expiration | VIN |
|---|---|---|---|---|---|---|---|---|---|
| 1: | GRAY/ | 2020 | MERCEDES-BG500 | | LL | SGAORG | AZ | 0/0 | W1NYC7HJ6MX410100 |

Registered Owner:  - ,

### Related Names

| | Name ID | Last Name | First Name | Middle Name | Suffix | Sex | Race | DOB | Age |
|---|---|---|---|---|---|---|---|---|---|
| 1: | 21843794 | NOWAK | JEFFREY | MICHAEL | | M | W | | 52 |
| 1: | 22005060 | | | | | F | W | | 41 |

# Exhibit J



| **Scottsdale Police Department** |
|---|

### Field Interview Detail

Scottsdale Police Department
8401 E. Indian School Rd.
Scottsdale, AZ 85251

**(480) 312-5000**
**www.scottsdalepd.com**

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY, for the original purpose requested. Contact the originating agency for any questions regarding this material.

Printed on: 10/28/2022
Printed by:    B847

**Field Contact Details**

| Field Contact ID | Date | Time | Reason | Officer |
|---|---|---|---|---|
| 118118 | 03/15/2022 | 11:14 | CIVIL - NO CRIME | (682) MITCHELL, P |

| Address | City | State | ZIP Code | Beat | Zone | District |
|---|---|---|---|---|---|---|
| N 136TH ST / E VIA LINDA | SCOTTSDALE | AZ | 85259 | 14 | 3118 | D3 |

Location Comments

**Person Details**

| Name | Sex | DOB | Age | SSN | Race | Ethnicity |
|---|---|---|---|---|---|---|
| JEFFREY MICHAEL NOWAK | M | | 52 | | W | N |

| Height | Weight | Hair | Eyes | Place of Birth |
|---|---|---|---|---|
| 6-01 | 250 | BRO | BRO | |

Scars / Marks / Tatoos

| Residential Address | City, State, ZIP | Home Phone |
|---|---|---|

| Employer Address | Employer | Occupation |
|---|---|---|

Driver's License

**Remarks**

On 031522, 1016 hrs, I was dispatched to an ATL for a possible stolen vehicle in the area of 136th St / Shea Bl, eastbound.  Comments added to the dispatched call were as follows:

| 10:24:46 | hp600t50008: | JOSH SAYS THAT WE NEED TO TALK TO MERZ DEALERSHIP - VERN FOUTZ 602-677-5703 |
|---|---|---|
| 10:24:21 | hp600t50015: | 2L14 -- WILL 45 W/RP |
| 10:24:03 | hp600t50008: | RP WAS IN THE SUV WHEN HE WAS FOLLOWING |
| 10:23:42 | hp600t50008: | ON WITH JOSH NOW |
| 10:23:20 | hp600t50008: | NO |
| 10:23:14 | hp600t50015: | (IS A SUV VEH) |
| 10:21:37 | hp600t50008: | CUBE SMART |
| 10:20:59 | hp600t50008: | RP IS 902 BACK TO CUBE SMART STORAGE |
| 10:20:44 | hp600t50008: | RP SAYS HE HAS NO FURTHER INFO ABOUT THIS - SAID TO TALK TO JOSH ABOUT ALL THIS |
| 10:20:21 | hp600t50008: | NOW TRACKING        - RP LOST VEH |
| 10:20:03 | hp600t50015: | 2L82 -- RUN AS VEH STOP FOR NO PLATE |
| 10:19:26 | hp600t50016: | VM FOR JOSH - |
| 10:19:09 | hp600t50016: | CALLING JOSH |
| 10:18:49 | hp600t50008: | RPS        - JOSH CAMERON - SHOULD HAVE INFO |
| 10:18:18 | hp600t50008: | RP HAS NO REPORT NUMBER OR ANY INFO |
| 10:18:07 | hp600t50008: | VEH IS WEAVING IN AND OUT OF TRAFFIC STILL EB |
| 10:17:45 | hp600t50015: | 2L14 -- ADV MCSO |
| 10:17:43 | hp600t50008: | NOW AT PALISAIDES AND SHEA IN FOUNTAIN HILLS |



| Scottsdale Police Department |
| :---: |

### Field Interview Detail

Scottsdale Police Department
8401 E. Indian School Rd.
Scottsdale, AZ 85251

(480) 312-5000
www.scottsdalepd.com

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY. for the original purpose requested. Contact the originating agency for any questions regarding this material.

Printed on: 10/28/2022
Printed by:     B847

**Field Contact Details**

| Field Contact ID | Date | Time | Reason | Officer |
| --- | --- | --- | --- | --- |
| 118118 | 03/15/2022 | 11:14 | CIVIL - NO CRIME | (682) MITCHELL, P |

| Address | City | State | ZIP Code | Beat | Zone | District |
| --- | --- | --- | --- | --- | --- | --- |
| N 136TH ST / E VIA LINDA | SCOTTSDALE | AZ | 85259 | 14 | 3118 | D3 |

Location Comments

---

| 10:17:22 | hp600t50008: | RP DOESNT KNOW WHY NO ONE CALLED PD WHEN IT WAS LOCATED BY GPS |
| 10:17:10 | hp600t50008: | MERZ DEALERSHIP LOCATED IT VIA LOJACK AT THE CUBESMART - AND THEY HAVE WATCHED IT SINCE THEY FOUND IT HERE |
| 10:16:31 | hp600t50008: | RP DOESNT KNOW THE PLATE - THINKS IT WAS LISTED 4 DAYS AGO |
| 10:16:21 | hp600t50008: | THIS IS LISTED AS STOLEN VEH - RP THINKS SPD TOOK THE REPORT |
| 10:15:38 | hp600t50008: | EB |
| 10:15:24 | hp600t50008: | NOW ON SHEA - RP IN A GRY HONDA CRV -SECGUY / AZ |
| 10:15:07 | hp600t50008: | HARD TO GET INFO ON THE RP |
| 10:14:46 | hp600t50008: | NO PLATE ON THE VEH |
| 10:14:43 | hp600t50008: | VEH DID A U TURN AND WENT SB TOWARDS SHEA |
| 10:14:28 | hp600t50008: | RP SAYS HE IS FOLLOWING A STOLEN CAR GRY MERZ G63 RP SAYS HIS COMPANY HAS BEEN WATCHING IT AT THE STORAGE PLACE FOR 3-4 DAYS - RP SAW IT RACE OUT OF THE STORAGE |

The vehicle left Scottsdale jurisdiction, eastbound on Shea Bl in Fountain Hills.  I returned to the CubeSmart to speak with the reporting pary Gerald Scheibly                    and the Mercedes Benz dealership, to attempt to get further information.

This field interview is taken as supplemental information to field interview #E0312220266, SPD Ofc Sledge.

I spoke with Jeff Nowak,                                                                          .
He told me that on 102721, his dealership paid approx $275,000 to "Wholesale Exotics" in Los Angeles, CA for the purchase of a 2020 Mercedes Benz G50.  The purchase was made sight unseen, with the agreement that the seller would ship the vehicle to the dealership.  Nowak said that the the dealership has dealt with Whoesale Exotics in the past, and it is not unusual to actually receive the vehicle several months later.  Nowak said that they also do not have the vehicle title.  He said that he has had some difficulty communicating with Wholesale Exotics, and became concerned when he utilized the MB GPS tracking and found the vehicle reportedly at CubeSmart,                         .

Nowak said that dealership attorries have gone to civil court to attempt to establish ownership of the vehicle.  He said that they had a hearing on 031422, and the situation has not yet been resolved.

Nowak and the dealership hired                                 to watch for the vehicle at the CubeSmart.  On this date,                   Gerald Scheibly saw the vehicle exit CubeSmart, and



### Scottsdale Police Department

### Field Interview Detail

**Scottsdale Police Department**
**8401 E. Indian School Rd.**
**Scottsdale, AZ 85251**

**(480) 312-5000**
**www.scottsdalepd.com**

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY, for the original purpose requested. Contact the originating agency for any questions regarding this material.

Printed on: 10/28/2022
Printed by:   B847

**Field Contact Details**

| Field Contact ID | Date | Time | Reason | | Officer |
|---|---|---|---|---|---|
| 118118 | 03/15/2022 | 11:14 | CIVIL - NO CRIME | | (682) MITCHELL, P |

| Address | City | State | ZIP Code | Beat | Zone | District |
|---|---|---|---|---|---|---|
| N 136TH ST / E VIA LINDA | SCOTTSDALE | AZ | 85259 | 14 | 3118 | D3 |

Location Comments

drive eastbound on Shea Bl, "speeding and weaving in and out of traffic."  Scheibly also erroneously told SPD that the vehicle was stolen.  Scheibly told me that he was unsure what to do, but that his "boss told me to follow the vehicle.

I advised Scheibly to not follow or attempt contact with potentially stolen vehicles, but to contact SPD and report description and last direction of travel.

I also advised Nowak that if they are going to hire private parties to monitor vehicles, to communicate clearly with security, and if the matter is criminal, to make sure that police are informed and aware of the situation.

No further.



## Scottsdale Police Department

### Field Interview Detail

**Scottsdale Police Department**
**8401 E. Indian School Rd.**
**Scottsdale, AZ 85251**

**(480) 312-5000**
**www.scottsdalepd.com**

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY, for the original purpose requested. Contact the originating agency for any questions regarding this material.

Printed on: 10/28/2022
Printed by:    B847

### Field Contact Details

| Field Contact ID | Date | Time | Reason | Officer |
|---|---|---|---|---|
| 118118 | 03/15/2022 | 11:14 | CIVIL - NO CRIME | (682) MITCHELL, P |

| Address | City | State | ZIP Code | Beat | Zone | District |
|---|---|---|---|---|---|---|
| N 136TH ST / E VIA LINDA | SCOTTSDALE | AZ | 85259 | 14 | 3118 | D3 |

Location Comments

### Related Vehicles

| | Color | Year | Make | Model | Style | License | State | Expiration | VIN |
|---|---|---|---|---|---|---|---|---|---|
| 1: | GRAY/ | 2020 | MERCEDES-BG500 | | LL | SGA0RG | AZ | 0/0 | W1NYC7HJ6MX410100 |

Registered Owner:  - ,

### Related Names

| Name ID | Last Name | First Name | Middle Name | Suffix | Sex | Race | DOB | Age |
|---|---|---|---|---|---|---|---|---|

There are no names related to this record.

# Exhibit K

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY. for the original purpose requested. Contact the originating agency for any questions regarding this material.

☐ DV ☐ Child Abuse ☐ Arson ☐ Homicide ☐ Hate Crime ☐ Elderly ☐ Gang Related ☐ Liquor Est. ☐ On-Body Camera

| Agency: SPD | **Incident / Investigation Report** | Case Number: 22-05913 |
|---|---|---|
| | FRAUDULENT SCHEMES/ARTIFICES | |

| Reported 03/18/2022 19:37 | Found 03/18/2022 19:37 | Occurred 03/18/2022 19:37 |
|---|---|---|
| Location 110█ N 115th St, Scottsdale, AZ | | Original Officer (1576) LIVINGSTON, T |

| **Original Information** | Original Page: 1 |
|---|---|
| Date Added: 03/18/2022 | Added By: (1576) LIVINGSTON, T |

## Charges

| **1** | Charge Type State | Description FRAUDULENT SCHEMES/ARTIFICES | | Statute 13-2310A | UCR 26A | ☐ Att ☑ Com |
|---|---|---|---|---|---|---|

| Alcohol, Drugs or Computers Used ☐ Alcohol ☐ Drugs ☐ Computers | Location Type RENTAL / STORAGE | Premises Entered | Forced Entry ☐ Yes ☑ No | Weapons 1. |
|---|---|---|---|---|
| Entry | Exit | Criminal Activity | | 2. |
| | | | | 3. |

| Bias Motivation | Bias Target | Bias Circumstances | Bias Group |
|---|---|---|---|

## Victim

| **1** | Type B | Code VI | Name(Last, First, M) PHOENIX MOTORSPORTS/MERCEDES OF SCOTTSDE | | AKA |
|---|---|---|---|---|---|

| SSN | DOB | Age | Race | Ethnicity | Sex | Height | Weight 0 | Hair | Eyes | Victim of Crimes 1 |
|---|---|---|---|---|---|---|---|---|---|---|

| License: ☐ DL ☐ ID ☐ Per | Number: | State: | Marital: | Resident: | Citizen: |
|---|---|---|---|---|---|

| Address | Hm ph: |
|---|---|
| Occupation | Employer Name/Address / | Cell ph: |
| | | Wk ph: |

| Scars, Marks, Tatoos or Other Distinguishing Features: |
|---|
| Physical Characteristics: |

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY. for the original purpose requested. Contact the originating agency for any questions regarding this material.

☐ DV  ☐ Child Abuse  ☐ Arson  ☐ Homicide  ☐ Hate Crime  ☐ Elderly  ☐ Gang Related  ☐ Liquor Est.  ☐ On-Body Camera

| Agency: SPD | **Incident / Investigation Report** | Case Number: 22-05913 |
|---|---|---|
| | **FRAUDULENT SCHEMES/ARTIFICES** | |

| Reported 03/18/2022 19:37 | Found 03/18/2022 19:37 | Occurred 03/18/2022 19:37 |
|---|---|---|
| Location 110_ N 115th St, Scottsdale, AZ | | Original Officer (1576) LIVINGSTON, T |

## Original Information

Date Added: 03/18/2022          Original Page: 2          Added By: (1576) LIVINGSTON, T

## Other Persons Involved

### 1

| Type | Code | Name(Last, First, M) | AKA |
|---|---|---|---|
| I | RP | COHEN, LARRY | |

| SSN | DOB | Age | Race | Ethnicity | Sex | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| | | 72 | U | | U | | 0 | | |

License: ☐ DL  ☐ ID  ☐ Per   Number:          State:          Marital:          Resident:          Citizen:

| Address | | Hm ph: |
|---|---|---|
| Occupation | Employer Name/Address | Cell ph: |
| | | Wk ph: |

Scars, Marks, Tatoos or Other Distinguishing Features:

Physical Characteristics:

### 1

| Type | Code | Name(Last, First, M) | AKA |
|---|---|---|---|
| B | IL | | |

| SSN | DOB | Age | Race | Ethnicity | Sex | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 0 | | |

License: ☐ DL  ☐ ID  ☐ Per   Number:          State:          Marital:          Resident:          Citizen:

| Address | Hm ph: |
|---|---|
| | Cell ph: |
| Occupation | Employer Name/Address / |
| | Wk ph: |

Scars, Marks, Tatoos or Other Distinguishing Features:

Physical Characteristics:

### 2

| Type | Code | Name(Last, First, M) | AKA |
|---|---|---|---|
| I | IL | | |

| SSN | DOB | Age | Race | Ethnicity | Sex | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

License: ☐ DL  ☐ ID  ☐ Per   Number:          State:          Marital:          Resident:          Citizen:

| Address | Hm ph: |
|---|---|
| | Cell ph: |
| Occupation | Employer Name/Address / |
| | Wk ph: |

Scars, Marks, Tatoos or Other Distinguishing Features:

Physical Characteristics:

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY. for the original purpose requested. Contact the originating agency for any questions regarding this material.

☐ DV ☐ Child Abuse ☐ Arson ☐ Homicide ☐ Hate Crime ☐ Elderly ☐ Gang Related ☐ Liquor Est. ☐ On-Body Camera

| Agency: SPD | **Incident / Investigation Report** | Case Number: **22-05913** |
|---|---|---|
| | **FRAUDULENT SCHEMES/ARTIFICES** | |

| Reported | 03/18/2022 19:37 | Found | 03/18/2022 19:37 | Occurred | 03/18/2022 19:37 |
|---|---|---|---|---|---|
| Location | 110   N 115th St, Scottsdale, AZ | | | Original Officer | (1576) LIVINGSTON, T |

| **Original Information** | Original Page: 3 |
|---|---|
| Date Added: 03/18/2022 | Added By: (1576) LIVINGSTON, T |

## Other Persons Involved

| 3 | Type I | Code IL | Name(Last, First, M) | | | | | AKA | |
|---|---|---|---|---|---|---|---|---|---|

| SSN | DOB | Age | Race | Ethnicity | Sex | Height | Weight | Hair | Eyes | |
|---|---|---|---|---|---|---|---|---|---|---|

| License: ☐ DL ☐ ID ☐ Per | Number: | State: | Marital: | Resident: | Citizen: |
|---|---|---|---|---|---|

| Address | | Hm ph: |
|---|---|---|
| | | Cell ph: |
| Occupation | Employer Name/Address / | Wk ph: |

| Scars, Marks, Tatoos or Other Distinguishing Features: |
|---|

| Physical Characteristics: |
|---|

## Property

| 1 | Prop ID 1416929 | Status STOLEN | Class 66 | NCIC | Make/Model | Serial Number |
|---|---|---|---|---|---|---|

| Owner PHOENIX MOTORSPORTS/MERCEDES OF | Owner Applied Number | License / State | Color | | |
|---|---|---|---|---|---|

| Description See Narrative And Supplements | | Quantity 1 | UM | Value $1.00 |
|---|---|---|---|---|

| Gun Type | Caliber | Finish | Grip | Gun Stock |
|---|---|---|---|---|

| Condition: | Gun Test: ☐ Yes ☑ No   Test Type: | Sight Test: ☐ Yes ☑ No   Sight Type: |
|---|---|---|

| Property Notes: |
|---|

## Vehicles

| 1 | Status | Year 2020 | Make MERCEDES-BENZ | Model G500 | Style LL | Color GRY |
|---|---|---|---|---|---|---|

| VIN W1NYC7HJ6MX410100 | License Plate Type | License / State SGA0RG / AZ | License Year 0 | Value |
|---|---|---|---|---|

| Owner | | |
|---|---|---|

| Vehicle Notes See Field Contact # 118118 & 118056 for further |
|---|

## Assisting Officers

(741) VAHLE, B

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY, for the original purpose requested. Contact the originating agency for any questions regarding this material.

☐ DV ☐ Child Abuse ☐ Arson ☐ Homicide ☐ Hate Crime ☐ Elderly ☐ Gang Related ☐ Liquor Est. ☐ On-Body Camera

| Agency: SPD | **Incident / Investigation Report** | Case Number: 22-05913 |
|---|---|---|

**FRAUDULENT SCHEMES/ARTIFICES**

| Reported 03/18/2022 19:37 | Found 03/18/2022 19:37 | Occurred 03/18/2022 19:37 |
|---|---|---|
| Location 110⬛ N 115th St, Scottsdale, AZ | | Original Officer (1576) LIVINGSTON, T |

**Original Information**    Original Page: 4

Date Added: 03/18/2022    Added By: (1576) LIVINGSTON, T

## Notes / Narratives

On 03/18/2022, at approximately 1700 hours, I responded to The Cube Smart Storage facility located at ⬛⬛⬛⬛ for a civil standby.

Upon arrival, I met with various representatives from the Mercedes Dealership in Scottsdale concerning a 2020 Mercedes. These representatives provided me with an Order of Repossession for the same Mercedes that they said was in a storage unit inside the Cube Smart Facility. This was signed from a judge from Maricopa County and only said that they could house the vehicle at their facility until a judgement of ownership was established.

They said that they had purchased it from another individual in California, but never received the vehicle in Scottsdale. The representatives from Mercedes said they were able to turn on the GPS tracker and located it here.

I asked for any proof of ownership, but they could not provide any. I asked if the car was reported stolen from CA and they said that it was not.

I advised them that for the Scottsdale Police Department to proceed, the vehicle would have to be reported stolen out of CA because besides being "found" here, there was no proof that the theft of the vehicle was stolen from Scottsdale and its last known location before today was CA.

I also advised that until the vehicle was reported stolen, or they could provide proof of ownership, this was entirely a civil matter.

I provided them all the necessary steps that needed to take place and left.

Shortly after, I was spoken to by LT. Bonnette #690. I was told and instructed to sit and watch the storage unit to make sure the Mercedes did not leave until SPD Detectives responded.

Det. Vahle #741 arrived on scene and advised me that he was going to be pulling a DR for ARS 13-2310A - FRAUDULENT SCHEMES/ARTIFICES and that I could clear.

I was never advised of any prior calls for service concerning this vehicle.

Please see related supplements for more information.

NFI 1576.

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY. for the original purpose requested. Contact the originating agency for any questions regarding this material.

☐ DV  ☐ Child Abuse  ☐ Arson  ☐ Homicide  ☐ Hate Crime  ☐ Elderly  ☐ Gang Related  ☐ Liquor Est.  ☐ On-Body Camera

| Agency:  SPD | **Incident / Investigation Report** | Case Number:  22-05913 |
|---|---|---|

### FRAUDULENT SCHEMES/ARTIFICES

| Reported  03/18/2022 19:37 | Found  03/18/2022 19:37 | Occurred  03/18/2022 19:37 |
|---|---|---|
| Location  110█ N 115th St, Scottsdale, AZ | | Original Officer  (1576) LIVINGSTON, T |

| **Supplement Information** | Supplement Page:  1 |
|---|---|
| Date Added: 03/23/2022 07:59:55 | Added By:  (590) HAWKINS, J |

## Supplement Notes

RELATED BACKGROUND

03.12.2022, Scottsdale FI card # 118056, Ofc. J. Sledge # 1565.
03.15.2022, Scottsdale FI # 118118, Ofc P. Mitchell # 682.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On or about Friday March 18th, in the evening, I was notified by command staff to contact LARRY COHEN, █████, at ██████ regarding a possible stolen vehicle.  I was the Lieutenant over property crimes investigations.

I called ██████.  A male answered identifying himself as LARRY COHEN.  COHEN and I spoke on Friday and the following Wednesday 03/23/2022.  COHEN stated:

- COHEN is ██████ Phoenix Motor Company, Mercedes Benz of Scottsdale, ██████.  Chuck THIESEN is ██████ and Vern FOUTZ is ██████.
- 10/27/2021 Phoenix Motor Company paid a wholesale company in Newport Beach California, Wholesale Exotics,  the sum of $274,800 for a Mercedes Benz G Wagon.  The wire payment would have originated from ██████ to Newport Beach.
- Since 10/27/2021 they have not received the G Wagon that was paid for.  They believed the G Wagon is a stolen car.
- As of 03/18/2022 COHEN had obtained a civil court order in Maricopa County Superior Court authorizing Phoenix Motor Company to take custody of the alleged stolen G Wagon.  COHEN wanted Scottsdale Police to seize the G Wagon
- They were able to get Mercedes Benz Corp to activate the GPS tracker installed on the G Wagon.  COHEN was able to track the G wagon to a storage facillity in Scottsdale.  Scottsdale patrol units were at the location currently, ██████, Cubestorage/Scottsdale Self-Storage.
- I asked for the Newport Beach Police report number and Vehicle Identification Number.  COHEN did not have a Newport Beach police report number.  He provided the VIN of w1nyc7hj6mx410100.  The vehicle was not listed as stolen.
- The Mercedes was currently registered to ██████  A secondary owner was an individual, ██████.
- 03/18/2022 I expalined to COHEN that the Mercedes was not listed as stolen.  Police dont enforce civil court orders over property.  I stated we would document a police report, which I provided to him, 22-05913.  I asked him to compile all relevant documents for the report.  He said he understood.
- 03/18/2022 I told COHEN at this time police will not enter the storage facility or seize the Mercedes.  I asked him to get a Newport Beach Police report number and get the vehicle entered as stolen.
- 03/18/2022 I told COHEN they could pursue repossession of the car  if it applies.
- 03/23/2022 I called COHEN on his cell phone.  COHEN said he had another court order authorizing Phoeninx Motor Sports to enter the storage facility and seize the Mercedes.  I told him I have never heard of such a civil order.  I adsvised him if there are any probloems to call police.
- 03/23/2022 COHEN told me he hopes this resolved the matter and he doesn`t have to call police again.  COHEN said he had all relevant documents.  He asked if I wanted them.  I told him an investigative police aide would get these items later.

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY, for the original purpose requested. Contact the originating agency for any questions regarding this material.

☐ DV ☐ Child Abuse ☐ Arson ☐ Homicide ☐ Hate Crime ☐ Elderly ☐ Gang Related ☐ Liquor Est. ☐ On-Body Camera

| Agency: SPD | Incident / Investigation Report | Case Number: 22-05913 |
|---|---|---|
| | FRAUDULENT SCHEMES/ARTIFICES | |

| Reported | 03/18/2022 19:37 | Found | 03/18/2022 19:37 | Occurred | 03/18/2022 19:37 |
|---|---|---|---|---|---|
| Location | 110_ N 115th St, Scottsdale, AZ | | | Original Officer | (1576) LIVINGSTON, T |

## Supplement Information

**Supplement Page:** 2

**Date Added:** 03/23/2022 07:59:55

**Added By:** (590) HAWKINS, J

No further.

SCOTTSDALE POLICE DEPARTMENT - Use of this document is regulated by LAW for OFFICIAL USE ONLY, for the original purpose requested. Contact the originating agency for any questions regarding this material.

☐ DV ☐ Child Abuse ☐ Arson ☐ Homicide ☐ Hate Crime ☐ Elderly ☐ Gang Related ☐ Liquor Est. ☐ On-Body Camera

| Agency: SPD | **Incident / Investigation Report** | Case Number: 22-05913 |
|---|---|---|
| | **FRAUDULENT SCHEMES/ARTIFICES** | |

| Reported 03/18/2022 19:37 | Found 03/18/2022 19:37 | Occurred 03/18/2022 19:37 |
|---|---|---|
| Location 110_ N 115th St, Scottsdale, AZ | | Original Officer (1576) LIVINGSTON, T |

| **Supplement Information** | Supplement Page: 1 |
|---|---|
| Date Added: 03/25/2022 22:16:53 | Added By: (1569) HONTZ, T |

## Supplement Notes

-03/25/2022-

On 03/25/2022, at approximately 2120 hours, I was working as a fully uniformed police officer when I self-attached to a pending supplemental report call at _____ Comments indicated this was related a possible fraud scheme case from days prior. The reporting party, _____ was calling in reference her listed Mercedes G Wagon that was missing from her storage unit. She initially requested in person contact but after the call had been pending, requested a phone call.

I called _____ at her listed phone number. She advised _____ was also with her. With no context as to what had happened to her vehicle, she explained the following to me. She had purchased the car on February 8, 2022, from _____ at Mercedes Benz of North Scottsdale through her company name _____. She advised she had the car until March 9 where she had taken the car back to the dealership for servicing. She had picked the car back up on March 22 and placed it in storage at the listed location as their home was under construction and could not accommodate it. She advised on March 12 she had received a call _____ from a subject advising he was security for the storage facility and that "they were dealing with a stolen car" but did not explain beyond that. She went to the facility and her car was still there so she thought nothing of it.

_____ explained that on March 25, they had gone to check on the car (and two others they had stored there) and found the listed vehicle missing.

_____ outlined that she had paid a down payment of $78,000 to the listed dealership and had taken a loan through Mercedes Benz for $245,998.35. She advised she made her first payment on March 15 for $4062.34, which cleared and was in accordance with her loan.

I advised _____ that there was little information on the report but that it appeared as though the car had been the center of a civil court order and had been repossessed. _____ was very confused and advised that she had already contacted her lawyer and would have them follow up with the dealership.

Without ever mentioning the car having been stolen, _____ sporadically stated that if she was being accused of stealing by the dealership, that she would contact her lawyer at let her handle it.

I gave _____ the listed case number and advised that, at the moment, the car was not going to be listed as stolen and appeared to be the center of a civil dispute.

Nothing further at this time.

# Exhibit L

MBUSA's Response to Subpoena in a Civil Case
Phoenix Motor Company, Inc. d/b/a Mercedes-Benz of Scottsdale vs. Dulceria La Bonita
Case # CV2022-003384

## MBUSA ACCOUNT DETAILS RE: VIN W1NYC7HJ6MX410100

1.a.4 Account Details pertaining to VIN

vernf@mbscottsdale.com

+16026775703

**4725 n scottsdale road**
**85251 Scottsdale Arizona**
**United States**

**01/10/1989**

| General | | | | |
|---|---|---|---|---|
| Date of Birth | 01/10/1989 | | Landline | |
| Address | 4725 n scottsdale road | | Mobile Phone Number | +16026775703 |
| | 85251 Scottsdale Arizona | | E-mail Address | vernf@mbscottsdale.com ☆ |
| | United States | | | |
| Preferences | | | Mercedes me connect Account Status | |
| Language | English | | Online Registration | ⊘ |
| Communication Preferences | ✉ @ & ⎘ | | Account verified | ⊘ |

1.a.5

Authorized User only **vernf@mbscottsdale.com** for W1NYC7HJ6MX410100

**Authorization Cache**

| Authorization ID | FIN | Owner | Owner Type | Vehicle Owner | Type | Created At | Last Updated At |
|---|---|---|---|---|---|---|---|
| 89C5CA5A3D | W1N4632771X410100 | 0012060ee22a2b39 | Customer | true | Existent | 2022-03-15T23:24:03.338Z | 2022-03-15T23:24:03.338Z |

Authorized User **vernf@mbscottsdale.com** is also user for below vehicles

| | | 0012060ee22a2b39 | | | Search | | |
|---|---|---|---|---|---|---|---|

○ Authorization ID  ○ FINVIN  ● Claim ID/Me ID  ○ Partner ID

**Authorization Cache**

| Authorization ID | FIN | Owner | Owner Type | Vehicle Owner | Type | Created At | Last Updated At |
|---|---|---|---|---|---|---|---|
| C8EB53CEA6 | W1K22517E5A104624 | 0012060ee22a2b39 | Customer | true | Existent | 2022-06-30T23:19:24.213Z | 2022-06-30T23:18:24.213Z |
| 098DED2CF6 | W1K2N06891A038293 | 0012060ee22a2b39 | Customer | true | Existent | 2022-04-13T22:19:42.804Z | 2022-06-15T21:32:00.009Z |
| 89C5CA5A3D | W1N4632771X410100 | 0012060ee22a2b39 | Customer | true | Existent | 2022-03-15T23:24:03.336Z | 2022-03-15T23:24:03.338Z |

1.a.6 Only last information is saved. New information overwrites previous.

# Exhibit M

3/30/22, 2:37 PM

AZ MVD Now



# Title Information

| Year | Make | Model |
|------|------|-------|
| 2021 | Mercedes Benz | G |

⚠ Title has lien(s) and no brand(s) and is not eligible to transfer until lien(s) is satisfied. If you have questions, call MVD at:

**Phoenix:** 602.255.0072
**Tucson:** 520.629.9808
**Elsewhere in Arizona:** 800.251.5866

**Vehicle Information**
VIN: W1NYC7HJ6MX410100
**Body Style:** Station Wagon 4 Dr
**Factory List Price:** $156,650.00
**Fuel Type:** Gasoline

**Title Information**
**Title Number:** A007391947
**Title Issue Date:** 02/24/2022
**Odometer Reading:** 3695 Miles
**Odometer Code:** Actual
**Previous Title Number:** A006466225
**Previous Title State:** AZ
**Previous Title Date:** 12/3/2021

**Owner Information**
DULCERIA LA BONITA WHOLESALE
 Or
Zakia J Rajabian

**Liens**

⚠ This vehicle has one or more liens.

**Mercedes-Benz Financial Services USA LLC**
Po Box 997542
Sacramento, CA 958997542

**Brands**

✓ This vehicle has no brands.

This is not a Certificate of Title document. Data is based on ADOT Motor Vehicle Division official records as of
03/30/2022 at 2:37 PM

# Exhibit N



# Supreme Court

### STATE OF ARIZONA

**ROBERT BRUTINEL**
**Chief Justice**

ARIZONA STATE COURTS BUILDING
1501 WEST WASHINGTON STREET, SUITE 402
PHOENIX, ARIZONA 85007
TELEPHONE: (602) 452-3396

**TRACIE K. LINDEMAN**
**Clerk of the Court**

November 1, 2022

**RE:  DULCERIA et al v HON. COOPER/PHOENIX MOTOR**
   Arizona Supreme Court No. CV-22-0167-PR
   Court of Appeals, Division One No. 1 CA-SA 22-0089
   Maricopa County Superior Court No. CV2022-003384

GREETINGS:

The following action was taken by the Supreme Court of the State
of Arizona on November 1, 2022, in regard to the above-
referenced cause:

**ORDERED: Petition for Review = GRANTED.**

**FURTHER ORDERED:  Remanding this matter to the superior court to
dissolve the temporary restraining order and proceed in
compliance with A.R.S. §§ 12-1301 to -1314.**

**FURTHER ORDERED: Request for Attorneys' Fees (Petitioners
Dulceria et al) = DENIED without prejudice to seek fees before
the superior court at the conclusion of the lawsuit.**

Tracie K. Lindeman, Clerk


TO:

Michael Andrew Schern
Yusra Batool Bokhari
Jennifer Putnam Ooms
Hon Katherine Cooper, Judge
Katherine Cooper
Larry J Cohen
Brendan A Murphy
Amy M Wood
Raymond L Billotte

Arizona Supreme Court No. CV-22-0167-PR
Page 2 of 2

Hon Katherine Cooper
Hon Joseph C Welty
Hon Danielle J Viola
Lexis Nexis
Thomson Reuters
West Publishing Company
jd